**CONSOVOY MCCARTHY PLLC**
Thomas R. McCarthy (PHV forthcoming)
Bryan Weir (SBN 310964)
bryan@consovoymccarthy.com
Cameron T. Norris (PHV forthcoming)
Frank H. Chang (PHV forthcoming)
Marie Sayer (PHV forthcoming)
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

**LAWFAIR LLC**
Adam K. Mortara (PHV forthcoming)
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154

**ALTVIEW LAW GROUP LLP**
John M. Begakis (SBN 278681)
john@altviewlawgroup.com
9454 Wilshire Blvd., Suite 825
Beverly Hills, CA 90212
(310) 230-5580

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DO NO HARM; STUDENTS FOR FAIR ADMISSIONS; and KELLY MAHONEY, individually and on behalf of others similarly situated,<br><br>                                          *Plaintiffs*,<br>v.<br>DAVID GEFFEN SCHOOL OF MEDICINE AT UCLA; UNIVERSITY OF CALIFORNIA, LOS ANGELES; REGENTS OF THE UNIVERSITY OF CALIFORNIA; MARIA ANGUIANO, ELAINE BATCHLOR, JOSIAH | Case No. 2:25-cv-4131<br><br>**CLASS ACTION COMPLAINT** |

BEHARRY, CARMEN CHU, MI-
CHAEL COHEN, GARETH ELLIOT,
HOWARD GUBER, JOSE HERNAN-
DEZ, NANCY LEE, RICHARD LEIB,
HADI MAKARECHIAN, ANA MA-
TOSANTOS, ROBERT MYERS,
LARK PARK, JANET REILLY,
MARK ROBINSON, GREGORY
SARRIS, AND JONATHAN SURES
JENNIFER LUCERO, GAVIN NEW-
SOM, ELENI KOUNALAKIS, ROB-
ERT RIVAS, TONY THURMOND,
GEOFFREY PACK, AND ALFONSO
SALAZAR, each in their personal and
official capacities as Regents; MI-
CHAEL DRAKE, in his personal and
official capacities as the President of the
UC System and Regent; JULIO
FRENK, in his personal and official ca-
pacities as the Chancellor of UCLA;
STEVEN DUBINETT, in his personal
and official capacities as the Dean of
David Geffen School of Medicine at
UCLA; JENNIFER LUCERO, in her
personal and official capacities as the
Associate Dean of Admissions of David
Geffen School of Medicine at UCLA;
ALICE KUO, RUSSELL BUHR, MA-
NUEL CELEDON, GARY HOL-
LAND, CAROLYN HOUSER, CHRIS-
TINE MYO, FAYSAL SAAB, each in
their personal and official capacities as
members of the Admissions Oversight
and Policy Committee of David Geffen
School of Medicine at UCLA; and
MEMBERS OF THE ADMISSIONS
COMMITTEE, in their personal and of-
ficial capacities as members of the Ad-
missions Committee of David Geffen
School of Medicine at UCLA,

*Defendants.*

2

## NATURE OF ACTION

1.      Plaintiffs—Do No Harm; Students for Fair Admissions; and Kelly Ma-honey, individually and on behalf of all others similarly situated—bring this civil action under the Equal Protection Clause of the Fourteenth Amendment, Title IV of the Civil Rights Act of 1964, 42 U.S.C. §1981, and the Unruh Civil Rights Act to stop the David Geffen School of Medicine at UCLA and various UCLA officials from engaging in intentional discrimination on the basis of race and ethnicity in the admissions process.

2.      In 2023, the U.S. Supreme Court reminded universities what has always been true: "Racial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). The right to "public education 'must be made avail-able to all on equal terms'" without regard to race. *Id.* at 204 (quoting *Brown v. Bd. of Educ.*, 493 U.S. 483, 493 (1954)). Race-based admissions "demean[] the dignity and worth of a person" by judging them "by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220 (cleaned up). The U.S. Constitution prohibits public universities from using race "as a factor in affording educational opportunities." *Id.* at 204.

3.      But UCLA didn't need that reminder. Long before *Harvard*, the people of California passed Proposition 209, which banned the consideration of race in uni-versity admissions. The California Constitution now unambiguously states: "The State shall not discriminate against, or grant preferential treatment to, any individual or

group on the basis of race … in the operation of … public education." Cal. Const. art. I, §31(a).

4.    But California's universities have never liked Prop 209, at least the part that bans them from giving admissions preferences to blacks. The University of California System has campaigned for Prop 209's repeal. And behind the scenes, its admissions offices have reintroduced the intentional consideration of race.

5.    Indeed, the UC System's illegal use of race is currently being challenged in another case pending before this Court. *Students Against Racial Discrimination v. Regents of the Univ. of Cal.*, No. 8:25-cv-192-JWH-JDE (C.D. Cal.).

6.    UCLA's medical school has adopted an "Anti-Racism Roadmap," under which it racially balances its medical-student population.

7.    Consistent with its racial goals, Geffen made Jennifer Lucero dean of admissions in 2020. Lucero is an outspoken advocate for using race to make admission and hiring decisions in medical schools and hospitals. As dean of admissions, Lucero wields significant influence over Geffen's admissions policies and practices, the appointment of the admissions committee members, the committee's deliberations, and admission decisions.

8.    Whistleblowers with first-hand knowledge of Lucero's admissions practices have now come forward. They report that, under the guise of "holistic" review, Geffen requires applicants to submit responses that are intended to allow the Committee to glean the applicant's race, which the medical school later confirms via

4

interviews. Lucero and her handpicked committee members routinely and openly discuss race (and racial proxies) and use race as a factor to make admission decisions. Lucero berates and belittles committee members who raise concerns about admitting minority students because of their race despite low GPAs and MCAT scores. At UCLA Medical School, race is not only a factor but often decisive—above GPA and MCAT scores—in making admission decisions.

