**CONSOVOY MCCARTHY PLLC**
Thomas R. McCarthy (PHV)
Bryan Weir (SBN 310964)
Cameron T. Norris (PHV)
cam@consovoymccarthy.com
Frank H. Chang (PHV)
Marie Sayer (PHV)
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

Patrick Strawbridge (PHV)
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109

**LAWFAIR LLC**
Adam K. Mortara (PHV)
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154

**ALTVIEW LAW GROUP LLP**
John M. Begakis (SBN 278681)
john@altviewlawgroup.com
9454 Wilshire Blvd., Suite 825
Beverly Hills, CA 90212
(310) 230-5580

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

DO NO HARM; STUDENTS FOR
FAIR ADMISSIONS; and KELLY MA-
HONEY, individually and on behalf of
others similarly situated,

*Plaintiffs*,

v.

REGENTS OF THE UNIVERSITY
OF CALIFORNIA; JULIO FRENK, in
his official capacity as the Chancellor of
UCLA; GENE BLOCK, in his personal
capacity; and JENNIFER LUCERO, in
her personal capacity and in her official
capacity as the Associate Dean of Ad-
missions of David Geffen School of
Medicine at UCLA,

*Defendants*.

Case No. 2:25-cv-4131

## AMENDED CLASS ACTION COMPLAINT

## NATURE OF ACTION

1.     The David Geffen School of Medicine at UCLA is illegally considering race in admissions. Plaintiffs—Do No Harm; Students for Fair Admissions; and Kelly Mahoney, individually and on behalf of all others similarly situated—bring this civil action under the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §1981, and the Unruh Civil Rights Act.

2.     In 2023, the U.S. Supreme Court reminded universities what has always been true: "Racial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). The right to "public education 'must be made avail-able to all on equal terms'" without regard to race. *Id.* at 204 (quoting *Brown v. Bd. of Educ.*, 493 U.S. 483, 493 (1954)). Race-based admissions "demea[n] the dignity and worth" of citizens by judging them "by ancestry instead of by [their] own merit and

essential qualities." *Id.* at 220 (cleaned up). The U.S. Constitution prohibits public universities from using race "'as a factor in affording educational opportunities'" unless they satisfy "strict scrutiny." *Id.* at 204, 213. The race-based admissions used by "[m]any universities" before 2023 fail that standard because they "lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points." *Id.* at 230-31. The Supreme Court's precedents "have *never* permitted admissions programs to work in that way." *Id.* at 230 (emphasis added).

3.    But UCLA didn't need that reminder. Long before *Harvard*, the people of California passed Proposition 209, which banned the consideration of race in university admissions. The California Constitution now unambiguously states: "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race … in the operation of … public education." Cal. Const. art. I, §31(a). And Regents Policy 4401, which was enacted in 2001, states that the UC System "will be governed by Article 1, Section 31 of the California Constitution by treating all students equally in the admissions process without regard to their race, sex, color, ethnicity or national origin."

4.    California's universities have never liked Prop 209, at least the part that bans them from giving admissions preferences to blacks. The University of California System has campaigned for Prop 209's repeal. And behind the scenes, its admissions offices have reintroduced the intentional consideration of race.

5.     Indeed, the UC System's illegal use of race is currently being challenged in another case pending before this Court. *Students Against Racial Discrimination v. Regents of the Univ. of Cal.*, No. 8:25-cv-192-JWH-JDE (C.D. Cal.).

6.     UCLA's medical school has adopted an "Anti-Racism Roadmap," under which it racially balances its medical-student population.

7.     Consistent with its racial goals, Geffen made Jennifer Lucero dean of admissions in 2020. Lucero is an outspoken advocate for using race to make admission and hiring decisions in medical schools and hospitals. As dean of admissions, Lucero wields significant influence over Geffen's admissions policies and practices, the appointment of the admissions committee members, the committee's deliberations, and admission decisions.

8.     Whistleblowers with first-hand knowledge of Lucero's admissions practices have now come forward. They report that, under the guise of "holistic" review, Geffen requires applicants to submit responses that are intended to allow the Committee to glean the applicant's race, which the medical school later confirms via interviews. Lucero and her handpicked committee members routinely and openly discuss race (and racial proxies) and use race as a factor to make admission decisions. Lucero berates and belittles committee members who raise concerns about admitting minority students because of their race despite low GPAs and MCAT scores. At UCLA Medical School, race is not only a factor but often decisive—above GPA and MCAT scores—in making admission decisions.

4

9.      Then-Chancellor Block had the power to hire, fire, discipline, investigate and oversee Lucero. He announced no action or reform in response to the whistle-blowers' revelations.

10.     The numbers show that UCLA is engaged in intentional racial balancing. Between 2020 and 2023, the percentage of white and Asian applicants to Geffen was consistently around 73% of the total applicant pool. Yet the percentage of matriculants to Geffen who are white and Asian plummeted: 65.7% in 2020, 57.1% in 2021, 57.8% in 2022, and 53.7% in 2023.

11.     UCLA has withheld key admissions data from the public and its own internal oversight body. UCLA has also effectively shut down its own internal probe into its admissions practices by insisting on non-disclosure agreements from the participants in the admissions process. Geffen's apparent illegal use of race has even prompted multiple federal agencies to launch investigations into its admissions practices.

12.     This much is clear: UCLA's illegal racial discrimination has harmed and is continuing to harm applicants, including Plaintiffs and their members. In this race-based system, all applicants are deprived of their right to equal treatment and the opportunity to pursue their lifelong dream of becoming a doctor because of utterly arbitrary criteria. Plaintiffs are entitled to relief.

## PARTIES

13.    Plaintiff Do No Harm is a voluntary membership organization of healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies. Do No Harm's purpose is to keep these ideologies out of medical education, clinical practice, and research fields. It is recognized by the IRS as a 501(c)(3) tax-exempt nonprofit and is validly incorporated in Virginia.

14.    Do No Harm is a traditional, genuine membership association. Founded in 2022, Do No Harm has grown to more than 27,000 members. Do No Harm's mission and outreach are highly public and detailed on its public-facing website. Members voluntarily join, pay dues, and receive regular communications about the association's litigation and other activities. Members' rights are spelled out in Do No Harm's bylaws, including the right to elect one director to the board. Do No Harm has represented the interests of many of its members in many federal cases. *See Litigation*, Do No Harm, donoharmmedicine.org/litigation.

