```
                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
                  (WESTERN DIVISION - LOS ANGELES)



DO NO HARM, ET AL,            ) CASE NO: 2:25-cv-04131-JWH-JDE
                              )
            Plaintiffs,       )              CIVIL
                              )
     vs.                      )     Los Angeles, California
                              )
DAVID GEFFEN SCHOOL           )   Tuesday, October 28, 2025
OF MEDICINE AT UCLA, ET AL,   )
                              )    (9:46 a.m. to 10:52 a.m.)
                Defendants.   )
_____)


        DEFENDANTS' MOTION TO DISMISS [DKT.NOS.46,57];

                   SCHEDULING CONFERENCE


          BEFORE THE HONORABLE JOHN W. HOLCOMB,
              UNITED STATES DISTRICT JUDGE




APPEARANCES:              SEE PAGE 2


Deputy Clerk:             Clarissa Lara


Court Reporter:           Recorded; CourtSmart


Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

<u>**APPEARANCES**</u>:


For Plaintiffs:              ADAM K. MORTARA, ESQ.
                             Lawfair LLC
                             40 Burton Hills Boulevard, Suite 200
                             Nashville, TN 37215
                             773-750-7154

                             CAMERON T. NORRIS, ESQ.
                             Consovoy McCarthy
                             1600 Wilson Boulevard
                             Suite 700
                             Arlington, VA 22209
                             703-243-9423

                             PATRICK N. STRAWBRIDGE, ESQ.
                             Consovoy McCarthy
                             Ten Post Office Square
                             8th Floor South PMB 706
                             Boston, MA 02109
                             703-243-9423

                             JOHN M. BEGAKIS, ESQ.
                             Altview Law Group
                             9454 Wilshire Boulevard
                             Suite 825
                             Beverly Hills, CA 90212
                             310-230-5580


For Defendants:              FELICIA H. ELLSWORTH, ESQ.
                             Wilmer Cutler Pickering Hale & Dorr
                             60 State Street
                             Boston, MA 02109
                             617-526-6000

                             JOSHUA A. VITTOR, ESQ.
                             Wilmer Cutler Pickering Hale & Dorr
                             350 S. Grand Ave., Suite 2400
                             Los Angeles, CA 90071
                             213-443-5375

                             MICHAEL S. CRAFTS, ESQ.
                             Wilmer Cutler Pickering Hale & Dorr
                             7 World Trade Center
                             250 Greenwich Street
                             New York, NY 10007
                             212-230-8800

|     |     |
| --- | --- |
| 1 | **Los Angeles, California; Tuesday, October 28, 2025; 9:46 a.m.** |
| 2 | **(Call to Order)** |
| 3 | **THE CLERK:** Calling Item Number 2, Case Number 2:25- |
| 4 | cv-04131; Do No Harm, et al. versus David Geffen School of |
| 5 | Medicine at UCLA, et al. |
| 6 | Counsel, please state your appearances for the |
| 7 | record, beginning with Plaintiff. |
| 8 | **MR. STRAWBRIDGE:** Yes, good morning. Patrick |
| 9 | Strawbridge from the Consovoy Law Firm for the plaintiffs. |
| 10 | **THE COURT:** Mr. Strawbridge, good morning to you. |
| 11 | **MR. STRAWBRIDGE:** Good morning. |
| 12 | **MR. NORRIS:** Good morning, Your Honor. Cameron |
| 13 | Norris, also from the Consovoy Law Firm, for the plaintiffs. |
| 14 | **THE COURT:** Mr. Norris, good morning. |
| 15 | **MR. MORTARA:** Good morning, Your Honor. Adam |
| 16 | Mortara. |
| 17 | **THE COURT:** Mr. Mortara, good morning to you. |
| 18 | **MR. BEGAKIS:** Good morning, Your Honor. John Begakis |
| 19 | of Altview Law Group, local counsel for the plaintiffs. |
| 20 | **THE COURT:** Mr. Begakis. Begakis (pronunciation)? |
| 21 | **MR. BEGAKIS:** Begakis, thank you. |
| 22 | **THE COURT:** If I mispronounce your name, please let |
| 23 | me know because I want to pronounce it properly. So good |
| 24 | morning to you, sir. |
| 25 | And that's everybody for Plaintiffs, right? |

1          **MR. STRAWBRIDGE:**  Yes, Your Honor.

2          **THE COURT:**  Okay.

3          **MS. ELLSWORTH:**  Good morning, Your Honor.  Felicia

4    Ellsworth, Josh Vittor and Mike Crafts from Wilmer Hale for

5    Defendants.

6          **THE COURT:**  Good morning again, Counsel.

7          We are here on Defendants' Motion to Dismiss and a

8    Scheduling Conference.

9          In the SARD case, if I can call it that, I issued a

10   tentative.  I did not issue a tentative in this case.  But it

11   occurred to me that I probably should have sent it to

12   Plaintiffs' counsel.  Did you see the tentative that I issued

13   in the other case?

14         **MR. NORRIS:**  We received it last night, Your Honor,

15   we read it.

16         **THE COURT:**  Okay.  And I ask because it probably

17   won't surprise you that I'm unlikely to see the same issue

18   differently in the two cases so I want to make sure that the

19   plaintiffs in this case, the Do No Harm Plaintiffs, were aware

20   of what I'd sent in the tentative manner in that other case and

21   you are.

22         **MR. NORRIS:**  Yes, Your Honor.

23         **THE COURT:**  Okay.  All right.  Well let's proceed in

24   roughly the same way.  Let me hear from the moving party first.

25   A little bit more of a blank slate here because I hadn't --

1    hadn't gotten as far in terms of gelling to a tentative in this

2    case but as I said, you can see how I kind of viewed some of

3    the issues from the other case.

4         So let me ask you a couple questions, please,

5    Ms. Ellsworth.

6         On the class allegation argument, you want me to

7    strike the class allegation aspect of the amended complaint in

8    this case but isn't that an issue that should wait for a class

9    certification motion?  I think I only saw one district court

10   case that you cited where a court had done that at the pleading

11   stage.  Give me your thoughts, please, on that.

12        **MS. ELLSWORTH:**  Certainly, Your Honor.

13        Certainly, Your Honor.  It certainly can be done at

14   the motion to dismiss stage and we cited cases where it has

15   been.  I think here the class definition that the plaintiffs

16   have chosen to articulate shows why this should be stricken at

17   the motion to dismiss stage.  So the class is for any applicant

18   who does not identify as Black; whereas the allegations in the

19   complaint allege that there is discrimination in favor of Black

20   and Hispanic students and Native American students sometimes

21   and a disfavor of White and Asian American students.  So the

22   class definition itself doesn't make sense when mapped onto the

23   allegations of the complaint.

24        I would also note that there's an injunctive subclass

25   that's proposed that talks about lifting the transfer and no

1    more than three applications policies and I'd like to speak

2    about the propriety of that full stop at some point but more

3    importantly, Ms. Mahoney, the plaintiff in -- the named

4    plaintiff here, at least based on the allegations of the

5    complaint, could not represent that injunctive subclass and we

6    think that's also a reason why the class allegation should be

7    stricken at this point.

8         **THE COURT:**  So class definitions are very flexible

9    and fluid until a court certifies a class.  In fact, at the

10   class certification stage hearing, the definition can be

11   tinkered with by the parties or by the Court.  So why isn't --

12   if you're dead right that the class definition that Plaintiff -

13   - Plaintiffs have chosen here doesn't quite make sense, okay,

14   but it's likely to be changed in any event so why don't we just

15   wait on that?  Push back on that, please.

16        **MS. ELLSWORTH:**  Well because if Ms. Mahoney is

17   proceeding on her own individual case, that's a very different

18   case than proceeding on behalf of the putative class as a

19   representative member.  I don't think that Ms. Mahoney and the

20   plaintiffs have come forth with enough detailed allegations as

21   to why they should be allowed to proceed as a class.  And we

22   talked in our motion to dismiss about typicality and

23   commonality and all of those.  I focused here on

24   representativeness.  But in any event, I think that the manner

25   in which the complaint is pleaded has to map on in some way to

1  the class definition and it leaves the defendants, frankly,

2  with having to contend with class discovery at a time when we

3  don't think that actually a class can be certified.  I think if

4  they put forward a class definition that was tied more closely

5  to either Ms. Mahoney as a representative member or to the

6  allegations of the complaint, maybe we wouldn't have raised

7  this argument but they chose to define it in their complaint as

8  they did and I don't think that it's something that should be

9  allowed to proceed past the pleading stage, recognizing of

10  course we will have an opportunity to raise this argument or a

11  similar argument again if the Court doesn't agree to strike the

12  class allegations now.