9. The numbers show that UCLA is engaged in intentional racial balancing. Between 2020 and 2023, the percentage of white and Asian applicants to Geffen was consistently around 73% of the total applicant pool. Yet the percentage of matriculants to Geffen who are white and Asian plummeted: 65.7% in 2020, 57.1% in 2021, 57.8% in 2022, and 53.7% in 2023.

10. UCLA has withheld key admissions data from the public and its own internal oversight body. UCLA has also effectively shut down its own internal probe into its admissions practices by insisting on non-disclosure agreements from the participants in the admissions process. Geffen's apparent illegal use of race has even prompted the U.S. Department of Health and Human Services to begin an investigation into its admissions practices.

11. This much is clear: UCLA's illegal racial discrimination has harmed and is continuing to harm applicants, including Plaintiffs and their members. In this race-based system, all applicants are deprived of their right to equal treatment and the

opportunity to pursue their lifelong dream of becoming a doctor because of utterly arbitrary criteria. Plaintiffs are entitled to relief.

## PARTIES

12.    Plaintiff Do No Harm is a nationwide membership organization of healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies. Do No Harm's purpose is to keep these ideologies out of medical education, clinical practice, and research fields.

13.    Do No Harm has at least one member who applied to Geffen, was rejected, and is able and ready to reapply if a court orders Defendants to stop discriminating and to undo the effects of its past discrimination.

14.    Plaintiff Students for Fair Admissions is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and other lawful means. SFFA is a nonprofit membership group of tens of thousands of individuals across the country who believe that racial preferences in school admissions are unfair, unnecessary, and unconstitutional.

15.    SFFA has at least one member who will apply to Geffen.

16.    Plaintiff Kelly Mahoney is a college graduate who applied to, and was rejected from, Geffen.

6

17.    Defendant the David Geffen School of Medicine at UCLA is a medical school within UCLA and the UC System.

18.    Defendant the University of California, Los Angeles, is a state university within the UC System.

19.    Defendant the Regents of the University of California is a state agency that operates the UC System. Under Article IX, §9 of the California Constitution, the regents have the "full powers of organization and government" over the UC System, including the UCLA Medical School. Cal. Const. art. IX, §9(a).

20.    Defendants Maria Anguiano, Elaine Batchlor, Josiah Beharry, Carmen Chu, Michael Cohen, Gareth Elliot, Howard Guber, Jose Hernandez, Nancy Lee, Richard Leib, Hadi Makarechian, Ana Matosantos, Robert Myers, Lark Park, Janet Reilly, Mark Robinson, Gregory Sarris, and Jonathan Sures are appointed regents of the UC System and are sued in their personal and official capacities.

21.    Defendants Gavin Newsom, Eleni Kounalakis, Robert Rivas, Tony Thurmond, Geoffrey Pack, and Alfonso Salazar are ex officio regents of the UC System and are sued in their personal and official capacities.

22.    Defendant Michael V. Drake is the president of the UC System and an ex officio regent of the UC System. Drake has the "full authority and responsibility over the administration of all affairs and operations" of the UC System. Drake has been the UC President since 2020. Drake is sued in his personal and official capacities.

23.     Defendant Julio Frenk is the chancellor of UCLA. Frenk is responsible for administration and operation of the UCLA campus, including Geffen, and oversees all UCLA faculty personnel and staff, including Geffen faculty and staff. Frenk is sued in his personal and official capacities.

24.     Defendant Steven Dubinett has served as the Dean of UCLA Medical School since 2023 and as its interim dean between 2021 and 2023. Dubinett is responsible for overseeing the day-to-day operations of Geffen. Dubinett reports to Frenk. Dubinett is sued in his personal and official capacities.

25.     Defendant Jennifer Lucero has been the Associate Dean of Admissions at UCLA Medical School since 2020. Lucero has significant input on the appointment of the Admissions Committee, and she sits on and deliberates with the Admissions Committee. Lucero also sits on the Admissions Policy and Oversight Committee as an ex officio member and has significant influence over Geffen's admissions policies. Lucero reports to Dubinett. Lucero is sued in her personal and official capacities.

26.     Defendants Alice Kuo, Russell Buhr, Manuel Celedon, Gary Holland, Carolyn Houser, Christine Myo, and Faysal Saab are faculty members who sit on Geffen's Admissions Oversight and Policy Committee, which develops and reviews admissions policies, monitors implementation of admissions policies and outcomes, and oversees the execution and adherence to the policies. The members are appointed by Geffen's Faculty Executive Committee. They are each sued in their personal and official capacities.

27.    Defendants Members of the Admissions Committee of David Geffen School of Medicine at UCLA are faculty members who sit on the Admissions Committee. The names and identities of the members of the Admissions Committee are currently unknown to Plaintiffs. These members are appointed by the Faculty Executive Committee with significant input from the Dean of Admissions. The Admissions Committee is responsible for screening and interviewing applicants, ranking them, and making admission decisions. They are sued in their personal and official capacities.

## JURISDICTION AND VENUE

28.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331 and §1367(a).

29.    Venue is proper in the Central District of California under 28 U.S.C. §1391 because Defendants reside here and a substantial part of the events and omissions giving rise to the claim occurred here.

## FACTUAL ALLEGATIONS

**I.    UCLA Medical School's Admissions Process**

30.    UCLA Medical School is highly selective. Each year, Geffen receives between 11,000 and 14,000 applicants yet matriculates roughly 175 medical students.