15.    Do No Harm brings this lawsuit in a representational capacity on behalf of its members who would have standing to sue on their own. All of Do No Harm's standing members voluntarily joined the organization, support its mission, paid dues, authorized Do No Harm to represent their rights in this litigation, receive updates and can give input and direction on this litigation, and are represented by Do No Harm in good faith.

16.    Plaintiff Students for Fair Admissions is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and other lawful means. SFFA and its members believe that racial preferences in school admissions are unfair, unnecessary, and unconstitutional. SFFA is recognized by the IRS as a 501(c)(3) tax-exempt nonprofit and is validly incorporated in Virginia.

17.    SFFA is a traditional, genuine membership association. Founded in 2014, SFFA has grown to over 19,000 members. SFFA's mission and outreach are highly public and detailed on its public-facing website. Members voluntarily join, pay dues, and receive regular communications about its litigation and other activities. Members' rights are spelled out in SFFA's bylaws, including the right to have one member-elected director on the board. SFFA has represented the interests of many members in many federal cases, including its successful litigation against Harvard and UNC. *See Our Cases*, SFFA, studentsforfairadmissions.org/our-cases.

18.    SFFA brings this lawsuit in a representational capacity on behalf of its members who would have standing to sue on their own. All of SFFA's standing members voluntarily joined the organization, support its mission, paid dues, authorized SFFA to represent their rights in this litigation, receive updates and can give input and direction on this case, and are represented by SFFA in good faith.

19.    Plaintiff Kelly Mahoney is a college graduate who applied to, and was rejected from, Geffen.

20.     Defendant the Regents of the University of California is a state agency that operates the UC System. Under Article IX, §9 of the California Constitution, the regents have the "full powers of organization and government" over the UC System, including the UCLA Medical School. Cal. Const. art. IX, §9(a). Defendants have stipulated in this case that any injunctive or declaratory relief against the Regents "will apply to and be binding on UCLA and the David Geffen School of Medicine at UCLA." Doc.27 at 3.

21.     Defendant Julio Frenk is the current chancellor of UCLA. Under the Regents' bylaws, the chancellor is "the executiv[e]" head of UCLA's campuses, including Geffen. He sets and has the power to change UCLA's "policies," including Geffen's admissions policies and practices. He is also "responsible for the organization, internal administration, operation, financial management, and discipline of [UCLA's] campuses," including monitoring how Geffen conducts admissions and overseeing its compliance with federal and state laws banning the use of race in admissions. He further "oversee[s] all faculty personnel and other staff at their locations," including Lucero and everyone who administers admissions at Geffen. Frenk is sued in his official capacity. Defendants have stipulated in this case that any injunctive or declaratory relief against Frenk in his "official capacit[y] will apply to and be binding on UCLA and the David Geffen School of Medicine at UCLA." Doc.27 at 3.

22.     Defendant Gene Block was chancellor of UCLA from August 2007 to July 2024. He was chancellor when Lucero was hired, when the plaintiffs and standing

members here were denied admission to Geffen, and when Geffen adopted and implemented the main policies and practices challenged in this lawsuit. An outspoken critic of Prop 209, Block created and oversaw the implementation of UCLA's "efforts at UCLA to increase representation of African American" students. As chancellor, Block was responsible for addressing allegations that a UCLA school was violating the law in how it conducted admissions, including the allegations in this lawsuit. In response to the "Varsity Blues" sting, for example, Block issued a statement falsely stating that "UCLA is absolutely committed to ensuring that every applicant is considered purely on their merits." And when three separate researchers at UCLA found that the school gave race-based admissions preferences to blacks, Block issued a statement falsely stating that "UCLA neither discriminates nor grants preference to prospective students based on race, ethnicity, sex or national origin." Block is sued in his personal capacity.

23.    Defendant Jennifer Lucero has been the Associate Dean of Admissions at UCLA Medical School since 2020. Lucero has significant input on the appointment of the admissions committee, and she sits on and deliberates with the admissions committee. Lucero also sits on the Admissions Policy and Oversight Committee as an ex officio member and has significant influence over Geffen's admissions policies. Lucero is sued in her personal and official capacities. Defendants have stipulated in this case that any injunctive or declaratory relief against Lucero in her "official capacit[y] will

apply to and be binding on UCLA and the David Geffen School of Medicine at UCLA." Doc.27 at 3.

# JURISDICTION AND VENUE

24.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331, §1343, and §1367(a).

25.    Venue is proper in the Central District of California under 28 U.S.C. §1391 because Defendants reside here and a substantial part of the events and omissions giving rise to the claim occurred here.

# FACTUAL ALLEGATIONS

## I.    UCLA Medical School's Admissions Process

26.    UCLA Medical School is highly selective. Each year, Geffen receives between 11,000 and 14,000 applicants yet matriculates roughly 175 medical students.

27.    Geffen does not have a minimum GPA or MCAT score that applicants must have before they can apply or be admitted; all completed applications are considered, regardless of MCAT or GPA. According to the admissions office, applicants are even "competitive" for Geffen "as long as" their GPA is "over a 3.0." *What Is the Holistic Admissions Approach for Medical School* at 0:41-0:46, David Geffen School of Medicine, YouTube (July 20, 2023), youtube.com/watch?v=482vInqbLVk. If an applicant's grades improved over time, that "upward trend" is also "always looked favorably upon by the [admissions] committee." *What GPA Do You Need to Get into Med School at UCLA? Is There a Cut-off?* at 0:28-0:48, David Geffen School of Medicine, YouTube (July 20, 2023), youtube.com/watch?v=LG-fAR75pJs.

28.     UCLA has no list of specific courses that applicants must take before they can apply to or attend Geffen.

29.     UCLA chooses to let applicants apply to Geffen up to three times total. And although medical schools can allow for transfers, Geffen chooses not to accept transfers. Applicants can reuse their MCAT score from up to four years ago; an applicant applying in 2025, for example, can use an MCAT score from as early as January 1, 2021.

30.     Geffen reviews applications and makes admission decisions through its admissions committee, which consists of approximately 20-30 faculty members. Committee members can serve up to three five-year terms. About five medical students also sit on the admissions committee to provide input on admission decisions. UCLA does not make public who sits on the admissions committee.

31.     The admissions committee's application-review process for the traditional M.D. track generally takes place in the following steps: primary application, secondary application, interview, committee deliberation, and decision.

32.     ***Primary Application***. Applicants submit a primary application through the American Medical College Application Service, which is run by the Association of American Medical Colleges. Geffen is a member of AAMC.

33.     AMCAS sends the applicant's primary application to the applicant's designated medical schools. Applicants pay $175 for the first designated school and $46 for each subsequently designated school.