13          **THE COURT:**  So we're jumping ahead a bit to the

14  scheduling conference but my typical manner of proceeding in

15  putative class action cases is to first set a schedule,

16  briefing schedule and a hearing on the anticipated motion for

17  class certification and not set the rest of the case schedule

18  because so much matters follows from whether or not a class is

19  certified.

20          Are you proposing that we not do that in this case?

21          **MS. ELLSWORTH:**  The parties had proposed a later

22  deadline for class certification and part of the reason for

23  that is I think a lot of the discovery that will go to class

24  certification is the same discovery that will go to the merits

25  and so that was sort of an administrability point.  We're happy

8

1   to proceed however the Court sees fit.  And I think we had

2   proposed an earlier deadline and the parties ended up agreeing

3   on a date at some point to put in for the Court.  But it wasn't

4   as early as I had seen from other orders of Your Honor the

5   Court sometimes prefers.

6           **THE COURT:**  So you're talking about discovery.  And

7   usually what I say, often a defendant in class action case

8   says, let's bifurcate discovery.  Let's take just class

9   certification-related discovery now and see how that goes and

10  then do the rest of the discovery later.  And what I usually

11  say is, well, the rules don't provide for that; go do your

12  discovery, whatever plaintiff wishes to do, keeping in mind

13  Rule 26 proportionality issues.

14          So again, we're getting a little bit ahead of

15  ourselves but are you proposing that we just open up discovery

16  generally and because there's so much overlap between class

17  certification-related discovery and the merits that just do it

18  all?

19          **MS. ELLSWORTH:**  I do usually make that bifurcated

20  argument on behalf of other defendants.  In this case we did

21  not -- I don't like that argument because again, I do think

22  that according to what the plaintiffs have indicated they think

23  they will want, need for class discovery, it is going to

24  overlap with the merits.

25          Now we've suggested discovery shouldn't start at all

1   pending the outcome of this motion which we think would narrow

2   the case substantially but recognizing the Court may wish the

3   parties to proceed forward, we aren't seeking to bifurcate

4   class discovery right now.

5          THE COURT:  Plaintiffs make the argument in their

6   opposition that they say, ah, hah, even if -- even if

7   defendants prevail in full on their motion, we still have a

8   case here.  That's correct, right?

9          MS. ELLSWORTH:  That's correct they have -- if our

10  motion is granted in full, the case would still proceed as to

11  Ms. Mahoney as an individual plaintiff, not a class

12  representative, and against The Regents under Title 6.  And we

13  did that purposefully, Your Honor.  We don't want to bring

14  arguments to the Court that we think will waste the Court's

15  time.  I do think there's value to narrowing the case and

16  ensuring we have appropriate plaintiffs and appropriate

17  defendants before the case proceeds into discovery to help the

18  parties shape discovery and to shape the ultimate presentation

19  of the case to the court.

20         THE COURT:  Let me ask another question and I do want

21  to hear your full argument but on the Ex Parte Young issue in

22  this case, does Ex Parte Young limit the injunctive remedies to

23  prospective remedies?  Because as I read Plaintiffs' request,

24  Plaintiffs want injunctive remedies related to transfer and

25  multiple applications which are designed to remedy past harms.

1  So how do I -- help me understand Ex Parte Young on the

2  prospective versus I guess retrospective nature of what

3  Plaintiff seeks here.

4          **MS. ELLSWORTH:**  My understanding of what Plaintiffs

5  seek -- and Mr. Strawbridge I'm sure will be able to more

6  eloquently articulate it -- is an injunction that ordering

7  Defendant the School Geffen -- Geffen School of Medicine not to

8  use race in admissions, if it's able to prove that in fact race

9  is being used, and order admitting Ms. Mahoney as a medical

10  student.  And then an order for equitable relief which would

11  include as relevant, I guess, lifting of the transfer and the

12  multiple admissions policies as to applicants who those

13  policies may have affected.  So I don't know exactly how that

14  would work.

15          I don't believe it's within the Court's jurisdiction

16  to require the Geffen School of Medicine to enact processes

17  that it does not have in place.  So there is no-transfer

18  admissions process to change.  It'd be one thing if there was a

19  transfer process and the allegation is race is used in both the

20  admissions process for first year students and also the

21  transfer process and so an injunction should say that race

22  can't be used in the transfer process.  There's actually no

23  process at all.  They don't accept transfer students.  It's 175

24  students per class.  It's a very small school.  And no

25  transfers are allowed.

1          The same with the idea of a fourth or fifth or sixth

2     application.  As a policy matter, the school only allows people

3     to try and apply three times.  Asking as a remedy for some past

4     discrimination for that to be lifted to allow them to apply a

5     fourth or a fifth or a sixth time is not addressing a

6     discriminatory barrier because there's no allegation that the

7     fourth or fifth or sixth application cycle would somehow be

8     different than the first or second or third.  This is sort of a

9     matter of academic policy.  So I don't think the Court really

10    could address those as a matter of sort of fashioning relief.

11    And I think that's relevant to standing as well which I'll

12    address at the appropriate time.

13          **THE COURT:**  So I understand that point but help me

14    understand how Ex Parte Young fits within these issues; that

15    is, let's say for whatever reason I thought Plaintiffs have a

16    great case and an appropriate remedy here would be issuing a

17    mandatory injunction saying the defendant has to change its

18    transfer policy and has to change its multiple application

19    policy.  To be clear, I'm not there right now.  Maybe I will

20    be.  I don't know.  But let's say I am.

21          Is there still an argument that, well that's great,

22    but Plaintiffs can't even get that under Ex Parte Young?

23          **MS. ELLSWORTH:**  I think there would be an argument

24    that they can't get that against the defendants who we've moved

25    for dismissal individually under Ex Parte Young because those

12

1  defendants are not directly involved in the admissions process

2  such that an injunction against them would allow them to make

3  that change.  So I would tie this, I think, to our both

4  Ex Parte Young argument as well as our intentional

5  discrimination Section 1981 and 1983 argument that Chancellor

6  Frank and former Chancellor Block who's sued in his individual

7  capacity, are not sufficiently alleged to have been directly

8  involved that either of those claims can stand against them.

9          **THE COURT:**  Okay.  Okay.  Go to your -- please, go to

10  your argument generally.

11          **MS. ELLSWORTH:**  All right.  Well let me pick up with

12  what we were just discussing which relates to the two

13  individuals.

14          Current Chancellor Frank, former Chancellor Block.

15          **THE COURT:**  Right.

16          **MS. ELLSWORTH:**  As to current Chancellor Frank, he's

17  sued in his official capacity.  And the argument I think that

18  the Court articulated in its tentative in SARD about the only

19  allegations being of supervisory control holds true with

20  respect to Chancellor Frank as well.

21          I'd point the Court to Paragraph 21 of the Amended

22  Complaint which are the allegations that relate to Chancellor

23  Frank.  And they relate only to his supervisory authority over

24  the campus and by extrapolation, at least according to the

25  complaint, Geffen's admissions policies and practices.

1          As the Court noted in the tentative, the *Fogra* case

2     (phonetic), which is what I like to call it rather than trying

3     to pronounce the name in French, indicates that simply

4     supervisory authority is insufficient to overcome sovereign

5     immunity for purposes of Ex Parte Young and the same holds true

6     for Chancellor Frank here.

7          **THE COURT:**  I understand your argument.

8          **MS. ELLSWORTH:**  As to former Chancellor Block, there

9     are more factual allegations I will say as to Chancellor Block

10    as to statements that he has made but not allegations about his

11    role in the medical school admissions process.  So the

12    allegations relating to prior statements of former Chancellor

13    Block relate to his view on Proposition 209, assuming they're

14    accurately quoted, and to his view on sort of admissions

15    overall, without a reference to that relating to the medical

16    school.  So the only arguments that are made as to Chancellor

17    Block -- or excuse me -- former Chancellor Block, also relate

18    to his prior supervisory authority.  And there are certainly no

19    allegations of the type of specific and direct conduct and

20    participation that would be required to make out a claim of

21    intentional discrimination against him in his individual

22    capacity under Sections 1981 or 1983.

23          As to standing, for the two associations --

24          **THE COURT:**  Yes.

25          **MS. ELLSWORTH:**  -- two sort of separate arguments as

1    to why those associations don't have standing based on the

2    members they chose to identify as conferring standing on them.