31.    Geffen's matriculants have an average GPA of 3.8 and average MCAT score of 514.

32.    UCLA chooses to let applicants apply to Geffen up to three times total. And although medical schools can allow for transfers, Geffen chooses not to accept transfers.

9

33.    Geffen reviews applications and makes admission decisions through its Admissions Committee, which consists of approximately 20-30 faculty members. Committee members can serve up to three five-year terms. About five medical students also sit on the Admissions Committee to provide input on admission decisions. UCLA does not make public who sits on the admissions committee.

34.    The Admissions Committee's application-review process for the traditional M.D. track generally takes place in the following steps: primary application, secondary application, interview, committee deliberation, and decision.

35.    ***Primary Application***. Applicants submit a primary application through the American Medical College Application Service, which is run by the Association of American Medical Colleges.

36.    AMCAS sends the applicant's primary application to the applicant's designated medical schools. Applicants pay $175 for the first designated school and $46 for each subsequently designated school.

37.    The primary application contains the applicant's biographical information (including race), citizenship status, family income, academic background, undergraduate GPA, MCAT score, internship and volunteer experience, and personal statement.

38.    Geffen receives an applicant's primary application through AMCAS and uses the primary application to initially screen applicants. It purportedly removes the checkbox information for race and ethnicity.

39.    Geffen requires applicants to take AAMC's PREview Exam, which at-tempts to measure applicants' professional readiness and situational judgment. The PREview Exam is a multiple-choice test that purports to measure applicants' cultural awareness, cultural humility, empathy and compassion, and interpersonal skills, among others. The PREview Exam was created by diversity-affairs officers from various med-ical schools, whom AAMC calls its "DEI constituents," to "level the playing field" for applicants deemed historically underrepresented in medicine. It does so by stressing factors other than academics.

40.    It costs $100 to take the PREview Exam. The PREview Exam scores initially get reported to UCLA as part of the applicant's primary application. Geffen again asks about the PREview Exam in the secondary application.

41.    ***Secondary application***. After primary review, select applicants receive an invitation to submit a UCLA-specific secondary application.

42.    The secondary application asks the applicant to submit several open-ended responses. For instance, in 2024, Geffen asked a series of questions, including the following: "Do you identify as being part of a group that has been marginalized (examples include, but are not limited to LGBTQIA, disabilities, federally recognized tribe) in terms of access to education or healthcare? If you answered "Yes" …, describe how this inequity has impacted you or your community and how educational disparity, health disparity and/or marginalization has impacted you and your community."

43.    To submit the secondary application, the applicant must pay a fee to Geffen. In 2025, the secondary-application fee is $100. For previous application cycles, the secondary-application fee was $95.

44.    After the secondary review, select students get an opportunity to interview with faculty members. The interviews are conducted either in person or remotely by video.

45.    After the interviews, the Admissions Committee deliberates on the applications together.

46.    After the committee deliberates, it ranks the applicants and makes final admission decisions on who to admit.

47.    At each step of the process—primary review, secondary review, interview, and committee deliberation—the Admissions Committee purports to review each application holistically. Harvard, UNC, and virtually all other elite universities that openly considered race in admissions before *Harvard* likewise use holistic admissions. *Cf.* 600 U.S. at 257 (Thomas, J., concurring) ("Harvard's 'holistic' admissions policy began in the 1920s when it was developed to exclude Jews."). Notwithstanding *Harvard*, AAMC has encouraged medical schools like UCLA to continue using holistic review to "boost racial diversity."

## II.    UCLA Medical School uses race as a factor in admissions.

48.    In defiance of state and federal law, UCLA uses race as a factor in admissions. Both the UC System and Geffen have publicly expressed their intent to racially

balance the class. Geffen's dean of admissions, Lucero, both publicly and privately said she uses race as a factor in making admission decisions. And whistleblowers confirm that the admissions committee, either led or intimidated by Lucero, use all available methods to glean an applicant's race, openly discuss applicants' race, and use race to hold students to different standards based on race.

49.    In *Harvard*, the UC System submitted an amicus brief stating that it "implemented numerous and wideranging race-neutral measures designed to increase … racial diversity." The UC System also said although "Proposition 209 barred consideration of race in admissions decisions at public universities in California," its competitor universities outside of California "must retain the ability to engage in the … consideration of race" under *Grutter v. Bollinger*, 539 U.S. 306 (2003). That would have made it more difficult for the UC System to attract minority students. Indeed, this position makes no sense unless the UC System was still using race and needed that practice to be lawful under federal law.

50.    Similarly, in 2024, the UC System said that "system- and campus-level strategies and innovations are being piloted or have been implemented" to "achieve representational diversity in its student body."

51.    The UC System further adopted the "UC 2030 Capacity Plan," with the goal of having its student bodies "better reflec[t] California's racial/ethnic … diversity." Drake, the UC System President, wanted "intentional" "growth" in terms of making "graduate students … better reflect and tap the talent of underrepresented

populations who represent the majority of Californians." To support this goal of "mov[ing] the needle on the diversity of graduate students," the Regents "requested graduate professional programs" to "present race/ethnicity data on students and faculty, along with diversity plans within the program."

52.    The UC System meticulously measures its racial outcomes in a variety of ways, including by closely tracking the racial demographics of its students.

53.    In 2020, Geffen adopted the "Anti-Racism Roadmap" with the purpose of creating a "path toward racial justice, equity, diversity and inclusion."