34.    The primary application contains the applicant's biographical infor-mation (including race), citizenship status, family income, academic background, un-dergraduate GPA, MCAT score, internship and volunteer experience, and personal statement.

35.    Geffen receives an applicant's primary application through AMCAS and uses the primary application to initially screen applicants. It purportedly removes the checkbox information for race and ethnicity.

36.    Geffen requires applicants to take AAMC's PREview Exam, which at-tempts to measure applicants' professional readiness and situational judgment. The PREview Exam is a multiple-choice test that purports to measure applicants' cultural awareness, cultural humility, empathy and compassion, and interpersonal skills, among others. The PREview Exam was created by diversity-affairs officers from various med-ical schools, whom AAMC calls its "DEI constituents," to "level the playing field" for applicants deemed historically underrepresented in medicine. It does so by stressing factors other than academics.

37.    It costs $100 to take the PREview Exam. The PREview Exam scores initially get reported to UCLA as part of the applicant's primary application. Geffen again asks about the PREview Exam in the secondary application.

38.    ***Secondary application***. After primary review, select applicants receive an invitation to submit a UCLA-specific secondary application.

39.     The secondary application asks the applicant to submit several open-ended responses. For instance, in 2024, Geffen asked a series of questions, including the following: "Do you identify as being part of a group that has been marginalized (examples include, but are not limited to LGBTQIA, disabilities, federally recognized tribe) in terms of access to education or healthcare? If you answered "Yes" …, describe how this inequity has impacted you or your community and how educational disparity, health disparity and/or marginalization has impacted you and your community." On its face and by design, this question asks black applicants to reveal their race so that Geffen can know and consider it.

40.     To submit the secondary application, the applicant must pay a fee to Geffen. In 2025, the secondary-application fee is $100. For previous application cycles, the secondary-application fee was $95.

41.     After the secondary review, select students get an opportunity to interview with faculty members. The interviews are conducted either in person or remotely by video.

42.     After the interviews, the admissions committee deliberates on the applications together.

43.     After the committee deliberates, it ranks the applicants and makes final admission decisions on who to admit.

44.     At each step of the process—primary review, secondary review, interview, and committee deliberation—the admissions committee purports to review each

13

application holistically. Harvard, UNC, and virtually all other elite universities that openly considered race in admissions before *Harvard* likewise use holistic admissions. *Cf.* 600 U.S. at 257 (Thomas, J., concurring) ("Harvard's 'holistic' admissions policy began in the 1920s when it was developed to exclude Jews."). Notwithstanding *Harvard*, AAMC has encouraged medical schools like UCLA to continue using holistic review to "boost racial diversity."

## II.  UCLA Medical School uses race as a factor in admissions.

45.    In defiance of state and federal law, UCLA uses race as a factor in admissions. Both the UC System and Geffen have publicly expressed their intent to racially balance the class. Geffen's dean of admissions, Lucero, both publicly and privately said she uses race as a factor in making admission decisions. And whistleblowers confirm that the admissions committee, either led or intimidated by Lucero, use all available methods to glean an applicant's race, openly discuss applicants' race, and use race to hold students to different standards.

46.    In *Harvard*, the UC System submitted an amicus brief stating that it "implemented numerous and wide-ranging race-neutral measures designed to increase … racial diversity." The UC System also said that, although "Proposition 209 barred consideration of race in admissions decisions at public universities in California," its competitor universities outside of California "must retain the ability to engage in the … consideration of race." Had the Supreme Court adopted that position, it would have made it *harder* for the UC System to attract minority students. As Chancellor Block

once put it, "the most serious competition for UCLA" in trying to enroll black students is "highly ranked private colleges and universities" openly using race in admissions. The UC System's position at the Supreme Court thus makes no sense unless its schools were still using race, and it hoped that the Supreme Court would say the practice was lawful under federal law.

47.    Similarly, in 2024, the UC System said that "system- and campus-level strategies and innovations are being piloted or have been implemented" to "achieve representational diversity in its student body."

48.    The UC System further adopted the "UC 2030 Capacity Plan," with the goal of having its student bodies "better reflec[t] California's racial/ethnic … diversity." The UC System President wanted "intentional" "growth" in terms of making "graduate students … better reflect and tap the talent of underrepresented populations who represent the majority of Californians." To support this goal of "mov[ing] the needle on the diversity of graduate students," the Regents "requested graduate professional programs" to "present race/ethnicity data on students and faculty, along with diversity plans within the program."

49.    The UC System meticulously measures its racial outcomes in a variety of ways, including by closely tracking the racial demographics of its students. "The whole goal of public universities," according to then-chancellor Block, is to "represent the demographics of the community that we serve."

15

50.    UCLA commissioned a report by Robert Mare to study its admissions process for undergraduates—which, like Geffen, uses "holistic" review. Even the Mare report found that, over a two-year span, the admission of nearly one-third of all admitted black students could not be explained on grounds other than race. In response to this shocking finding, then-Chancellor Block did not order an investigation or any changes to decrease the use of race in admissions. UCLA instead endorsed Mare's study as proof that its holistic admissions were working as intended. Throughout his tenure, Block refused to investigate or make any changes in response to evidence that UCLA was using race in admissions, including credible evidence about Geffen.

51.    When he was chancellor, Block oversaw UCLA's efforts to achieve "diversity" in admissions, including by "adopt[ing] admissions policies that are designed to draw together a student body that looks like" the country. He often touted each year that the incoming class was "the most diverse" in UCLA's "103-history." Yet Block elsewhere maintained that "it is nearly impossible to achieve true diversity on our campuses without taking some account of race or ethnicity in admissions."

52.    Block created the new position of "vice chancellor for equity, diversity, and inclusion"—as well as new "diversity officers" who reported to the vice chancellor—with the specific mandate to "strengthen campus diversity and equity."

53.    In 2020, Geffen adopted the "Anti-Racism Roadmap" with the purpose of creating a "path toward racial justice, equity, diversity and inclusion."