3    So remember, the allegations of the complaint are that SFFA has

4    over 19,000 members and that Do No Harm has over 27,000

5    members.  These are the two individuals that they chose to put

6    forth for the Court to establish standing and we think both are

7    insufficient.  So let me start first with SFFA Member One.

8         **THE COURT:**  Yes, you make a compelling argument

9    there.  And if I agree with you and grant your motion to

10   dismiss on this particular point, cannot those two plaintiffs

11   merely pick a different member who fits better, has better

12   characteristics?

13        **MS. ELLSWORTH:**  If they have such a member.  They

14   haven't put one before the Court and this, again, is an amended

15   complaint.

16        **THE COURT:**  There's no indication that Plaintiff

17   Kelly Mahoney is a member of either of those organizations.

18        **MS. ELLSWORTH:**  That's correct.  There's nothing in

19   the complaint that suggests that.

20        **THE COURT:**  If she was -- and I don't know if she is

21   or not and I don't know if she could be going forward -- but if

22   she were a member of both those organizations, that would cure

23   the standing problem for both of those organizations, would it

24   not?

25        **MS. ELLSWORTH:**  It might, Your Honor, and the reason

1    I say that is the allegations of the complaint are that

2    Ms. Mahoney applied once and was planning to apply again.  The

3    briefing opposition suggested that she is making her third

4    application right now which would, if she is not admitted, mean

5    that she would then be barred from applying in the future under

6    the subsequent application policy and then we would have the

7    same standing argument as to Ms. Mahoney as we do to the DNH

8    member.  I don't know what -- all I can look at is the

9    complaint in terms of what's before the Court but I share that

10   only to say it may be that we have an argument as to

11   Ms. Mahoney's standing down the road.  We did not raise that in

12   our motion to dismiss based on the allegations of the

13   complaint.

14          **THE COURT:**  And I just have to ask this because it's

15   interesting.

16          If Ms. Mahoney was a member of those two

17   organizations, putting aside the multiple application problem

18   that you raise, can she both be a member of those organizations

19   and thereby provide them with organizational standing and be a

20   class representative?

21          **MS. ELLSWORTH:**  That's an excellent question to which

22   I don't have an answer.  I think it's an interesting question.

23   I'm not sure whether she could be both a representative of the

24   association and also an appropriate representative of the class

25   but that's not -- it's not something I had to grapple with yet

1    so I don't have a great answer.

2              **THE COURT:**  Okay.  Sorry, it just occurred to me and

3    it's interesting.  It's like angels dancing on the head of a

4    pin.

5              **MS. ELLSWORTH:**  Well I do -- my surmise is that the

6    putative class is an effort to be able to move forward with as

7    broad a case as the plaintiffs would like without having the

8    associations in the event that associational standing is not

9    allowed or can't be continued.  I think they serve a similar

10   purpose, putative class and the associations, but the

11   plaintiffs are the masters of their complaint and they've

12   chosen to put it together in this way.

13             **THE COURT:**  Okay.

14             **MS. ELLSWORTH:**  As to DNH Member A, again our

15   argument is that that individual is not able and ready because

16   they have enrolled at another law school -- excuse me --

17   medical school.

18             **THE COURT:**  I understand your arguments there.

19             **MS. ELLSWORTH:**  Okay.

20             **THE COURT:**  I find them persuasive but I'm very

21   interested in hearing what Plaintiffs have to say.

22             **MS. ELLSWORTH:**  And I do want to raise the UNRA

23   Act ...

24             **THE COURT:**  Yes, please.

25             **MS. ELLSWORTH:**  ... which we've indicated, there's

1    two reasons why that case -- excuse me -- why the claim under

2    that Act shouldn't proceed.

3            **THE COURT:**  The business establishment argument that

4    you make I find quite persuasive.  I don't know if you want to

5    say more.

6            **MS. ELLSWORTH:**  If the Court's persuaded, I don't

7    need to take up more time.

8            **THE COURT:**  I need to hear from plaintiffs on that.

9    Maybe they can explain to me why this educational institution

10   should be treated as a business establishment under the UNRA

11   Act.  There might have been a case -- but they can tell me

12   more.  Okay.

13           **MS. ELLSWORTH:**  And the last point I'd like to raise

14   is there are claims for punitive damages that we don't think

15   should survive the motion to dismiss stage because the only

16   allegations that go to punitive or that plaintiffs point to as

17   supporting the availability of punitive damages are that the

18   allegations are of intentional discrimination.

19           Now, for Chancellor Frank and former Chancellor

20   Block, if those allegations are insufficient based on the lack

21   of direct involvement, I think the punitives would fall out

22   sort of necessarily because those defendants would fall out of

23   the case but as to Associate Dean Lucero, the only allegations

24   relate to I'll say alleged conduct towards colleagues in

25   admissions committee discussions -- that's what the complaint

1   alleges.  That's insufficient to state a claim for punitive

2   damages against this individual who's named in her official

3   capacity just simply stating intentional discrimination.  And

4   again, allegations which I need to accept as true of sort of

5   problematic interpersonal conduct, is insufficient to allow

6   punitive damages to stay against this individual.

7          **THE COURT:**  For these plaintiffs.

8          **MS. ELLSWORTH:**  For these plaintiffs.

9          **THE COURT:**  What -- say more, please, about former

10  Chancellor Block.  Again, accepting the allegations as true,

11  why don't those -- why aren't those allegations sufficient for

12  a punitive damages claim?  I don't know if it's going to

13  succeed or not but --

14         **MS. ELLSWORTH:**  All they allege is that he engaged in

15  intentional discrimination by purportedly preferring to

16  preference African American and Hispanic applicants over other

17  applicants of other racial backgrounds.  That's an intentional

18  discrimination claim.  That's not sufficient to open the door

19  to punitive damages.  There needs to be some either

20  willfulness, there needs to be something more than just a claim

21  under Section 1981 or 1983 if it were to stand for punitive

22  damages.

23         **THE COURT:**  Okay, I understand.

24         **MS. ELLSWORTH:**  If the Court doesn't have further

25  questions, I'm happy to yield to Mr. Strawbridge.

1          **THE COURT:**  No further questions right now.  You'll

2    probably want to say more in reply.

3          **MS. ELLSWORTH:**  I suspect I will.

4          **THE COURT:**  And I'll give you a chance to do that.

5          **MS. ELLSWORTH:**  Thank you, Your Honor.

6          **THE COURT:**  Thank you.  Mr. Strawbridge, are you

7    going to handle the argument?

8          **MR. STRAWBRIDGE:**  Mr. Strawbridge is going to yield

9    to Mr. Norris.

10          **THE COURT:**  Okay.  Mr. Norris, let me start with a

11    couple of questions and then I'll give you a chance to respond

12    however you wish to Ms. Ellsworth's argument and then tell me

13    anything in addition.  But let me start with standing.

14          You heard me say that I found Defendants' standing

15    arguments with respect to the two organizations persuasive.  It

16    doesn't look like the individuals that Plaintiffs have

17    identified in the complaint have the right characteristics to

18    convey organizational associational standing.  What am I

19    missing?

20          **MR. NORRIS:**  Couple of things, Your Honor.  Thank

21    you.

22          **THE COURT:**  Please.

23          **MR. NORRIS:**  Number one is only one plaintiff needs

24    standing.  It is conceded that there are individual -- our

25    individual plaintiff has standing and she seeks all the same

1   and forward-looking relief and raises all the same claims as

2   the associational plaintiffs.

3           THE COURT:  I understand that argument.  She not a

4   member though of either organization is she?  There's no

5   allegation that she is.

6           MR. NORRIS:  There is no allegation that she is.  I'm

7   not saying that she's not.  We -- I don't have authority today

8   to disclose the membership of the organizations further than we

9   have already but there's no allegation in the complaint.

10          THE COURT:  This is back to angels on the head of a

11   pin but say that she's not presently a member but quickly joins

12   these two organizations.  Does that fix the problem as it were?

13          MR. NORRIS:  It could but Your Honor already

14   anticipated what we're worried about which is that that will

15   get turned around to attack her adequacy as a representative of

16   a class.  So currently the complaint does not take that

17   approach.  That is something we would certainly consider if

18   given leave to amend for because one or more plaintiffs is

19   dismissed for lack of standing.

20          THE COURT:  You've got 27,000 members thereabouts for

21   DNH and 19,000 for SFFA, correct?

22          MR. NORRIS:  Correct.

23          THE COURT:  Can you find a few who fit -- who have

24   the right characteristics?