54.    Under the roadmap, Geffen instituted sweeping policies concerning race in its operations.

    a.    Geffen re-defined "merit" to include "diversity and inclusion initiatives."

    b.    Geffen committed itself to increasing BIPOC employees and chairs among its faculty and created a special pathway for BIPOC postdoctoral trainees, fellows, and residents to become faculty.

    c.    Geffen committed itself to creating special opportunities for BIPOC researchers to present seminars, present research, and otherwise participate in research opportunities, including by providing "minority supplements" to NIH grants.

    d.    Geffen vowed that the medical-student body "should reflect the population of State of California" and adopted a strategic plan to "increase the number of URiM students." The term "URiM" stands for

underrepresented in medicine. Its proponents consider all lacks to be un-

derrepresented and all whites and Asians to be overrepresented.

e. Geffen vowed collaboration among the Admissions Committee, the Ad-

missions Policy Oversight Committee, and Faculty Executive Committee

to "review and improve diversity to reflect the population of the State of

California."

f. Geffen sought the participation of "diverse" medical students and its Eq-

uity, Diversity, and Inclusion Office in the admissions process to further

its racial goals.

g. Geffen also explained how it would monitor the racial numbers in the

admissions process. It explained that it would engage in "strategic plan-

ning to improve diversity for all UCLA Health professional students using

data-driven, evidence-based approaches." In addition, it would "collect

and publicly report data on diversity in all school programs."

55.     Geffen's Anti-Racism Roadmap has separately been incorporated into

the school's diversity statements, which the Admissions Committee applies in review-

ing each application.

56.     In 2020, Geffen named Lucero its Dean of Admissions. Lucero is also

the Vice Chair of DEI efforts at UCLA Health, the hospital system affiliated with

Geffen.

57.    Lucero is an outspoken advocate for using race as a factor in admissions and hiring in medical school and healthcare. Lucero has stated her view that every part of society—including academic medicine—is structurally racist. Lucero has stated her view that racism affects admission decisions and impedes DEI efforts. Lucero has also stated her view that comments like "We want diversity, but we also want qualified people" are biased and racist.

58.    Lucero has stated in articles and public interviews that it's important to racially diversify medical-school admissions, residencies, and leadership positions in medicine. As Dean of Admissions, Lucero has significant influence over the appointment of Admissions Committee members. Lucero has remade the Admissions Committee to be, what she calls, a "brave space" that both looks racially diverse and is where the committee members feel free to further DEI efforts.

59.    Consistent with Lucero's beliefs, Geffen's current "Guiding Principles for Student Representation" state that the chair of the Admission Committee will ensure that medical students who identify as BIPOC are placed on the committee to provide their input on admissions.

60.    Given the UC System's and Geffen's explicit desire to racially balance the student body, and with Lucero at the helm, the Admissions Committee makes admission decisions by using race as a factor.

61.    Lucero and her handpicked Admissions Committee take advantage of UCLA's holistic-review procedure to uncover and then use applicants' race.

62.     Lucero and the Admissions Committee routinely admit black applicants with below-average GPA and MCAT scores—even significantly below-average scores—while requiring whites and Asians to have near-perfect scores to even be seriously considered.

63.     Lucero and the Admissions Committee explicitly discuss and use applicants' race. On one occasion when the Committee was deliberating on a black applicant with a significantly below-average GPA and MCAT score, Lucero stated: "Did you not know African-American women are dying at a higher rate than everyone else?" "We need people like this in the medical school."

64.     Committee members report that the bar for underrepresented minorities is "as low as you could possibly imagine" and that the Committee "completely disregards grades and achievements" for those applicants.

65.     Lucero regularly bullies and berates members of the Admissions Committee who voice concerns about admitting below-average black applicants by labeling them as "privileged" and implying that they are racist.

66.     Another time when the Committee rejected a Native American applicant, Lucero berated the Committee and made the members sit through a two-hour lecture on Native American history taught by Lucero's sister.

67.     Lucero and the Admissions Committee regularly glean the applicants' race through direct and indirect means. The secondary application even asks questions

designed to uncover applicants' race. The interviews further enable the committee to know applicants' race and ethnicity.

68.     Statistical evidence obtained through public-records requests confirm that Lucero and the Admissions Committee are using race.

69.     Despite consistently making up a large percentage of the total applicant pool, the percentage of white and Asian students who matriculate at UCLA Medical School has dropped precipitously since Lucero took over as dean.

70.     In 2020, white applicants constituted 36.71% of the total applicant pool. Yet only 30.29% of the matriculants were white.

71.     In 2021, white applicants constituted 35.02% of the total applicant pool. Yet only 27.43% of the matriculants were white.

72.     In 2022 white applicants constituted 34.64% of the total applicant pool. Yet only 26.59% of the matriculants were white.

73.     In 2023, white applicants constituted 32.83% of the total applicant pool. Yet only 24% of the matriculants were white.

74.     In 2020, Asian applicants constituted 37.83% of the total applicant pool. Yet only 35.43% of the matriculants were Asian.

75.     In 2021, Asian applicants constituted 37.13% of the total applicant pool. Yet only 29.71% of the matriculants were Asian.

76.     In 2022, Asian applicants constituted 39.34% of the total applicant pool. Yet only 31.21% of the matriculants were Asian.

77.    In 2023, Asian applicants constituted 40.79% of the total applicant pool. Yet only 29.71% of the matriculants were Asian.