54.     Under the roadmap, Geffen instituted sweeping policies concerning race in its operations.

a.  Geffen re-defined "merit" to include "diversity and inclusion initiatives."

b.  Geffen committed itself to increasing BIPOC employees and chairs among its faculty and created a special pathway for BIPOC postdoctoral trainees, fellows, and residents to become faculty.

c.  Geffen committed itself to creating special opportunities for BIPOC researchers to present seminars, present research, and otherwise participate in research opportunities, including by providing "minority supplements" to NIH grants.

d.  Geffen vowed that the medical-student body "should reflect the population of State of California" and adopted a strategic plan to "increase the number of URiM students." The term "URiM" stands for underrepresented in medicine. Its proponents consider all blacks to be underrepresented and all whites and Asians to be overrepresented.

e.  Geffen vowed collaboration among the admissions committee, the Admissions Policy Oversight Committee, and the Faculty Executive Committee to "review and improve diversity to reflect the population of the State of California."

  f. Geffen sought the participation of "diverse" medical students and the Equity, Diversity, and Inclusion Office in the admissions process to further its racial goals.

  g. Geffen also explained how it would monitor the racial numbers in the admissions process. It explained that it would engage in "strategic planning to improve diversity for all UCLA Health professional students using data-driven, evidence-based approaches." In addition, it would "collect and publicly report data on diversity in all school programs."

55. Geffen's Anti-Racism Roadmap has separately been incorporated into the school's diversity statements, which the admissions committee applies in reviewing each application.

56. In 2020, Geffen named Lucero its Dean of Admissions. Lucero is also the Vice Chair of DEI efforts at UCLA Health, the hospital system affiliated with Geffen.

57. Lucero is an outspoken advocate for using race as a factor in admissions and hiring in medical school and healthcare. Lucero has stated her view that every part of society—including academic medicine—is structurally racist. Lucero has stated her view that racism affects admission decisions and impedes DEI efforts. Lucero has also stated her view that comments like "We want diversity, but we also want qualified people" are biased and racist.

58.     Lucero has stated in articles and public interviews that it's important to racially diversify medical-school admissions, residencies, and leadership positions in medicine. As Dean of Admissions, Lucero has significant influence over the appointment of admissions committee members. Lucero has remade the admissions committee to be, what she calls, a "brave space" that both looks racially diverse and is where the committee members feel free to further DEI efforts.

59.     Consistent with Lucero's beliefs, Geffen's current "Guiding Principles for Student Representation" state that the chair of the Admission Committee will ensure that medical students who identify as BIPOC are placed on the committee to provide their input on admissions.

60.     Given the UC System's and Geffen's explicit desire to racially balance the student body, and with Lucero at the helm, the admissions committee makes admission decisions by using race as a factor.

61.     Lucero and her handpicked admissions committee take advantage of UCLA's holistic-review procedure to uncover and then use applicants' race.

62.     Lucero and the admissions committee routinely admit black applicants with below-average GPA and MCAT scores—even significantly below-average scores—while requiring whites and Asians to have near-perfect scores to even be seriously considered.

63.     Lucero and the admissions committee explicitly discuss and use applicants' race. On one occasion when the Committee was deliberating on a black

19

applicant with a significantly below-average GPA and MCAT score, Lucero stated: "Did you not know African-American women are dying at a higher rate than everyone else?" "We need people like this in the medical school."

64.    Committee members report that the bar for underrepresented minorities is "as low as you could possibly imagine" and that the Committee "completely disregards grades and achievements" for those applicants.

65.    Lucero regularly bullies and berates members of the admissions committee who voice concerns about admitting below-average black applicants by labeling them as "privileged" and implying that they are racist.

66.    Lucero and the admissions committee regularly glean the applicants' race through direct and indirect means. The secondary application even asks questions designed to uncover applicants' race. The interviews further enable the committee to know applicants' race and ethnicity.

67.    Statistical evidence obtained through public-records requests confirm that Lucero and the admissions committee are using race.

68.    Despite consistently making up a large percentage of the total applicant pool, the percentage of white and Asian students who matriculate at UCLA Medical School has dropped precipitously since Lucero took over as dean.

69.    In 2020, white applicants constituted 36.71% of the total applicant pool. Yet only 30.29% of the matriculants were white.

70.      In 2021, white applicants constituted 35.02% of the total applicant pool. Yet only 27.43% of the matriculants were white.

71.      In 2022 white applicants constituted 34.64% of the total applicant pool. Yet only 26.59% of the matriculants were white.

72.      In 2023, white applicants constituted 32.83% of the total applicant pool. Yet only 24% of the matriculants were white.

73.      In 2020, Asian applicants constituted 37.83% of the total applicant pool. Yet only 35.43% of the matriculants were Asian.

74.      In 2021, Asian applicants constituted 37.13% of the total applicant pool. Yet only 29.71% of the matriculants were Asian.

75.      In 2022, Asian applicants constituted 39.34% of the total applicant pool. Yet only 31.21% of the matriculants were Asian.

76.      In 2023, Asian applicants constituted 40.79% of the total applicant pool. Yet only 29.71% of the matriculants were Asian.

77.      A disproportionately higher number of black applicants matriculated to Geffen in 2020, 2021, 2022, and 2023.

78.      In 2020, black applicants made up 7.06% of the applicant pool. Yet 8% of the matriculants were black.

79.      In 2021, black applicants made up 8.93% of the applicant pool. Yet 11.43% of the matriculants were black.

80.    In 2022, black applicants made up 7.64% of the applicant pool. Yet 9.83% of the matriculants were black.

81.    In 2023, black applicants made up 7.86% of the applicant pool. Yet 14.29% of the matriculants were black.

82.    Geffen's matriculants have an average GPA of 3.8 and average MCAT of 514. Nationally, the average GPA for white matriculants was a 3.8 and the average MCAT was 512.4, while Asian matriculants had an average GPA of 3.83 and an average MCAT of 514.3. Yet black matriculants had an average GPA of 3.59 and an average MCAT of 505.7.

83.    Geffen closely guards the GPA and MCAT scores for its matriculants. And it does not make the GPAs or MCAT scores of matriculants available to the public. Geffen has stubbornly refused to produce full MCAT scores, even in response to a public-records request. For years, Geffen's administration even refused to provide admissions data to the faculty oversight board. UCLA's refusal to turn over this information confirms that the data would show large racial preferences.

84.    Lucero's and the admissions committee's illegal use of race in admissions was known, and caused grave concern, among Geffen's faculty members.

85.    After receiving multiple complaints for years, UCLA's internal Discrimination Prevention Office, charged with ensuring compliance with Title VI and other laws, sought to investigate Lucero and Geffen's admissions practices.

86.    Four members of the admissions committee initially agreed to participate in that investigation. But the admissions committee had required its members to sign a nondisclosure agreement barring any discussion of the committee's deliberations. When these four members wrote to Geffen's administration seeking written assurance that they would not be retaliated against for cooperating with the internal probe, the administration refused to give them that assurance. Geffen's administration thus effectively shut down UCLA's internal probe.