25          MR. NORRIS:  Well Your Honor it's not -- it's not

just looking out at our members and then picking them.  It

takes quite a bit to convince someone -- even on an anonymous

basis -- who is a active participant in a medical school

application process to sue arguably the most prestigious

medical school in the entire country for racial discrimination.

It's difficult.  And so we're very fortunate that people do

come forward and have their rights represented by our

organizations but it's not -- it's certainly not simple or

easy.

I do want to say -- I'll just talk about the

associations themselves.

**THE COURT:**  Please.

**MR. NORRIS:**  I think we all agree that you could

dismiss plaintiff by plaintiff even though only one plaintiff

needs standing.  But you have a discretion not to.  I think

this would be a good case not to exercise it because with

associations seeking forward-looking relief, our members are

going to change in this case a lot.  It's not going to be the

people that we filed with.  In the Harvard case, for example, I

think there were over 20 standing members that took that case

from filing to eight years later a decision in the Supreme

Court.  So they're going to change.  They can be substituted

later.  This will be vetted out in discovery.

And so in the allegations against students for fair

admissions, for example, is that our member has not yet taken

1  the MCAT.  She could not even register to take the MCAT until

2  last week.  Last week was the first time.  I talked to her

3  yesterday.  She is registering now, she's waiting for a fee-

4  waiver so she can take the MCAT without paying for it

5  potentially.  So that's all going to play out very soon.  I'm

6  not saying this is in the complaint, I'm saying this is what

7  will happen if we are dismissed without prejudice is that they

8  can come right back in two weeks when she's registered to take

9  the MCAT and that problem will be solved.

10      **THE COURT:**  But don't we have to go through that

11  exercise?

12      **MR. NORRIS:**  I don't think so, Your Honor, because

13  only one plaintiff needs standing for each claim and each form

14  of relief and it's conceded that we have one plaintiff with

15  standing for each claim in form of forward-looking relief.

16      **THE COURT:**  So I'll confess that I -- if you made

17  that argument in your papers I missed it.  Can you point to me

18  where you make that argument?

19      **MR. NORRIS:**  Yes, Your Honor.  I know we cited the

20  case.  It's called *Macinas versus Hobbs* (phonetic).  It's a

21  case that we litigated so I remember it, it's a Ninth Circuit

22  opinion saying only one plaintiff needs standing so you have

23  the discretion to not consider the standing of others.

24          I also know the *Little Sisters* case that went to the

25  Supreme Court has a footnote saying it's actually maybe

1    inappropriate to consider standing when you don't need to

2    basically to render a constitutional ruling when it's

3    sufficient that only one person needs it on that side of -- on

4    each side of the V.  So I'd point Your Honor to those cases.

5    But I also am willing to stand up for our associational --

6    association standing claims.

7             Do No Harm relies on someone who applied to this

8    medical school, was rejected and wants to attend still.  That

9    is verbatim the plaintiff who has brought every successful

10   race-based submissions case in the history of this country

11   that's made it to the Supreme Court.  That's Fisher (phonetic),

12   that's Grabs (phonetic), that Gruter (phonetic), that's our

13   Harvard people.  That's always been the winning play.

14            The reason they say it doesn't work here is because

15   the medical school decides in its discretion not to accept

16   transfers.  It could accept transfers.  Other medical schools

17   accept transfers.  They decided not to and they say that it is

18   beyond the equitable powers of this court to make them consider

19   transfers as a remedy for intentional racial discrimination.

20   We don't think that's the law.  We cite dozens of -- or not

21   dozens but we cite several desegregation cases that say courts

22   could enforce the *Brown* decision by making schools accept

23   transfers when they didn't want to.  They weren't cawed by sort

24   of the policy preferences of the individual schools.

25            Now Your Honor made a point that we may not be

1    entitled to that relief at the end of this case.  We may not

2    prove our claims with that sufficient level of intentional

3    discrimination or a concern about circumvention.  That's not a

4    question for standing.  The question is whether our arguments

5    for that relief are nonfrivolous at this point.  That's enough

6    to confer standing.

7                    **THE COURT:**  Plausible.

8                    **MR. NORRIS:**  Plausible, yes.

9                    And with respect to Students For Fair Admissions, I

10   think my friends would agree that someone who is currently

11   actively applying to medical school has standing.  We don't

12   think it's that narrow.  The law would allow someone who's

13   applying, who's ready and able to apply for the very next

14   cycle, at least, and that's who students for fair admissions

15   Member 1 is.  She is taking the MCAT in a matter of months.

16   She's graduating in a matter of months.  You don't have to

17   graduate college to apply to medical school.  Most people are

18   still in college when they apply.  The MCAT thing is a

19   requirement but the question is does she intend to fulfill that

20   requirement?  She does.  She's already toured the campus of

21   this medical school and it's her dream to go there.  She's from

22   California.  She is actually taking a fifth year in college in

23   order to get a medically-related minor to bolster her

24   application.  She's gotten her grades up.  She's very, very,

25   very sincere in her intent to apply to this school and she will

1  do so in a matter of seven months.

2        **THE COURT:**  You said she's already toured the campus.

3  This is beyond the scope of the pleadings but I'm going to ask

4  nevertheless.

5        Was that an official tour?  Did the school welcome

6  her?  Did she identify who she was and what her background and

7  characteristics were and the school said, yeah, you're -- we'd

8  love to give you a tour, or words to that effect?

9        **MR. NORRIS:**  That level of specificity is not in the

10  complaint (inaudible) because I don't know the answer.

11        **THE COURT:**  I know it's -- okay, you don't know the

12  answer.

13        **MR. NORRIS:**  Yeah.  What I understand it to be is

14  that she has her best friend growing up currently attends the

15  medical school and loves it and maybe she was going to visit

16  that friend and went and did a tour sort of informally that

17  way.  But she's very much in the process and is about to start.

18        So I think if it's too late after you apply and get

19  rejected, it certainly can't be too early if you're gearing up

20  for the very next cycle.  I think that person should have

21  standing.

22        **THE COURT:**  So are you also saying that if I grant

23  Defendants' motion on this particular point, that the

24  individual who's been described in the pleading isn't --

25  doesn't have sufficient characteristics to convey standing to

26

1    the organization?  Are you saying, well a few months have

2    passed, things have changed and now she does fit the -- now she

3    does have the characteristics necessary?  So are you saying

4    it's kind of a -- it's a moot exercise?  You could do it but

5    come on.

6         **MR. NORRIS:**  I'd say it's one of those cases where

7    you should use your discretion to rely on the standing of one

8    plaintiff instead of looking plaintiff by plaintiff because

9    it's not going to accomplish very much.  And in fact, as I

10   mentioned, she's registering for the MCAT right now so we're

11   almost already up to that point.

12        **THE COURT:**  Okay.  I understand your argument there.

13        **MR. NORRIS:**  Thank you, Your Honor.  I don't have

14   anything further on whether this could be a -- whether the

15   class allegations can be dismissed at this stage.  I think the

16   caselaw is very clear that it's too early for that.

17        I don't have anything further on punitive damages

18   except to say --

19        **THE COURT:**  Let's see.  The class action allegations,

20   I'm looking at Page 27 of the first-amended complaint.

21        Defendant -- Defendants made the argument that the

22   individual, Ms. Mahoney, the individual plaintiff, doesn't even

23   fit within the injunctive subclass as set forth in the first-

24   amended complaint.  Can you respond to that?  Are Defendants

25   correct?

1          **MR. NORRIS:**  Well I believe she does not -- she does

2     not need relief from their no-transfers policy because she is

3     not currently attend another medical school.  That is true.  We

4     can debate whether she needs relief from the no-fourth

5     applications policy.  It happens to be true that this is her

6     third application.  We didn't say otherwise in the complaint.

7     We actually said in the complaint that she's applied multiple

8     times and we give an example of 2023 but we didn't say that was

9     the only time.  This is her third application so she does fit

10    that criteria.  But I don't think any of this matters.  They

11    make this as a typicality argument under 23(a).  To be typical

12    you don't have to have the same claims or the same relief or

13    the same injuries as the entire class.  They just have to have

14    the same core.  And the core, what happened to Ms. Mahoney and

15    what happened to the proposed class is the same.  They were

16    discriminated against by having to participate in a race-based

17    system where race is considered as a factor in admissions.  She

18    wants, at the core, relief in the form of an injunction

19    stopping them from using race.