78.    A disproportionately higher number of black applicants matriculated to Geffen in 2020, 2021, 2022, and 2023.

79.    In 2020, black applicants made up 7.06% of the applicant pool. Yet 8% of the matriculants were black.

80.    In 2021, black applicants made up 8.93% of the applicant pool. Yet 11.43% of the matriculants were black.

81.    In 2022, black applicants made up 7.64% of the applicant pool. Yet 9.83% of the matriculants were black.

82.    In 2023, black applicants made up 7.86% of the applicant pool. Yet 14.29% of the matriculants were black.

83.    Geffen's matriculants have an average GPA of 3.8 and average MCAT of 514. Nationally, the average GPA for white matriculants was a 3.8 and the average MCAT was 512.4, while Asian matriculants had an average GPA of 3.83 in and an average MCAT of 514.3. Yet black matriculants had an average GPA of 3.59 and an average MCAT of 505.7.

84.    Geffen closely guards the GPA and MCAT scores for its matriculants. And it does not make the GPAs or MCAT scores of matriculants available to the public. Geffen has stubbornly refused to produce full MCAT scores, even in response to a public-records request. For years, Geffen's administration even refused to provide

19

admissions data to the faculty oversight board. UCLA's refusal to turn over this information confirms that the data would show large racial preferences.

85.    Lucero's and the Admissions Committee's illegal use of race in admissions was known, and caused grave concern, among Geffen's faculty members.

86.    After receiving multiple complaints for years, UCLA's internal Discrimination Prevention Office, charged with ensuring compliance with Title VI and other laws, sought to investigate Lucero and Geffen's admissions practices.

87.    Four members of the Admissions Committee initially agreed to participate in that investigation. But the Admissions Committee had required its members to sign a nondisclosure agreement barring any discussion of the committee's deliberations. When these four members wrote to Geffen's administration (including Dubinett) seeking written assurance that they would not be retaliated against for cooperating with the internal probe, the administration refused to give them that assurance. Geffen's administration thus effectively shut down UCLA's internal probe.

88.    Geffen's use of race in admissions has now prompted HHS to open an investigation.

## III.    UCLA's racial discrimination has harmed and continues to harm Plaintiffs.

89.    Do No Harm has at least one member who is ready and able to apply to Geffen, including DNH-Member A.

90.    DNH-Member A is white, a U.S. citizen, and a recent college graduate.

91.    DNH-Member A applied to Geffen in 2024.

92.    DNH-Member A had a 3.88 cumulative college GPA and scored 526 on the MCAT, which was in the 100th percentile. He completed all necessary courses.

93.    DNH-Member A submitted both the primary and secondary applications to Geffen. DNH-Member A paid the primary-application fee and the secondary-application fee. DNH-Member A also incurred the cost of taking the PREview Exam.

94.    Despite his stellar academic achievements, DNH-Member A was rejected by Geffen.

95.    If a court were to order Defendants to stop discriminating and issue an injunction undoing the effects of their prior discrimination, DNH-Member A is able and ready to reapply to Geffen, including by applying to transfer.

96.    SFFA has at least one member who will apply to Geffen.

97.    SFFA-Member 1 is female, half-Asian and half-white, a U.S. citizen who graduated from a high school in California, and a current college student. She will satisfy all requirements to attend medical school.

98.    SFFA-Member 1 has a GPA of 3.4. Her science grades are near the 90th percentile of her class this semester. SFFA-Member 1 has worked as a health aide at a resident-care home and has managed multiple businesses even at a young age. SFFA-Member 1 will prepare for and take the MCAT.

99.    SFFA-Member 1 wants to attend Geffen, will apply, and will take all necessary steps to apply.

100.    Because of Geffen's racially discriminatory admissions policies and practices, without a court order fully preventing Defendants from discriminating, SFFA-Member 1 will not be able to compete for admissions on an equal footing.

101.    Plaintiff Mahoney has been harmed by Defendants' illegal use of race in admissions.

102.    Mahoney is female and a U.S. citizen.

103.    Mahoney started at a community college and later transferred to UC Davis, graduating with a GPA around 3.8.

104.    Mahoney scored 519 on MCAT (96th percentile), well above Geffen's average.

105.    To follow in the footsteps of her father, who is a doctor and who taught her about the responsibility of doctors to guide patients through the most vulnerable periods in their lives, Mahoney decided to apply to medical school. She spent her college years taking difficult science classes and preparing for the MCAT. After graduating, she gained research, clinical, and volunteer experiences. With her stellar credentials, Mahoney applied to various medical schools multiple times, including Geffen.

106.    In 2023, for example, Mahoney applied to Geffen and was invited to submit a secondary application. When she applied, Mahoney paid the primary-application fee and the secondary-application fee. Mahoney also incurred the cost of taking the PREview Exam.

107.    But Mahoney was rejected without an interview. Geffen sent a rejection letter to Mahoney on February 6, 2024.

108.    Mahoney is white. Though she has some Hispanic background, UCLA did not know that fact when she applied in 2023.

109.    If she were black, Mahoney would have had a far better chance of getting admitted to UCLA. Mahoney finds it hurtful and offensive that UCLA would judge her based on irrelevant racial factors that she cannot control.

110.    Mahoney is able and ready to apply to Geffen again if a court orders Defendants to stop discriminating and to undo the effects of their prior discrimination.

## CLASS ACTION ALLEGATIONS

111.    Per Federal Rule of Civil Procedure 23, Mahoney brings this action individually and on behalf of all other persons similarly situated.

112.    Mahoney proposes the following class definition and seek class certification, subject to amendment based on information obtained through discovery:

**Class**: All individuals who applied to Geffen within the statute of limitations, do not identify as black, paid an application-related fee, and were denied admission.

> **Injunctive Subclass**: All individuals who are able and ready to apply or reapply to Geffen if the Court order relief that fully stops the school from considering race in admissions and undoes the effect of the school's prior discrimination, including by enjoining the school's limitations on transfers and multiple applications.