87.    Geffen's use of race in admissions has prompted the federal government to open several investigations. In July 2025, the government suspended hundreds of millions of dollars of federal funding to Geffen. The first cited reason for the suspension is Geffen's "surreptitious—and unlawful—prioritization of race over merit" in "admissions."

## III.    UCLA's racial discrimination has harmed and continues to harm Plaintiffs.

88.    Do No Harm has members who are ready and able to apply to Geffen, including DNH-Member A.

89.    DNH-Member A is white, a U.S. citizen, and a recent college graduate.

90.    DNH-Member A applied to Geffen in 2024.

91.    DNH-Member A had a 3.88 cumulative college GPA and scored 526 on the MCAT, which was in the 100th percentile. He completed all necessary courses.

23

92.     DNH-Member A submitted both the primary and secondary applications to Geffen. DNH-Member A paid the primary-application fee and the secondary-application fee. DNH-Member A also incurred the cost of taking the PREview Exam.

93.     Despite his stellar academic achievements, DNH-Member A was rejected by Geffen.

94.     DNH-Member A is attending another medical school, one lower than Geffen on his list of preferred schools.

95.     DNH-Member A is able and ready to reapply to Geffen, including by applying to transfer, as soon as a court orders Geffen to stop discriminating and undoes the effects of Geffen's prior discrimination.

96.     SFFA has at least one member who will apply to Geffen in the next admissions cycle, which will open when primary applications become available in May 2026.

97.     SFFA-Member 1 is female, half-Asian and half-white, a U.S. citizen who graduated from a high school in California, and a current college student. She will graduate college in May 2026 with a bachelor of science.

98.     SFFA-Member 1 has already taken the courses needed to demonstrate competency in science, the humanities, and the other subjects and skills that Geffen evaluates. She will satisfy all other requirements to attend medical school.

99.    SFFA-Member 1 has worked as a health aide at a resident-care home and has managed multiple businesses even at a young age. Because she wants to use her medical degree to work in pediatrics, she has picked up an extra minor in family studies.

100.    SFFA-Member 1 has a GPA of 3.4. Her science grades are near the 90th percentile of her class this semester. Her grades also show an upward trajectory. Her lower grades occurred earlier and were the product of her simultaneously working 40-50 hours a week to put herself through college. In her last three semesters, she earned all As and Bs.

101.    SFFA-Member 1 wants to attend Geffen, will apply, and will take all necessary steps to apply. Getting into Geffen is a personal dream of hers. She has toured Geffen in person, which she enjoyed so much that it solidified her desire to attend medical school.

102.    SFFA-Member 1 will take the MCAT in June 2026. She will take the MCAT again if she is unsatisfied with her first score. But no matter what her best score is, she will apply to Geffen in the next admissions cycle.

103.    Because of Geffen's racially discriminatory admissions policies and practices, without a court order fully preventing Defendants from discriminating, SFFA-Member 1 will not be able to compete for admission on an equal footing.

104.    Plaintiff Mahoney was and is harmed by Defendants' illegal use of race in admissions.

105.    Mahoney is female and a U.S. citizen.

106.    Mahoney started at a community college and later transferred to UC Davis, graduating with a GPA around 3.8.

107.    Mahoney scored 519 on the MCAT (96th percentile), well above Geffen's average, in 2022.

108.    To follow in the footsteps of her father, who is a doctor and who taught her about the responsibility of doctors to guide patients through the most vulnerable periods in their lives, Mahoney decided to apply to medical school. She spent her college years taking difficult science classes and preparing for the MCAT. After graduating, she gained research, clinical, and volunteer experiences. With her stellar credentials, Mahoney applied to various medical schools multiple times, including Geffen.

109.    In 2023, for example, Mahoney applied to Geffen and was invited to submit a secondary application. When she applied, Mahoney paid the primary-application fee and the secondary-application fee. Mahoney also incurred the cost of taking the PREview Exam.

110.    But Mahoney was rejected without an interview. Geffen sent a rejection letter to Mahoney on February 6, 2024.

111.    Mahoney is white. Though she has some Hispanic background, UCLA did not know that fact when she applied in 2023.

112.    If she were black, Mahoney would have had a far better chance of getting admitted to UCLA. Mahoney finds it hurtful and offensive that UCLA would judge her based on irrelevant racial factors that she cannot control.

113.    Mahoney recently decided to apply to medical school again, including to Geffen, this year. She will submit her primary application this month and select Geffen as one of her schools. She has predrafted her secondary application for Geffen. And she will complete all the steps and meet all the deadlines to apply to Geffen this year.

114.    Should Geffen reject her again, Mahoney is able and ready to apply to Geffen as soon as a court orders Geffen to stop discriminating and undoes the effects of its prior discrimination.

## CLASS ACTION ALLEGATIONS

115.    Per Federal Rule of Civil Procedure 23, Mahoney brings this action individually and on behalf of all other persons similarly situated.

116.    Mahoney proposes the following class definition and seeks class certification, subject to amendment based on information obtained through discovery:

> **Class**: All individuals who applied to Geffen within the statute of limitations, do not identify as black, paid an application-related fee, and were denied admission.
>
> > **Injunctive Subclass**: All individuals who are able and ready to apply or reapply to Geffen if the Court orders relief that fully stops the school from considering race in admissions and undoes the effect of the school's prior discrimination, including by enjoining the school's limitations on transfers and multiple applications.

117.    Mahoney reserves the right to amend the definition of the class or to add a class or subclass if further information and discovery indicate that the definition of the class should be narrowed, expanded, or otherwise modified.

118.    Specifically excluded from this class are Defendants' officers, directors, employees, and agents; any entity in which a Defendant has a controlling interest; and affiliates, legal representatives, attorneys, successors, heirs, or assigns of Defendant. Also excluded from this class are any judicial officers to whom this case is assigned, their families, and members of their staff.

119.    Class certification is appropriate under Federal Rule of Civil Procedure 23(a).

120.    **Numerosity**: The class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see Powers v. McDonough*, 732 F. Supp. 3d 1184, 1192 (C.D. Cal. 2024) ("courts generally find that numerosity obtains when a class has forty or more members."). The members of the class and the subclasses are so numerous that joinder of them all is impracticable. Each year, UCLA Medical School receives between 11,000 and 14,000 applications; and the nonblack applicants make up the vast majority. Class members can be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, email, internet postings, or other published notice.