20          She also understands that there will be class members

21    who in order to get any benefit from that will need relief from

22    the transfers policy and the no-fourth applications policy.  I

23    think her asking for that relief makes her a good

24    representative.  She's looking out for the class members who

25    need that relief.  It does not defeat typicality.

1          **THE COURT:**  Why did you put this much detail in the

2     complaint at this point?  We're not yet at the motion for class

3     certification stage.  Did you say too much?

4          **MR. NORRIS:**  Perhaps.  If we had said too little,

5     there would be something that says you need to dismiss this

6     because their class definition is too vague, we can't tell what

7     it is that they want you to certify.  So you had to pick your

8     poison a little bit.  We tried to be as specific as we could

9     be.  We also tried to model off the *Gratz* (phonetic) decision.

10    So *Gratz* is really important because the Supreme Court said not

11    only was this a class action but it should have been a class

12    action and that was correct, a correct way to approach a race-

13    based admissions case.  And so it pretty closely models the

14    *Gratz* definition.

15         I think the one difference is we said non-Black

16    instead of class members who are not members of a preferred

17    race and leave it sort of open-ended as to which races are

18    being preferred.  I think that's because that matches the

19    allegations in the complaint based on the information we have

20    so far.  But if that information changes and it turns out that

21    that Native American, for example, get a preference in

22    admissions that's just as large as Black applicants, then we'll

23    come to you and ask you to change that class definition to

24    match the actual facts which I think as Your Honor mentioned is

25    something that happens quite often when you have the benefit of

1  some discovery after you've filed.

2        The punitive damages question, Your Honor, I just

3  would point again to the Supreme Court's decision in the

4  *Colstead* (phonetic) case that we cite, that intentional

5  discrimination alone qualifies you for punitive damages.

6        **THE COURT:**  So you've said enough at least with

7  respect to former Chancellor Block to entitle you at this point

8  at the pleading stage to seek punitive damages.  Is that your

9  point?

10        **MR. NORRIS:**  Correct.  And it's really easy because

11  he can be held vicariously liable as a supervisor to Dean

12  Lucero.  I think we clearly allege intentional racial

13  discrimination by Dean Lucero so he could -- that *Colstead* also

14  says you could be vicariously liable in a way that makes you

15  liable for punitive damages as well so long as the test under

16  federal law for vicarious liability is met.  We believe that we

17  pleaded it's met.  He condoned, acquiesced and ratified,

18  supported, did not control, train, supervise, fire, Dean

19  Lucero, despite all of the public allegations as to what was

20  going on.

21        **THE COURT:**  Okay.  I understand your argument there.

22        **MR. NORRIS:**  Move to Ex Parte Young and current

23  chancellor.

24        **THE COURT:**  Yes, please.

25        **MR. NORRIS:**  To answer Your Honor's question, we do

1   not seek damages against any individual in their official

2   capacity.  So we only seek forward-looking relief against the

3   current chancellor and then Dean Lucero as well.

4           We read Your Honor's tentative ruling.  It has some

5   overlap here with respect to the chancellor question.  I think

6   our case is different for three reasons.

7           **THE COURT:**  Please.

8           **MR. NORRIS:**  Number one is that there is -- it is

9   unchallenged that we can sue Dean Lucero under Ex Parte Young.

10  So there is an individual defendant who should survive this

11  motion to dismiss because it's not even challenged.

12          Number two is we have a stipulation that we entered

13  with on the other side that in exchange for dropping a whole

14  lot of defendants, we had the president of the whole UC system,

15  we had all sorts of people, we had the dean of the medical

16  school, we agreed to drop all of those people in exchange for a

17  stipulation that said, any relief against Chancellor Frank in

18  his official capacity would be binding on the medical school

19  itself.  My friends don't like me to call that a waiver or

20  sovereign immunity.  You don't have to call it that.  That is a

21  stipulation that guarantees the predicate for Ex Parte Young is

22  satisfied, that when you enter relief against the chancellor in

23  hits official capacity, that relief will bind and change the

24  policies of the medical school.

25          **THE COURT:**  Is that stipulation of record in this

1   case?

2           **MR. NORRIS:**  It is, Your Honor.  We filed it in

3   conjunction with voluntarily dismissing several defendants.  It

4   is cited in this portion of our brief.  I do not have the

5   docket number with me, I apologize.

6           **THE COURT:**  ECF 27?

7           **MR. NORRIS:**  That sounds right, that sounds right.

8           **THE COURT:**  I think I said 27 in the other case --

9           **MR. NORRIS:**  -- but it's 27 in this case, correct.

10          **THE COURT:**  Right.  Okay.

11          **MR. NORRIS:**  Right.  And the last thing is Your

12  Honor's dismissal in the SARD case -- tentative dismissal,

13  sorry, in the SARD case said that the Court was not convinced

14  that there couldn't be more allegations that sort of bridged

15  the gap with respect to the chancellors in that case.  I think

16  our complaint has additional allegations that do this for

17  Chancellor Frank.  So we cite or we quote from the Regent's

18  Bylaw 31 which says:

19              "The chancellor of each UC school has the authority

20              over all policies and all employees and staff."

21          **THE COURT:**  Paragraph of the complaint, please?

22          **MR. NORRIS:**  Yes.  I believe that's 21.  It is where

23  we discuss -- it the underneath the parties and it's where we

24  introduce Chancellor Frank as a party.

25          **THE COURT:**  Okay, I'm there.  Say it again, please,

1   your point here.

2        **MR. NORRIS:**  We are quoting from The Regents Bylaw 31

3   and it lists off your authority as a chancellor of a UC school

4   and how that makes you the chief executive of that school.

5   That bylaw goes on to say you have authority over all policies

6   and all staff and all operations of all UCLA schools in this

7   context.  My friends say that doesn't say "admissions".  Our

8   point is that it says "all" which would include admissions.

9        The other thing that we have in our complaint that I

10  think my friends don't appreciate is we have a lot of

11  allegations about former Chancellor Block.  And we think those

12  allegations show that the chancellor of UCLA has quite an

13  active role with respect to allegations that the admissions

14  process is breaking the law.  Chancellor Block was the leader -

15  - lead investigator, lead spokesperson, the face of every time

16  that the UCLA admissions process was accused of being broken or

17  discriminatory or illegal.  Took a very active role.  He has

18  the job that Chancellor Frank now has and so we think that, at

19  least at the pleading stage, draws a reasonable inference that

20  the chancellors' job duties include monitoring the admissions

21  policies of all the schools to ensure they comply with the law.

22        That's also what the Ninth Circuit's decision alludes

23  to in the *Coalition Defending Affirmative Action* case where --

24        **THE COURT:**  In the say again case?

25        **MR. NORRIS:**  The Coalition for the Defense of

1   Affirmative Action.  I think I might be butchering the name of

2   the plaintiff, the case against Governor Brown that's actually

3   challenging the constitutionality of Prop 209.

4           **THE COURT:**  Yes.

5           **MR. NORRIS:**  In that case the Ninth Circuit says the

6   whole -- the president of the entire UC system is a proper Ex

7   Parte Young defendant in a case alleging the -- about their use

8   of race in admissions because the buck stops with him.  He's

9   the top of the pyramid of the UC system.  We think, under Ex

10  Parte Young, we can't be worse off because we went lower down

11  the pyramid.  We found the person who the buck stops with with

12  respect to UCLA.

13          **THE COURT:**  This coalition case, can you give me the

14  citation?  I'll confess I didn't focus on that.

15          **MR. NORRIS:**  Yes, sorry, one second, Your Honor.

16      (Pause)

17          **THE COURT:**  Oh, here.  CDAA against Brown?

18          **MR. NORRIS:**  Yes.

19          **THE COURT:**  Okay.

20          **MR. NORRIS:**  It's 674 F.3d 1128.

21          **THE COURT:**  Got it, yep, I have it, thank you.  Now

22  I'm tracking you.

23          **MR. NORRIS:**  The UC president is by the way one of

24  the defendants that we agreed to drop in this case in exchange

25  for that stipulation about the UCLA chancellor so but same

1    principle, the buck stops with the chancellor with respect to

2    anything illegal happening at any of the UCLA schools.

3         With that, Your Honor, I think the last thing I'd

4    like to talk about, barring further questions from the Court,

5    is the UNRA Act claim.

6         **THE COURT:**  Yes.