113.    Mahoney reserves the right to amend the definition of the class or to add a class or subclass if further information and discovery indicate that the definition of the class should be narrowed, expanded, or otherwise modified.

114.    Specifically excluded from this Class are Defendants' officers, directors, employees, and agents; any entity in which a Defendant has a controlling interest; and affiliates, legal representatives, attorneys, successors, heirs, or assigns of Defendant. Also excluded from this Class are any judicial officers to whom this case is assigned, their families, and members of their staff.

115.    Class certification is appropriate under Federal Rule of Civil Procedure 23(a).

116.    **Numerosity**: The class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see Powers v. McDonough*, 732 F. Supp. 3d 1184, 1192 (C.D. Cal. 2024) ("courts generally find that numerosity obtains when a class has forty or more members."). The members of the class and the subclasses are so numerous that joinder of all of them is impracticable. Each year, UCLA Medical School receives between 11,000 and 14,000 applications; and the nonblack applicants make up the vast majority. Class members can be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, email, internet postings, or other published notice.

117.    **Commonality**: There are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A common question 'must be of such nature that it is

capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022). Claims challenging a "government policy" that "results in the systematic discrimination against class members" subjects class members to a "common injury" of "systematic discrimination." *Powers*, 732 F. Supp. 3d at 1193; *see also Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 419 (D.D.C. 2017) (challenging a "single" discriminatory policy "that was applied to all members of the class" satisfied commonality). Here, the members of the class and subclass raise the "core claim" that applicants "were subjected to different standards and criteria for admission" because of "their race or ethnicity." *Smith v. Univ. of Wash. Law Sch.*, 2 F. Supp. 2d 1324, 1342 (W.D. Wash. 1998). Whether Defendants "intentionally discriminated … on the basis of race"—and thus denied the class members "equal treatment under the law"—is "common to the putative classes." *Id.* Specifically, this case presents questions of law and fact that are common to the class and subclass, including but not limited to the following: (1) whether Defendants use race as a factor in making admission decisions; (2) whether Defendants' use of race in making admission decisions violates the Constitution, Title VI, and §1981; and (3) whether Plaintiff Mahoney and members of the class and subclass are entitled to relief.

118.    **Typicality**: The "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This element asks

"'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Powers*, 732 F. Supp. 3d at 1195. Mahoney's claims are typical of the claims of the proposed class and subclass because her claims are based upon the same legal theories and violations of the law. Mahoney and the class members all suffered the same injury because of Defendants' intentional discrimination in Geffen's admissions process. *See Smith*, 2 F. Supp. 2d at 1342-43.

119.    **Adequacy**: The representative parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Mahoney will fairly and adequately represent and protect the interests of the members the class and subclass. Mahoney's interests are coincident with, and not antagonistic to, those of the members of the class and subclass. She opposes all preferences based on race or ethnicity, of any kind and to any degree. Mahoney's lawyers are competent and experienced in litigating civil-rights cases and mass actions.

120.    Class certification is appropriate also because this case fits into all three categories listed in Federal Rule of Civil Procedure 23(b). Class certification requires satisfying only one. *Olean*, 31 F.4th at 663.

121.    **Superiority**: Under Rule 23(b)(1), a class action is a superior method for the fair and efficient adjudication of this case because class proceedings are superior to all other available methods for fair and efficient adjudication of this case, and joinder

of the class (and subclass) members is otherwise impracticable. Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation. It would impose a substantial hardship for most individual members of the class or subclass to prosecute individual actions, many of whom are not able to incur the expense of retaining their own counsel to prosecute individual actions. The litigation of individual cases would also create inconsistent results, with some members of the class recovering but not others, and some courts declaring Defendants liable for discrimination but potentially not others, establishing incompatible standards of conduct for Defendants. By contrast, if this Court adjudicates Defendants' liability for all class members, it can resolve their claims all at once, without inconsistent results, thus obtaining global relief and judicial efficiency.

122. **Injunctive or Declaratory Relief**: Injunctive and declaratory relief "with respect to the class as a whole" is appropriate. Fed. R. Civ. P. 23(b)(2). Because Defendants discriminated against white and Asian applicants "by applying different standards and criteria for admission," this is a "paradigm case for certification under Rule 23(b)(2)." *Smith*, 2 F. Supp. 2d at 1343.

123. **Predominance**: Under Rule 23(b)(3), Defendants engaged in a common course of discriminatory conduct toward Mahoney and class members. Mahoney and class members were denied equal treatment in the admissions process because of their race. The common issues arising from Defendants' discriminatory conduct toward the

class members predominate over any individualized issues, especially given the mechanical nature of the requested damages.

# CLAIMS FOR RELIEF
## COUNT I
### Violation of the Fourteenth Amendment
### (U.S. Const. amend. XIV; 42 U.S.C. §1983)

124.   Plaintiffs repeat and reallege the preceding allegations.

125.   Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983.

126.   All individual Defendants are "person[s]" acting under the color of state law. §1983.

127.   The Fourteenth Amendment provides, among other things, that no person shall be denied "the equal protection of the laws." U.S. Const. amend. XIV, §1.

128.   The "central mandate" of equal protection is "racial neutrality" by the government. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). And the "'core purpose' of the Equal Protection Clause" is to "'d[o] away with *all* governmentally imposed discrimination based on race.'" *Harvard*, 600 U.S. at 206 (emphasis added). "[W]henever the

government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000).