121.    **Commonality**: There are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A common question 'must be of such nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663

(9th Cir. 2022). Claims challenging a "government policy" that "results in the systematic discrimination against class members" subjects class members to a "common injury" of "systematic discrimination." *Powers*, 732 F. Supp. 3d at 1193; *see also Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 419 (D.D.C. 2017) (challenging a "single" discriminatory policy "that was applied to all members of the class" satisfied commonality). Here, the members of the class and subclass raise the "core claim" that applicants "were subjected to different standards and criteria for admission" because of "their race or ethnicity." *Smith v. Univ. of Wash. Law Sch.*, 2 F. Supp. 2d 1324, 1342 (W.D. Wash. 1998). Whether Defendants "intentionally discriminated … on the basis of race"—and thus denied the class members "equal treatment under the law"—is "common to the putative classes." *Id.* Specifically, this case presents questions of law and fact that are common to the class and subclass, including but not limited to the following: (1) whether Defendants use race as a factor in making admission decisions; (2) whether Defendants' use of race in making admission decisions violates Title VI and other antidiscrimination laws; and (3) whether Plaintiff Mahoney and members of the class and subclass are entitled to relief.

122. **Typicality**: The "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This element asks "'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Powers*, 732 F. Supp. 3d at

1195. Mahoney's claims are typical of the claims of the proposed class and subclass because her claims are based on the same legal theories and violations of the law. Mahoney and the class members all suffered the same injury because of Defendants' intentional discrimination in Geffen's admissions process. *See Smith*, 2 F. Supp. 2d at 1342-43.

123. **Adequacy**: The representative parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Mahoney will fairly and adequately represent and protect the interests of the members the class and subclass. Mahoney's interests are coincident with, and not antagonistic to, those of the members of the class and subclass. She opposes all preferences based on race or ethnicity, of any kind and to any degree. Mahoney's lawyers are competent and experienced in litigating civil-rights cases and mass actions.

124. Class certification is appropriate also because this case fits into all three categories listed in Federal Rule of Civil Procedure 23(b). Class certification requires satisfying only one. *Olean*, 31 F.4th at 663.

125. **Superiority**: Under Rule 23(b)(1), a class action is a superior method for the fair and efficient adjudication of this case because class proceedings are superior to all other available methods, and joinder of the class (and subclass) members is otherwise impracticable. Class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation. *Gratz*, 539 U.S. at 267 n.17. It would impose a substantial hardship for most individual members of

the class or subclass to prosecute individual actions, many of whom are not able to

incur the expense of retaining their own counsel to prosecute individual actions. The

litigation of individual cases would also create inconsistent results, with some members

of the class recovering but not others, and some courts declaring Defendants liable for

discrimination but potentially not others, establishing incompatible standards of con-

duct for Defendants. By contrast, if this Court adjudicates Defendants' liability for all

class members, it can resolve their claims all at once, without inconsistent results, thus

obtaining global relief and judicial efficiency.

126.    **Injunctive or Declaratory Relief**: Injunctive and declaratory relief

"with respect to the class as a whole" is appropriate. Fed. R. Civ. P. 23(b)(2). Because

Defendants discriminated against white and Asian applicants "by applying different

standards and criteria for admission," this is a "paradigm case for certification under

Rule 23(b)(2)." *Smith*, 2 F. Supp. 2d at 1343; *accord Gratz*, 539 U.S. at 267-68.

127.    **Predominance**: Under Rule 23(b)(3), Defendants engaged in a common

course of discriminatory conduct toward Mahoney and class members. Mahoney and

class members were denied equal treatment in the admissions process because of their

race. The common issues arising from Defendants' discriminatory conduct toward the

class members predominate over any individualized issues, especially given the nature

of the requested damages. The class would be entitled to recover, for example, any

application-related fees that they paid based on Geffen's denial of the opportunity to

compete on a racially equal playing field. *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633,

31

663 (5th Cir. 2014) (Garza, J., dissenting). The class members all suffered that inability to equally compete, regardless of whether they would have been admitted to Geffen under a lawful process. *Gratz*, 539 U.S. at 262. And their application-related fees can be easily calculated classwide, since they are fixed, historical, and documented in discoverable records.

## CLAIMS FOR RELIEF
### COUNT I
### Violation of the Fourteenth Amendment
### (Against the Individual Defendants)

128.    Plaintiffs repeat and reallege the preceding allegations.

129.    Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983.

130.    At all relevant times, all individual defendants are "person[s]" acting under the color of state law. §1983.

131.    The Fourteenth Amendment provides, among other things, that no person shall be denied "the equal protection of the laws." U.S. Const. amend. XIV, §1.

132.    The "central mandate" of equal protection is "racial neutrality" by the

government. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). And the "'core purpose' of the

Equal Protection Clause" is to "'d[o] away with *all* governmentally imposed discrimi-

nation based on race.'" *Harvard*, 600 U.S. at 206 (emphasis added). "[W]henever the

government treats any person unequally because of his or her race, that person has

suffered an injury that falls squarely within the language and spirit of the Constitution's

guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30

(2000).

133.    Defendants through Geffen intentionally engage in "'outright racial bal-

ancing,'" which is "'patently unconstitutional.'" *Harvard*, 600 U.S. at 223. The Supreme

Court has repeated that "'[r]acial balance is not to be achieved for its own sake.'" *Parents

Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 729-30 (2007) (plurality).

Despite this admonition, Geffen adopted and employs admissions policies and prac-

tices that ensure its medical-student population reflect the racial composition of the

State. Geffen's racial-balancing project is confirmed by statistical evidence. Between

2020 and 2023, the percentage of white and Asian matriculants plummeted precipi-

tously despite constituting a much larger share of the total applicant pool. At the same

time, the percentage of black matriculants jumped significantly, despite constituting a

much smaller portion of the total applicant pool.

134.    Geffen also uses a sophisticated "holistic" application-review method

that's designed to glean and use applicants' race. The secondary applications ask

questions designed to facilitate the Committee's use of race. And the in-person or virtual interview process facilitates the Committee's use of race. Geffen also explicitly discusses race and uses it as a factor in making admission decisions.

135.   Especially for black students, race results in a significant boost in the admissions process, sufficient to overcome a significant below-average GPA or MCAT score. No other racial group, not even Hispanics or Native Americans, receives a race-based boost as large as the boost for black applicants.

136.   This use of race is patently illegal. "'[N]o State has any authority under the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities.'" *Harvard*, 600 U.S. at 204.