7         **MR. NORRIS:**  And our point is this on the business

8    establishment point, in particular, which is, we are not saying

9    that UCLA Medical School is a business establishment.  We're

10   not.  We don't have to.  All of the cases, their cases and our

11   cases say that under UNRA, it is a functional conduct specific

12   test.  You don't have to ask whether someone is a business all

13   the time.  The question is, for most institutions, including

14   schools, even cities, governmental entities, non-profits,

15   hospitals, they always act sometimes in a business-like

16   capacity.  And so the *Brennan B* case (phonetic) from the

17   California Supreme Court says:

18         "The question is, how were you acting when you

19         discriminated?  Were you acting in a sufficiently

20         business-like capacity?"

21         And we think our complaint alleges that the process -

22   - the admissions process of the medical school is sufficiently

23   business-like to trigger the UNRA Act.  And there are several

24   reasons for that.  The *Brennan B* decision is actually quite a

25   bit narrower than it seems.  It says that at least public K

1  through 12 schools are not business establishments when they

2  act in their core educational capacity.  No one is educating

3  anyone in the admissions process.  They're not teaching,

4  they're not disciplining, there's no classroom, they're not

5  even students.  The people that are being discriminated against

6  are by definition non-students.  They solicit applications from

7  across the country.  The people who are rejected never become

8  students at UCLA.

9        The process also charges fees.  It generates

10  substantial revenue for the medical school through the

11  application process.  And the whole enterprise looks like what

12  a business would do.  They market, they advertise, they go out

13  and solicit applications.  They are trying to keep the number

14  of applications high and the number of acceptances low because

15  that increases the value of a Geffen Medical School degree.

16  They're in competition with other schools for the same group of

17  students.  It's very outward facing.  And really at the very

18  bottom, what is the decision?  The decision is to offer a

19  contract, a contract to a student where they agree to pay the

20  medical school over I think last time I checked it's about

21  $100,000 a year to attend the school.  It's a lot of money.

22  And in exchange they're agreeing to give certain services in

23  return.  That is the -- that is a contracting.  That's the

24  conduct that actually was why the Michigan undergraduate school

25  was allowed to be sued in *Gratz* under 1981 because they were

 1  involved in contracting.

 2          We're not saying, Your Honor, that this won't -- this

 3  debate won't reemerge at summary judgment but we think we've

 4  alleged that the admissions process is sufficiently business-

 5  like.  They may have responses to that that no, you should

 6  actually treat admissions like part of the educational

 7  enterprise that's covered by the *Brennan B* decision but they've

 8  not briefed that.  I think the first time that that type of

 9  argument even emerges is in their reply brief and I don't think

10  any of that's supported by the face of our complaint and this

11  is 12(b)(6) challenge.  I think our complaint has to be

12  accepted as true and not gone outside of.

13          **THE COURT:**  Okay, I understand your argument there.

14          **MR. NORRIS:**  I'd be happy to talk.  There's also a

15  state law immunity argument.  I think I'll leave that very

16  briefly and just say, state law immunity requires the medical

17  school to have the discretion, the policy discretion to be

18  immune.  Public schools in California do not have the

19  discretion to use race in admissions because Prop 209 as a

20  matter of constitutional law takes that away from them.

21          **THE COURT:**  Okay, I understand.  Thank you.

22          **MR. NORRIS:**  Thank you.

23          **THE COURT:**  Ms. Ellsworth, did you want to offer any

24  reply argument?

25          **MS. ELLSWORTH:**  I do.  Thank you, Your Honor.

1          To the point Mr. Norris made -- and my apologies,

2    Mr. Norris for calling you Mr. Strawbridge during my whole

3    argument -- about only one plaintiff needing standing --

4          **THE COURT:**  Yes.

5          **MS. ELLSWORTH:**  -- it's not clear to me that that is

6    good law as it relates to claims for damages, first of all.  It

7    is only ever invoked in the cases, at least cited by the

8    plaintiffs, for injunctive relief and there is a claim for

9    damages here.

10          But perhaps more relevantly, after *Trump versus CASA*,

11    which has made quite clear the breadth of injunctions cannot

12    reach beyond the parties, I think Ms. Mahoney is similarly

13    situated to the pregnant plaintiff referred to in Justice

14    Barrett's decision in *Trump versus CASA* which is to say

15    enjoining that executive order as to the pregnant plaintiff

16    gives her all of the relief that she's entitled to.  The same

17    would hold for Ms. Mahoney enjoining whatever practices are

18    alleged to be at issue as to Ms. Mahoney gives her all complete

19    relief that she is entitled to.

20          So I would suggest that the Court both should

21    actually reach the standing questions as to all plaintiffs and

22    shouldn't take the defendants' invitation that it need not

23    consider standing as to the two associational plaintiffs.

24          **THE COURT:**  I do have discretion, though?

25          **MS. ELLSWORTH:**  I -- there are cases that say that

1   when seeking injunctive relief, if one plaintiff has standing

2   the Court has discretion not to consider the other plaintiff's

3   standing.  There are many, many cases where courts choose not

4   to exercise that discretion, particularly as it relates to

5   associational plaintiffs and concludes that certain

6   associational plaintiffs don't have standing and others may.

7   So to the extent the Court does have discretion in this claim

8   for damages -- which it's not clear to me based on the caselaw

9   it does -- and certainly based on Trump versus CASA, we don't

10  think that discretion should be exercised here and we think

11  standing needs to be established as to all plaintiffs for

12  purposes of this case.

13          **THE COURT:**  An interesting linkage to Trump v. CASA.

14          **MS. ELLSWORTH:**  I do want to speak to the question

15  about the SFFA member who is hopefully signing up for the MCAT

16  soon.

17          **THE COURT:**  Yes.

18          **MS. ELLSWORTH:**  Lot of statements of intension and

19  willingness and I don't doubt the -- I don't doubt the manner

20  in which she feels about that but the *Carney* (phonetic) case

21  has said statements of intention are not enough to show that

22  one is able and ready.  And so that's *Carney* versus Adams which

23  is a Supreme Court's case.

24          I would also point the Court to another Do No Harm

25  case out of the District of Montana that speaks to the able-

1    and-ready standard.  That I think applies more to the DNH

2    member but that was a case where another member of Do No Harm

3    sought to challenge California -- excuse me -- the Montana

4    Board of Medical Examiners requirements and the Court found

5    that that individual was not able because there were not

6    openings for the county from which that -- in which that

7    individual resided.  I think the same is true here when we look

8    at the no-transfer policy and potentially for Ms. Mahoney, the

9    no-subsequent application policy to the extent that her -- what

10   I now understand to be -- third application is unsuccessful in

11   this round.

12        THE COURT:  What I understood Mr. Norris to say is,

13   well, even if you, Judge, grant the motion, dismiss the two

14   organizations for lack of standing because the individuals

15   we've identified don't quite have the right characteristics, at

16   least one of them already does.  A couple months have passed,

17   things have changed so it's kind of a futile exercise.  You

18   want us to do it, we'll do it.  Is he right?

19        MS. ELLSWORTH:  Article III requires standing at the

20   time that you file a complaint and it requires standing to be

21   maintained throughout the case. So I don't think it's futile, I

22   think it's what Article III requires.  And as I noted and as

23   the Court did as well, if there are this many members of these

24   organizations, the individuals they've chosen to rely on should

25   be individuals who had standing at the time the complaint was

1    filed.

2         **THE COURT:**  So fair enough but cannot Plaintiffs file

3    a supplemental complaint saying, well, maybe it wasn't true

4    then but as of today, the date the supplemental complaint is

5    filed, we fixed the problem, we got standing, we're good to go.

6    Doesn't that do it?

7         **MS. ELLSWORTH:**  I would submit I don't think that's

8    sufficient.  I think in order to actually demonstrate able --

9    ableness and readiness, they need more than just "I've signed

10   up to take the MCAT."  I mean the typical -- the prototypical

11   fact pattern here is an individual like Ms. Mahoney who has

12   applied and not been admitted.  To some degree that's because

13   these individuals may apply and be admitted and then I don't

14   know that they would be able to supply either of these

15   organizations with their standing and that's a reason for the

16   able and readiness requirement.  So I don't think that that

17   solves it and I do think they were required to have somebody

18   who could supply standing at the time they filed the complaint.

19   If they need to substitute as the cases go on, that's a

20   different fact pattern.

21         **THE COURT:**  Did that happen in the Harvard case?

22         **MS. ELLSWORTH:**  It did, Your Honor.

23         **THE COURT:**  Okay.  Okay I --

24         **MS. ELLSWORTH:**  But they had individuals who had

25   applied and been rejected at the time the complaint was filed,

1   at least one.