129.    Defendants through UCLA Medical School intentionally engage in "'outright racial balancing,'" which is "'patently unconstitutional.'" *Harvard*, 600 U.S. at 223. The Supreme Court has repeated that "'[r]acial balance is not to be achieved for its own sake.'" *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 729-30 (2007) (plurality). Despite this admonition, Defendants adopted admissions policies and practices that ensure that Geffen's medical-student population reflect the racial composition of the State. Geffen's racial-balancing project is confirmed by statistical evidence. Between 2020 and 2023, the percentage of white and Asian matriculants plummeted precipitously despite constituting a much larger share of the total applicant pool. At the same time, the percentage of black matriculants jumped significantly, despite constituting a much smaller portion of the total applicant pool.

130.    The Admissions Committee also uses a sophisticated "holistic" application-review method that's designed to glean and use applicants' race. The secondary applications ask questions designed to facilitate the Committee's use of race. And the in-person or virtual interview process facilitates the Committee's use of race. The Admissions Committee also explicitly discusses race and uses it as a factor in making admission decisions.

131.    Especially for black students, their race results in a significant boost in the admissions process, sufficient to overcome a significant below-average GPA or MCAT score.

132.    This use of race is patently illegal. "'[N]o State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities.'" *Harvard*, 600 U.S. at 204.

133.    At the very least, the Admissions Committee uses proxies for race in making admission decisions. This is also illegal. "What cannot be done directly cannot be done indirectly." *Id.* at 230. And "universities may not simply stablish through application essays or other means the regime" that is "unlawful." *Id.* Discrimination on the basis of perceived race, even if mistaken, is also equally actionable. *See, e.g.*, *Estate of Amos ex rel. Amos v. City of Page*, 257 F.3d 1086, 1094 (9th Cir. 2001); *Santos v. Peralta Cmty. Coll. Dist.*, 2009 WL 38098797, at *3 (N.D. Cal. Nov. 13).

134.    When the government "distributes … benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720 (majority).

135.    Strict scrutiny is a "searching examination, and it is the government that bears the burden to prove 'that the reasons for any racial classification are clearly identified and unquestionably legitimate.'" *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (cleaned up). The racial classification "must survive a daunting two-step examination." *Harvard*, 600 U.S. at 206. First, the racial classification must "'further compelling

governmental interests.'" *Id.* at 207. Second, the government's use of race must be "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Id.*

136. Defendants cannot satisfy strict scrutiny.

137. Defendants cannot show a compelling governmental interest. The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *Id.* There is no evidence that Defendants adopted their current admissions policies and practices to remedy some past discrimination that they took part in. Instead, Defendants are engaged in simple racial balancing, which is plainly illegitimate. Worse, Defendants want to accept more underrepresented applicants simply because they belong to underrepresented minority groups. Such an outright race-based distribution of governmental benefits and resources—especially in the educational context—is illegal. *See Brown*, 347 U.S. at 493-94; *Harvard*, 600 U.S. at 216-18.

138. Defendants' admissions policies and practices are also not narrowly tailored.

139. Race operates as a "negative" by disadvantaging nonblack applicants in the admissions process. Admission to Geffen is a highly selective, zero-sum process. Any benefit given to "some applicants but not to others necessarily advantages the former group at the expense of the latter." *Harvard*, 600 U.S. at 219.

31

140.    Defendants use race as a stereotype—for example, by proceeding from the unfounded assumption that "there is an inherent benefit in race *qua* race." *Id.* at 220.

141.    Defendants' use of race has no end date.

142.    Section 1983 authorizes damages and injunctive relief. It also authorizes punitive damages "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Bacon v. Woodward*, 104 F.4th 744, 750 (9th Cir. 2024). Defendants' direct and indirect use of race in making admission decisions—especially after Prop 209 and *Harvard*—shows callous disregard of applicants' right to equal treatment.

## COUNT II
## Violation of Title VI of the Civil Rights Act of 1964
## (42 U.S.C. §2000d et seq.)

143.    Plaintiffs repeat and reallege the preceding allegations.

144.    Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

145.    Defendants UCLA Medical School, UCLA, and the Regents are covered by Title VI. Title VI defines "program or activity" to mean "all of the operations of" a "university" or "public system of higher education" "any part of which is extended

32

Federal financial assistance." 42 U.S.C. §2000d-4a(2)(A). The UC System, UCLA, and UCLA Medical School receive federal funds in federal student aid and research grants.

146.    Under 42 U.S.C. §2000d-7(a)(1), a state is "not … immune … from suit in Federal court for a violation of … title VI."

147.    Private individuals can sue to enforce Title VI and obtain both injunctive relief and compensatory damages. *See Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

148.    Defendants have caused and will continue to cause applicants to be "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" UCLA's admissions policies and practices "on the ground of race, color, or national origin." 42 U.S.C. §2000d.

149.    Title VI has "'independent force'" and makes it "*always* unlawful to discriminate among persons even in part because of race" without subjecting racial classifications to strict scrutiny. *Harvard*, 600 U.S. at 308-09 (Gorsuch, J., concurring).

150.    At a minimum, because Defendants violate the Fourteenth Amendment, they also violate Title VI. *See SFFA v. Harvard*, 980 F.3d 157, 185 (1st Cir. 2020) ("Title VI's protections are coextensive with the Equal Protection Clause."), *rev'd on other ground* 600 U.S. 181.

## COUNT III
## Violation of the Civil Rights Act of 1866
## (42 U.S.C. §1981)

151.    Plaintiffs repeat and reallege the preceding allegations.

33

152.    Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). And it authorizes equitable and legal relief, including compensatory and punitive damages. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).

153.    White and Asian applicants are protected by §1981, whose "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.,* 586 U.S. 199, 208 (2019), by protecting the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Section 1981 "forbids racial discrimination … whether the aggrieved party is black or white." *Bobo v. ITT, Cont'l Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981).