137.   At the very least, the admissions committee uses proxies for race in making admission decisions. This is also illegal. "What cannot be done directly cannot be done indirectly." *Id.* at 230. And "universities may not simply stablish through application essays or other means the regime" that is "unlawful." *Id.* Discrimination based on perceived race, even if mistaken, is equally actionable. *See, e.g.*, *Estate of Amos ex rel. Amos v. City of Page*, 257 F.3d 1086, 1094 (9th Cir. 2001); *Santos v. Peralta Cmty. Coll. Dist.*, 2009 WL 38098797, at *3 (N.D. Cal. Nov. 13).

138.   When the government "distributes … benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved*, 551 U.S. at 720 (majority).

34

139.    Strict scrutiny is a "searching examination, and it is the government that bears the burden to prove 'that the reasons for any racial classification are clearly identified and unquestionably legitimate.'" *Fisher v. Univ. of Tex.*, 570 U.S. 297, 310 (2013) (cleaned up) (*Fisher I*). The racial classification "must survive a daunting two-step examination." *Harvard*, 600 U.S. at 206. First, the racial classification must "'further compelling governmental interests.'" *Id.* at 207. Second, the government's use of race must be "'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Id.*

140.    Defendants cannot satisfy strict scrutiny.

141.    Defendants cannot show a compelling governmental interest. The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *Id.* There is no evidence that Defendants adopted their admissions policies and practices to remedy some past discrimination that Geffen took part in. Instead, Defendants are engaged in simple racial balancing, which is plainly illegitimate. Worse, Defendants want to accept more underrepresented applicants simply because they belong to underrepresented minority groups. Such an outright race-based distribution of governmental benefits and resources—especially in the educational context—is illegal. *See Brown*, 347 U.S. at 493-94; *Harvard*, 600 U.S. at 216-18.

142.    Defendants' admissions policies and practices are also not narrowly tailored.

143.    Race operates as a "negative" by disadvantaging nonblack applicants in the admissions process. Admission to Geffen is a highly selective, zero-sum process. Any benefit given to "some applicants but not to others necessarily advantages the former group at the expense of the latter." *Harvard*, 600 U.S. at 219.

144.    Defendants use race as a stereotype—for example, by proceeding from the unfounded assumption that "there is an inherent benefit in race *qua* race." *Id.* at 220.

145.    Defendants' use of race has no end date.

146.    Since at least 2013, it was clear that Geffen's use of race in admissions was illegal under federal law.

147.    Geffen has not given "a reasoned, principled explanation for [its] academic decision" to use race in admissions to achieve the educational benefits of diversity, given "[c]onsideration" to whether it could achieve those benefits without considering race, or adopted race-based admissions in "good faith." *Fisher I*, 570 U.S. at 310; *Fisher II*, 579 U.S. at 383. To the outside world, it falsely denies considering race in admissions at all.

148.    Geffen does not use—and is not constrained by law to use—a percentage plan that requires it to fill most of the class a certain way. *Cf. Fisher v. Univ. of Texas at Austin*, 579 U.S. 365, 378-80 (2016) (*Fisher II*). And its use of race occurred after "*Fisher I* clarified the stringency of the strict-scrutiny burden." *Id.* at 379.

149.    Geffen uses race to "'assure within its student body some specific per-centage'" of a racial group. *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). That kind of "racial balancing" has been "patently unconstitutional" for decades. *Id.*

150.    Section 1983 authorizes damages and injunctive relief. It also authorizes punitive damages "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Bacon v. Woodward*, 104 F.4th 744, 750 (9th Cir. 2024).

151.    Defendants' direct and indirect use of race in making admission decisions was motivated by evil intent and shows callous disregard of applicants' right to equal treatment. All racial discrimination is invidious, and Defendants intentionally discrim-inated against thousands of young adults based on the immutable color of their skin. Defendants' discrimination was especially detrimental to Asian Americans, a racial mi-nority that has faced a long history of discrimination in this country perpetuated by the State of California and others. And it resulted in the federal government cutting off the school's federal funding. Before and certainly after *Harvard*, Defendants knew for certain that Geffen could not consider race in admissions. Yet they perpetuated the practice anyway behind closed doors, while falsely denying it in their statements to the public and even to the Supreme Court. When whistleblowers, investigators, and others tried to reveal this discrimination, Defendants acted to conceal it by shutting down internal investigations and baselessly denying public-records requests. Lucero in par-ticular used intimidation and shaming tactics to pressure the admissions committee to

unlawfully consider race in their decisions—including forcing them to sit through a

two-hour lecture by her sister.

## COUNT II
## Violation of Title VI of the Civil Rights Act of 1964
## (Against the Regents)

152.    Plaintiffs repeat and reallege the preceding allegations.

153.    Title VI provides that no person "shall, on the ground of race, color, or

national origin, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial

assistance." 42 U.S.C. §2000d.

154.    The Regents are covered by Title VI. Title VI defines "program or activ-

ity" to mean "all of the operations of" a "university" or "public system of higher edu-

cation" "any part of which is extended Federal financial assistance." 42 U.S.C. §2000d-

4a(2)(A). The UC System, UCLA, and UCLA Medical School receive federal funds in

federal student aid and research grants.

155.    Under 42 U.S.C. §2000d-7(a)(1), a state is "not … immune … from suit

in Federal court for a violation of … title VI."

156.    Private individuals can sue to enforce Title VI and obtain equitable and

legal remedies. *See Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

157.    Geffen has caused and will continue to cause applicants to be "excluded

from participation in," "denied the benefits of," and "subjected to discrimination

under" its admissions policies and practices "on the ground of race, color, or national origin." 42 U.S.C. §2000d.

158.    Title VI has "'independent force'" and makes it "*always* unlawful to discriminate among persons even in part because of race." *Harvard*, 600 U.S. at 308-09 (Gorsuch, J., concurring).

159.    At a minimum, because Geffen violates the Fourteenth Amendment, it also violates Title VI. *See SFFA v. Harvard*, 980 F.3d 157, 185 (1st Cir. 2020) ("Title VI's protections are coextensive with the Equal Protection Clause."), *rev'd on other grounds*, 600 U.S. 181.

## COUNT III
## Violation of 42 U.S.C. §1981
## (Against the Individual Defendants)

160.    Plaintiffs repeat and reallege the preceding allegations.

161.    Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). And it authorizes equitable and legal relief, including compensatory and punitive damages. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).

162.    White and Asian applicants are protected by §1981, whose "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.,* 586 U.S. 199, 208 (2019), by protecting the "equal right of all persons … to make and

39

enforce contracts without respect to race," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Section 1981 "forbids racial discrimination … whether the aggrieved party is black or white." *Bobo v. ITT, Cont'l Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981).