2           I do want to address the stipulation, ECF 27.

3           **THE COURT:**  Yes, please.

4           **MS. ELLSWORTH:**  And we mentioned this in our reply

5   brief but that stipulation says that Defendants do not waive

6   any defenses as a part of the stipulation.  The defense,

7   including the sovereign immunity defense that we raise on

8   behalf of Chancellor Frank, that is Paragraph 5 of the

9   stipulation that's at Document -- or ECF Entry 27.  "We do not

10  waive any defenses or objections by agreeing to the

11  stipulation."  So it is both inaccurate to suggest that that

12  stipulation waived sovereign immunity but also I think the

13  point that is being made by the stipulation was simply to try

14  and get a large number of individual defendants, all of whom

15  the plaintiff needed to determine how to serve, et cetera, out

16  of the case in order to allow the case to move forward on the

17  issues that matter.

18          I do want to address the UNRA Act very briefly.

19          **THE COURT:**  So you don't concede that Defendants have

20  essentially conceded sovereign immunity or waived sovereign

21  immunity with respect to was it Chancellor Frank?

22          **MS. ELLSWORTH:**  It's Chancellor Frank that is alleged

23  -- I guess the defendants allege that we waived it by saying we

24  don't waive any defenses or objections in this stipulation.

25          **THE COURT:**  But you do say that any relief that

1   Plaintiffs may obtain against Chancellor Frank are -- can be

2   imposed against the medical school.

3          **MS. ELLSWORTH:**  Well we say -- what Paragraph 4 of

4   the stipulation is a representation that injunctive or

5   declaratory relief against the university and/or the remaining

6   individual defendants in their official capacities will apply

7   to and be binding.

8          **THE COURT:**  Will apply to -- say the last part.

9          **MS. ELLSWORTH:**  And be binding.

10         **THE COURT:**  And be binding.  Okay.

11         **MS. ELLSWORTH:**  That doesn't --

12         **THE COURT:**  How is that different from a waiver of

13   sovereign immunity?

14         **MS. ELLSWORTH:**  Well because it doesn't suggest that

15   they would actually obtain any injunctive or declaratory relief

16   and/or the remaining defendants.  And it has the university in

17   here which is The Regents as a body which we were discussing in

18   the prior argument.

19         **THE COURT:**  Okay.  I understand your argument.

20         **MS. ELLSWORTH:**  As to the UNRA Act --

21         **THE COURT:**  Yes.

22         **MS. ELLSWORTH:**  -- I'd point the Court to both the

23   *Norty* case (phonetic) and the *Brinkley* (phonetic) case, both

24   cited in our reply brief.  One -- *Norty* is against the

25   University of California, The Regents.  It actually relates to

43

1    UCLA.  And the *Brinkley* case is against California State

2    University.  Those are both California Court of Appeals cases

3    from 2002 -- sorry -- 2022 and 2024, both of which find that

4    these public universities are not business establishments for

5    purposes of UNRA Act liability.

6           **THE COURT:**  What page of your reply brief?

7           **MS. ELLSWORTH:**  Page 13 of the reply brief.

8     (Pause)

9           **THE COURT:**  *Norty* and *Brinkley*, okay, gotcha.  I'm

10   tracking now.  Thank you.

11         **MS. ELLSWORTH:**  And those -- both cases, again, found

12   UNRA Act liability was not available against these two public

13   universities.  The question, as I think Your Honor is well

14   aware, is whether the challenged conduct is a core educational

15   capacity.  And nothing could be more core to educating students

16   than admitting and determining which students to admit.

17        To the extent that there were a claim again UCLA that

18   related to some other form of contracting, software licenses,

19   something along those lines, that would be a different argument

20   about whether that public university could be a business

21   establishment for purposes of that type of a claim.  But here,

22   where the claim relates to admissions, that does fall within

23   the core educational capacity that *Brennan B* but also these

24   *Norty* and *Brinkley* cases have found brings conduct outside of

25   the scope of the UNRA Act.

44

1          **THE COURT:**  Did *Norty* and *Brinkley* involve

2   admissions?

3          **MS. ELLSWORTH:**  *Norty* involved I believe a Ph.D.

4   program and *Brinkley*, I would have to remember, I don't believe

5   it involved admissions.

6          **THE COURT:**  Okay, I'll take a look, closer look at

7   those cases.

8          Okay.  What else?

9          **MS. ELLSWORTH:**  Unless the Court has further

10  questions, I don't have anything else to address.

11      (Pause)

12         **THE COURT:**  No, I -- you've given me lots to think

13  about.  I don't have any further questions.

14         **MS. ELLSWORTH:**  Thank you, Your Honor.

15         **THE COURT:**  Anything else on the motion?  Anything

16  from Plaintiffs?

17         **MR. NORRIS:**  Your Honor, could I say one quick thing?

18  I just --

19         **THE COURT:**  You may.

20         **MR. NORRIS:**  -- omitted from my presentation?

21         **THE COURT:**  You may.  I'm going to give Ms. Ellsworth

22  the last word if she wants it but please.

23         **MR. NORRIS:**  I'll leave it to this one small point, I

24  meant to say this.

25         Your Honor's tentative ruling in the other case said

1   that associations can seek nominal damages.  Do No Harm seeks

2   nominal damages for the past rejection of its member.  So I

3   don't think Do No Harm can be dismissed as a plaintiff because

4   it would at least have that damages claim even if it does not

5   have standing to seek forward-looking relief.  And my friends

6   don't contest that Do No Harm can seek damages.

7         **THE COURT:**  Okay.  Response to that?

8         **MS. ELLSWORTH:**  We don't contest at this stage that

9   Do No Harm might be entitled to seek nominal damages.  That

10   would only be for backwards-looking relief so Do No Harm would

11   not be entitled to seek some sort of injunctive or forward-

12   looking relief either on the transfer policy or anything else.

13         **THE COURT:**  So what would I say in my order?  Motion

14   is denied with respect to a standing challenge to Do No Harm?

15   But do I strike certain allegations?  I'm not sure -- I'm not

16   sure I'm there.  But if this is the point of contention, how do

17   I draw the line?

18         **MS. ELLSWORTH:**  Well, I think it has to do with which

19   plaintiffs can seek what types of relief.  So if the Court were

20   to agree that SFFA -- the SFFA member is insufficiently able

21   and ready, then SFFA would be dismissed from the case entirely

22   unless Your Honor grants repleading.

23       If the Court were to conclude to agree that the DNH

24   member cannot seek forward-looking relief because of the no-

25   transfer policy -- maybe I've gotten confused as to which is

1    which --

2            THE COURT:  I'll sort it out.

3            MS. ELLSWORTH:  Okay.  Then I think the Court's order

4    would have to say that the Do No Harm plaintiff could maintain

5    a claim for backwards-looking nominal damages only on behalf of

6    either this one member or any other members that may come forth

7    to show that in fact were denied admission.  I don't know if

8    there's anyone else other than this one individual they've

9    identified in the complaint.

10           THE COURT:  Okay.  I understand.

11           All right.  Anything further on the motion?

12           MR. NORRIS:  No, Your Honor.

13           THE COURT:  All right.  Thank you very much for the

14   robust argument and the briefing.  Again, it's I appreciate the

15   efficiency with which you have presented these issues to me.  I

16   am going to take the motion under submission.

17           So let's move to the scheduling conference.  I

18   already telegraphed that my preference here would be to set a -

19   - set a briefing schedule on the anticipated motion for class

20   certification and then set the rest of the case schedule after

21   that issue has been decided one way or the other.  And of

22   course that assumes that the class certification piece survives

23   this particular challenge so it's without prejudice to being

24   revisited if -- depending on what happens with this motion to

25   dismiss.

1          But anyway, class certification schedule.  Where in

2  the Rule 26(f) report or elsewhere did you tell me what you

3  propose for a briefing schedule and class certification?

4  Mr. Norris, do you know?

5          **MR. NORRIS:**  Your Honor, I believe we agreed on a

6  deadline to file the initial motion.  I don't think we

7  articulated the briefing schedule and I don't think we

8  contemplated this being the first thing that occurs sort of as

9  a major anchor in the schedule.

10         **THE COURT:**  Well let's go to that point.

11         Does Plaintiff push back on that?  Does Plaintiff

12  want me to set the whole case schedule and we'll just see what

13  happens on class certification?

14         **MR. STRAWBRIDGE:**  I'm sorry, Your Honor.  Yes, we

15  would prefer we set the whole schedule and work the class

16  certification into it without -- obviously don't want to offend

17  the Court by departing too far from its preferred practice but

18  that would be our preference.