154.    "[A] contract for educational services is a 'contract' for purposes of §1981." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003).

155.    The admissions process at Geffen implicates the right to "make … contracts." §1981(a). Section 1981 "protects 'would-be contractor[s]' … to the same extent that it protects contracting parties." *AAER v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 776 (11th Cir. 2024). The statute broadly "offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's*, 546 U.S. at 476.

156.    Defendants are violating §1981 by intentionally limiting the formation of contractual relationships based on race.

157.    Race is a but-for cause of applicants' "'loss of a legally protected right'" to make contracts. *Newman v. Amazon.com, Inc.*, 2022 WL 971297, at *7 (D.D.C. Mar. 31). "So long as the plaintiff's [race] was one but-for cause of that decision, that is enough." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). But for the fact that the applicants are a disfavored race, they would have had the "same right" to "make … contracts" with UCLA. §1981(a).

158.    At a minimum, because Defendants violate the Fourteenth Amendment, they also violate §1981. *Gratz*, 539 U.S. at 276 n.23.

## COUNT IV
## Violation of the California Unruh Civil Rights Act
## (Cal. Civ. Code §51 et seq.)

159.    Plaintiffs repeat and reallege the preceding allegations.

160.    California's Unruh Civil Rights Act provides that "[a]ll persons within the jurisdiction of this state are free and equal" and that "no matter what their" "race," "color," "ancestry," or "national origin," they are "entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code §51(b). The Unruh Act "prohibits arbitrary discrimination, both benign and improperly intentioned, against minorities or majorities." *Park Redlands Covenant Control Comm. v. Simon*, 226 Cal. Rptr. 199, 202 (Cal. Ct. App. 1986).

161.   "Whoever denies, aids or incites a denial, or makes any discrimination or distinction … is liable for each and every offense for the actual damages, and any amount … up to a maximum of three times the amount of actual damages but in no case less than four thousand dollars." Cal. Civ. Code §52(a). "The litigant need not prove she suffered actual damages to recover the independent statutory damages of $4,000." *Molski v. M.J. Cables, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007). The Unruh Act also authorizes attorney's fees.

162.   Defendants Frenk, Dubinett, Lucero, Kuo, Buhr, Celedon, Holland, Houser, Myo, Saab, and Members of the Admissions Committee can be sued under the Unruh Act in their personal capacities. *See, e.g.*, *Fruciano v. Regents of Univ. of Cal.*, 2018 WL 4219232, at *4 (N.D. Cal. Sept. 5); *K.S. v. Fremont United Sch. Dist.*, 2007 WL 4287522, at *6 (N.D. Cal. Dec. 6).

163.   Geffen, especially as it relates to its admissions practices, is a "business establishmen[t] of every kind whatsoever" under the Unruh Act, Cal. Civ. Code §51(b), because it "'resemble[s] an ordinary for-profit business,'" "'effectively operate[s] as a business or a commercial enterprise,'" and "'involve[s] sufficient businesslike attrib-utes,'" *Kohn v. State Bar of Calif.*, 2024 WL 4533446, at *2 (9th Cir. Oct. 21). Geffen advertises itself as a top medical school in the country to attract competitive applicants and to enhance its economic value. Geffen collects application fees from applicants nationwide. And it enters into contractual relationships. It also solicits and operates with private endowments and other non-state funds.

164.    Geffen engaged in intentional racial discrimination in violation of Unruh by disfavoring certain applicants because of their race.

## PRAYER FOR RELIEF

Plaintiffs ask this Court to enter judgment in its favor and against Defendants and to provide the following relief:

A.    A declaratory judgment that Defendants' admissions policies and practices violate the Constitution, Title VI, §1981, and the Unruh Act.

B.    A permanent injunction prohibiting Defendants from knowing or considering applicants' race when making admission decisions.

C.    Structural injunctive relief, including the appointment of a monitor to oversee all decisions relating to admissions at UCLA Medical School, to ensure compliance with federal law.

D.    An order requiring UCLA Medical School to admit Mahoney.

E.    An order certifying this action as a class action and appointing Mahoney and her counsel to represent any class and subclass.

F.    Compensatory damages equivalent to a refund of any application fee(s) paid.

G.    Statutory damages under the Unruh Act not less than $4,000 per occurrence of discrimination.

H.    Punitive damages in an amount to be proven at trial.

I.    Nominal damages of $1 per occurrence of discrimination.

J.    Disgorgement of federal financial assistance received by UCLA Medical School during the period in which it did not comply with federal law.

K.    Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

L.    Pre- and post-judgment interest on any amounts awarded.

M.    All other relief that the plaintiffs and the class are entitled to.

Dated: May 8, 2025

Respectfully submitted,

*/s/ Bryan Weir*

**LAWFAIR LLC**
Adam K. Mortara (PHV forthcoming)
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154

*Attorney for Students for Fair
Admissions*

**ALTVIEW LAW GROUP LLP**
John M. Begakis (SBN 278681)
john@altviewlawgroup.com
9454 Wilshire Blvd., Suite 825
Beverly Hills, CA 90212
(310) 230-5580

*Local Counsel*

**CONSOVOY MCCARTHY PLLC**
Thomas R. McCarthy (PHV forthcoming)
Bryan Weir (SBN 310964)
bryan@consovoymccarthy.com
Cameron T. Norris (PHV forthcoming)
Frank H. Chang (PHV forthcoming)
Marie Sayer (PHV forthcoming)
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

*Attorneys for Do No Harm, Students for Fair
Admissions, Kelly Mahoney*