163.    "[A] contract for educational services is a 'contract' for purposes of §1981." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003).

164.    The admissions process at Geffen implicates the right to "make … contracts." §1981(a). Section 1981 "protects 'would-be contractor[s]' … to the same extent that it protects contracting parties." *AAER v. Fearless Fund Mgmt.*, 103 F.4th 765, 776 (11th Cir. 2024). The statute broadly "offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's*, 546 U.S. at 476.

165.    Geffen violates §1981 by intentionally limiting the formation of contractual relationships based on race.

166.    Race is a but-for cause of applicants' "'loss of a legally protected right'" to make contracts with Geffen. *Newman v. Amazon.com*, 2022 WL 971297, at *7 (D.D.C. Mar. 31). "So long as the plaintiff's [race] was one but-for cause of that decision, that is enough." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). But for the fact that the applicants are a disfavored race, they would have had the "same right" to "make … contracts" with the medical school. §1981(a).

167.    At a minimum, because Geffen violates the Fourteenth Amendment, it also violates §1981. *Gratz*, 539 U.S. at 276 n.23.

## COUNT IV
## Violation of the California Unruh Civil Rights Act
## (Against Block and Lucero in their personal capacities)

168.    Plaintiffs repeat and reallege the preceding allegations.

169.    California's Unruh Civil Rights Act provides that "[a]ll persons within the jurisdiction of this state are free and equal" and that "no matter what their" "race," "color," "ancestry," or "national origin," they are "entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code §51(b). The Unruh Act "prohibits arbitrary discrimination, both benign and improperly intentioned, against minorities or majorities." *Park Redlands Covenant Control Comm. v. Simon*, 226 Cal. Rptr. 199, 202 (Cal. Ct. App. 1986).

170.    "Whoever denies, aids or incites a denial, or makes any discrimination or distinction … is liable for each and every offense for the actual damages, and any amount … up to a maximum of three times the amount of actual damages but in no case less than four thousand dollars." Cal. Civ. Code §52(a). "The litigant need not prove she suffered actual damages to recover the independent statutory damages of $4,000." *Molski v. M.J. Cables, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007). The Unruh Act also authorizes attorney's fees.

171.    Defendants can be sued under the Unruh Act in their personal capacities. *See, e.g.*, *Fruciano v. Regents of Univ. of Cal.*, 2018 WL 4219232, at *4 (N.D. Cal. Sept. 5); *K.S. v. Fremont United Sch. Dist.*, 2007 WL 4287522, at *6 (N.D. Cal. Dec. 6).

41

172.   Geffen, at least with respect to admissions, is a "business establishmen[t] of every kind whatsoever" under the Unruh Act, Cal. Civ. Code §51(b). Geffen receives hundreds of millions of dollars from the state and federal government. It solicits and receives substantial money from the general public as well. And its students treat members of the general public at UCLA Health. When conducting admissions, Geffen operates like a for-profit business. It conducts substantial advertising and marketing to compete against other elite medical schools, to maximize the number of applications it receives, and to enhance its value by keeping its acceptance rate low. *See generally* Selingo, *Who Gets In and Why* 21 (2020) ("College admissions is a big business…. [U]niversities spend an estimated $10 billion annually on recruiting students … using tactics not much different than those of credit card companies and retailers.") Geffen broadly solicits and accepts applications from all students, who have no current affiliation with Geffen. It charges application fees, conducts interviews, and decides whether to extend offers of admission—contracts worth hundreds of thousands of dollars. Given the high number of applications, the application fees are substantial. According to a study of one cycle of UCLA's undergraduate process in 2017, UCLA earned fees from rejected applicants worth nearly $7 million—the most of any university in the country. *See also* Selingo 40 ("'Colleges are a business … and admissions is its chief revenue source.'").

173.   Defendants' misconduct here does not involve educating, disciplining, or otherwise interacting with students at Geffen. It involves discrimination against

applicants who are outsiders to Geffen when they apply—and nearly all of whom will

never be students at Geffen.

174.    Under Proposition 209, Regents Policy 4401, and other laws and policies,

no one at Geffen had discretion to consider or let race be considered as a factor in

admissions.

175.    Lucero and Block engaged in intentional racial discrimination in violation

of Unruh by causing Geffen to favor certain applicants and disfavor others because of

their race.

## PRAYER FOR RELIEF

Plaintiffs ask this Court to enter judgment in their favor and against Defendants

and to provide the following relief:

A.    A declaratory judgment that Geffen's admissions policies, practices, and
decisions violate the Constitution, Title VI, §1981, and the Unruh Act.

B.    A permanent injunction prohibiting Geffen from in any way knowing or
considering applicants' race when making admission decisions.

C.    Structural injunctive relief, including the appointment of a monitor to
oversee all decisions relating to admissions at Geffen, to ensure compli-
ance with federal law.

D.    An order requiring Geffen to admit Mahoney.

E.    An order certifying this action as a class action and appointing Mahoney
and her counsel to represent any class and subclass.

F.    Compensatory damages to Mahoney from the Regents and the individual
defendants in their personal capacities.

G.    Damages to the class from the individual defendants in their personal
capacities in an amount equivalent to a refund of all application-related
fees paid.

43

H.   Statutory damages under the Unruh Act not less than $4,000 per occurrence of discrimination to Mahoney and the class from the individual defendants in their personal capacities.

I.   Punitive damages in an amount to be proven at trial to Mahoney and the class from the individual defendants in their personal capacities.

J.   Nominal damages.

K.   Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

L.   Pre- and post-judgment interest on any amounts awarded.

M.   All other relief that the plaintiffs and the class are entitled to.

Dated: May 8, 2025
Amended: August 13, 2025

**LAWFAIR LLC**
Adam K. Mortara (PHV)
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154

*Attorney for Students for Fair Admissions*

**ALTVIEW LAW GROUP LLP**
John M. Begakis (SBN 278681)
john@altviewlawgroup.com
9454 Wilshire Blvd., Suite 825
Beverly Hills, CA 90212
(310) 230-5580

*Local Counsel*

Respectfully submitted,

*/s/ Cameron T. Norris*

**CONSOVOY MCCARTHY PLLC**
Thomas R. McCarthy (PHV)
Bryan Weir (SBN 310964)
Cameron T. Norris (PHV)
cam@consovoymccarthy.com
Frank H. Chang (PHV)
Marie Sayer (PHV)
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423

Patrick Strawbridge (PHV)
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(6170 227-0548

*Attorneys for Do No Harm, Students for Fair Admissions, and Kelly Mahoney*

44