19         **MS. ELLSWORTH:**  And Your Honor, just to situate you.

20  In Paragraph 18 of the 26(f) report on Page 12, the parties

21  noted the deadline for Plaintiff to submit the motion for class

22  certification would be 90 days before the close of discovery.

23         **THE COURT:**  Okay.  So you did it in a relative

24  manner.

25         **MR. STRAWBRIDGE:**  And I guess the only other note

1  that I would make, Your Honor, is I do think it is true that in

2  this case, a lot of discovery on class certification is going

3  to overlap heavily with the merits discussion which I think is

4  why the parties approached this the way they did, although I

5  don't want to speak for Ms. Ellsworth.

6          **MS. ELLSWORTH:**  That's correct.

7          **THE COURT:**  Okay.  So Plaintiff wants me to set the

8  whole case schedule.  Defendant?

9          **MS. ELLSWORTH:**  We ask you to hold pending the

10  outcome of the motion to dismiss but having --

11          **THE COURT:**  Well isn't it clear that based on what's

12  been conceded that at least something is going to -- something

13  is going to move forward.

14          **MS. ELLSWORTH:**  That's correct, Your Honor.

15          **THE COURT:**  Okay.

16          **MS. ELLSWORTH:**  We've agreed on -- I believe we have

17  an agreed-upon schedule with the plaintiffs that --

18          **THE COURT:**  So you want me to adopt -- so the

19  defendants want me to adopt your proposed schedule for the

20  entire case?

21          **MS. ELLSWORTH:**  That's right.

22          **THE COURT:**  Or do what I usually do and only deal

23  with class certification at this schedule conference?  You want

24  me to do the whole schedule?

25          **MS. ELLSWORTH:**  Your Honor, we would prefer the whole

49

1  schedule because I --

2          **THE COURT:**  Good enough.

3          **MS. ELLSWORTH:**  -- for the reasons Mr. Strawbridge

4  stated.

5          **THE COURT:**  Good enough.  Jury trial in this case.

6  We've got a jury demand, right?

7          **MR. STRAWBRIDGE:**  Yes, Your Honor.

8          **THE COURT:**  And okay.  All right.  Let me look at

9  these dates.

10     (Pause)

11          I think your trial date is fine.  June 28th, 2027.

12  I'm going to set it for a 10-day jury trial at this point.  We

13  can revisit that based upon what is left in the case or not

14  left in the case but for the time being I'll set that.

15          Madam Clerk, we don't have a problem with that date,

16  correct?

17     **(Pause; Court and Clerk confer)**

18          That's far enough out that I -- the information I

19  have I don't think it's --

20          **THE CLERK:**  Yeah.

21          **THE COURT:**  We're okay, all right.

22          So June 28th, 2027, I'll set for the jury trial.

23          Final pretrial conference, June 11th, 2027 at 1:00

24  p.m.

25          Deadline for hearing motions in limine, June 4th,

1    2027.

2            Deadline for me to hear dispositive motions, April

3    16th, 2027.

4            Let me come back to the settlement conference date.

5            All discovery cutoff, June 15th, 2027.

6            Deadline for rebuttal expert disclosures, December

7    18th, 2026.

8            Deadline for initial expert disclosures, October

9    16th, 2026.

10            You've got a later date for the settlement conference

11    than I would prefer.  You heard me in the other case set it for

12    before the deadline for hearing dispositive motions.  I'd

13    rather set it for some time in February or March, probably

14    February.  Pushback?

15            **MR. STRAWBRIDGE:**  No objection, Your Honor.

16            **MS. ELLSWORTH:**  That's fine, Your Honor.

17            **THE COURT:**  Okay.  Let's set the deadline for

18    settlement conference as February 12th, 2027.

19            **MR. STRAWBRIDGE:**  One note, Your Honor.

20            **THE COURT:**  Please.

21            **MR. STRAWBRIDGE:**  I just think you might have

22    misspoke when you were reading off the dates but I think you

23    said all discovery cutoff on June 15th and the parties had

24    proposed January 15th which obviously makes more sense with the

25    rest of the dates.

1          **THE COURT:**  It does.  If I said June I misspoke.  I

2   meant to adopt what you had proposed.  Thank you.

3          So January 15th, 2027 for all discovery cutoff.

4          And February 12th, 2027 for the deadline for a

5   settlement conference.  I'll send you to private mediation?

6          **MR. STRAWBRIDGE:**  Yes, I think that's most effective.

7          **THE COURT:**  In this case like in the other case, do

8   you not hold out much hope for resolution?

9          **MR. STRAWBRIDGE:**  Well it depends on what one reads

10  in the newspapers every now and then but we'll -- I guess we

11  shall see.

12          **THE COURT:**  Okay.  Now, for the class certification

13  motion, you suggest the deadline to file is 90 days before

14  discovery cutoff which would be --

15          **MR. STRAWBRIDGE:**  Would be October 15th if I'm doing

16  the math correctly.

17          **THE COURT:**  So October 16th, 2026, that's a Friday.

18          **MR. STRAWBRIDGE:**  Yes, that's fine.

19          **MS. ELLSWORTH:**  That's fine, Your Honor.

20          **THE COURT:**  So the normal -- as you know from the

21  Local Rules, the normal sequence for motions is, motion if it's

22  filed on a Friday for me, opposition a week later, reply a week

23  later, hearing two weeks later.  Does that work?

24          **MR. STRAWBRIDGE:**  I think that's fine.  The

25  opposition is probably the bigger deadline there.

1          **MS. ELLSWORTH:**  Right.  We probably would prefer more

2    than a week to oppose class certification.  I don't know if the

3    Court has a practice with class certification of adjusting

4    those deadlines at all?

5          **THE COURT:**  I do.  I usually do whatever the parties

6    want.  Sometimes they want a significant period of time.  I

7    usually give it to them if they want it.

8          **MR. STRAWBRIDGE:**  I guess my thought is and we could

9    also meet and confer about this if that'd be easier for the

10   Court and propose something, or we can hash it out right now.

11   I don't mind adjusting the time frame.  The class certification

12   motions I think takes more time but if we're going to do that,

13   I don't want it to go so far that we're getting into the other

14   deadlines I guess.

15         **THE COURT:**  Let's do this.  I'm going to set a

16   hearing on the motion for class certification which will, per

17   the Local Rules, by default, set that schedule.  Meet and

18   confer if you want to stipulate to a briefing schedule, given

19   that hearing date you're welcome to do that and I encourage you

20   to do that.

21         Let me set the hearing on class certification on a

22   standalone day as opposed to a normal Friday because it may

23   take longer.

24         Madam Clerk, how is November 17th, 2026?  That's a

25   Tuesday.

1          **(Pause)**

2              **THE COURT:**  Okay.  All right.  So the hearing on

3    class certification -- on the motion for class certification

4    will be set for Tuesday, November 17th, 2026 at 10:00 a.m.  And

5    again, I encourage you to file a stipulation to set a briefing

6    schedule on that.

7              I had one housekeeping issue.

8              The motion to dismiss the previous complaint, I think

9    it's still pending on our docket.  I'm going to deny that as

10   moot in view of the filing of the first-amended complaint and

11   the subsequent motion to dismiss.

12             No objection?

13             **MS. ELLSWORTH:**  No, thank you, Your Honor.

14             **THE COURT:**  Okay.  So ECF 46 -- if I've got that

15   number right -- will be denied as moot.

16             That covers everything that I wanted to cover.  What

17   else do we need to address in this case?

18             **MR. STRAWBRIDGE:**  Nothing from Plaintiffs.

19             **MS. ELLSWORTH:**  Nothing from the defendants.  Thank

20   you, Your Honor.

21             **THE COURT:**  All right.  Counsel, thank you very much.

22   Again, thanks for your efficiency and the quality of the

23   briefing and argument.  I do appreciate it.  I'll try to get an

24   order out on both these cases as quickly as I can.  I wish you

25   luck with your discovery and I'll see you next time I see you.

54

1          Thank you very much.

2          **MS. ELLSWORTH:**  Thank you, Your Honor.

3          **MR. STRAWBRIDGE:**  Thank you, Your Honor.

4          **THE CLERK:**  All rise.  Court is adjourned.

5      **(Proceeding adjourned at 10:52 a.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

55

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

November 12, 2025

Signed                                    Dated

*TONI HUDSON, TRANSCRIBER*