HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
JEFFREY MORRISON (MO No. 44401)
Acting Chief, Educational Opportunities Section
JOHN P. MERTENS (CA No. 252762)
Acting Deputy Chief, Educational Opportunities Section
BRIAN REPPER (VA No. 90254)
Trial Attorney, Educational Opportunities Section
Civil Rights Division
U.S. Department of Justice
    950 Pennsylvania Ave. NW
    Washington, DC 20530
    Telephone: (202) 598-9726
    Email: john.mertens@usdoj.gov

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
United States Attorney's Office
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2464
    E-Mail: julie.hamill@usdoj.gov

ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DO NO HARM, et al., <br>     *Plaintiffs*, <br> and <br><br> UNITED STATES OF AMERICA, <br>     *Plaintiff-Intervenor*, <br> v. <br><br> DAVID GEFFEN SCHOOL OF MEDICINE AT UCLA, et al., | Case No. 2:25-cv-04131-JWH-JDE <br><br> **UNITED STATES OF AMERICA'S COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Honorable John W. Holcomb <br> United States District Judge |

1

*Defendants*.

## INTRODUCTION

The United States brings this action to stop the David Geffen School of Medicine at UCLA ("UCLA Med"), part of the University of California at Los Angeles ("UCLA") and itself a part of the State of California, from engaging in race-based admissions in violation of the Equal Protection Clause and the standards recently articulated by the United States Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023). After a long history of moving incrementally away from racial preferences in education, this Nation and its Supreme Court cast off this vestige of our troubled history surrounding race and set out to mandate colorblind admissions in all public (and publicly funded) universities.

Nevertheless, UCLA Med's Associate Dean for Admissions, Jennifer Lucero, boldly states on her official profile that "she takes a special interest in diversity issues in medicine." There is but one legal avenue for a public or publicly funded medical school to pursue diversity in medicine: admit the most qualified candidates regardless of race, and expect that those most qualified candidates will come from every race, because they do.

Racial preferences cause three disastrous outcomes. First, if UCLA Med and other medical schools lower their academic standards to obtain the "right" racial mix, the result is less well academically qualified doctors practicing medicine. Second, by lowering academic standards for certain applicants, patients will question whether their Underrepresented Minority ("URM," meaning Black, Hispanic, Pacific Islander, or Native American) doctor is really qualified to practice medicine and can give them the same quality care as a White or Asian doctor who did not receive preferential admission to medical school. This shadow follows URM doctors throughout their careers, whether or not that doctor needed a preference to be

admitted to medical school. Third, it undermines and delays delivery upon the promise enshrined in the Fourteenth Amendment to the United States Constitution that each state government, including UCLA Med, will treat its citizens equally without regard to their race.

"The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748, 127 S. Ct. 2738, 2768, 168 L. Ed. 2d 508 (2007). The United States intervenes, because ending racial discrimination in our university systems is of general public importance.

## PRELIMINARY STATEMENT

1. This action challenges the constitutionality of a policy and practice of UCLA Med to consider race in medical school admissions.

2. This action was filed by plaintiffs Do No Harm, Students for Fair Admissions, and Kelly Mahoney.

3. The plaintiffs title their first count of their claim for relief "Violation of the Fourteenth Amendment," and expressly assert as the basis for this count that "The Fourteenth Amendment provides, among other things, that no person shall be denied 'the equal protection of the laws.' U.S. Const. amend XIV, § 1." Plaintiffs' Second Amended Complaint, ¶ 132.

4. Count 1 of the plaintiffs' claim for relief asserts that plaintiffs are denied equal protection based on race, because Defendants take race into account to racially balance their medical school classes via racially unequal admissions at UCLA Med. *See* Plaintiffs' Second Amended Complaint, ¶ 134.

5. This Action was brought to seek relief from the denial of equal protection of the laws under the Fourteenth Amendment to the Constitution on account of race. The Attorney General of the United States has certified that this case is of general public importance, and intervenes under 42 U.S.C. § 2000h-2 to seek declaratory relief that UCLA Med has been and continues to consider race in

1  admissions in violation of the Equal Protection rights of Plaintiffs and others who
2  apply to UCLA Med, and to permanently enjoin the violation.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

7. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). Declaratory relief is authorized by 28 U.S.C. §§ 2201-02.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because at least some of the Defendants reside in this District, UCLA Med is located in this District, and a substantial part of the events or omissions giving rise to this claim occurred here.

## PARTIES

9. Plaintiff-Intervenor is the United States of America.

10. On information and belief, plaintiff Do No Harm is a nonprofit organization that advocates against radical, divisive, and discriminatory ideologies in medical education, clinical practice, and research.

11. On information and belief, plaintiff Students for Fair Admissions is a nonprofit organization that advocates for human rights and civil liberties, including equal protection under the law from racial preferences in school admissions that are unfair, unnecessary, and unconstitutional.

12. On information and belief, plaintiff Kelly Mahoney is a qualified college graduate who applied to, and was rejected from, UCLA Med.

13. Defendant the Regents of the University of California is a state agency that operates the UC System. Under Article IX, §9 of the California Constitution, the Regents have the "full powers of organization and government" over the UC System, including UCLA Med. Cal. Const. Art. IX, §9(a). Defendants have stipulated in this case that any injunctive or declaratory relief against the Regents "will apply to and be binding on UCLA and the David Geffen School of Medicine

1  at UCLA." Dkt. 27, ¶ 4.

2      14.    Defendant Julio Frenk is the current chancellor of UCLA. Under the Regents' bylaws, the chancellor is "the executiv[e]" head of UCLA's campuses, including UCLA Med. He sets and has the power to change UCLA's "policies," including UCLA Med's admissions policies and practices. He is also "responsible for the organization, internal administration, operation, financial management, and discipline of [UCLA's] campuses," including monitoring how UCLA Med conducts admissions and overseeing its compliance with federal and state laws banning the use of race in admissions. He further "oversee[s] all faculty personnel and other staff at their locations," including Lucero and everyone who administers admissions at UCLA Med. Frenk is sued in his official capacity. Defendants have stipulated in this case that any injunctive or declaratory relief against Frenk in his "official capacit[y] will apply to and be binding on UCLA and the David Geffen School of Medicine at UCLA." Dkt. 27, ¶ 4.

    15.    Defendant Gene Block was chancellor of UCLA from August 2007 to July 2024. He was chancellor when Lucero was hired, and when UCLA Med adopted and implemented the main policies and practices challenged in this lawsuit. An outspoken critic of Prop 209, Block created and oversaw the implementation of UCLA's "efforts at UCLA to increase representation of African American" students. As chancellor, Block was responsible for addressing allegations that a UCLA school was violating the law in how it conducted admissions, including the allegations in this lawsuit. In response to the "Varsity Blues" sting, for example, Block issued a statement falsely stating that "UCLA is absolutely committed to ensuring that every applicant is considered purely on their merits." And when three separate researchers at UCLA found that the school gave race-based admissions preferences to Black applicants, Block issued a statement falsely stating that "UCLA neither discriminates nor grants preference to prospective students based on race, ethnicity, sex or national origin." Block is sued in his personal capacity.

16. Defendant Jennifer Lucero has been the Associate Dean of Admissions at UCLA Med since 2020. Lucero has significant input on the appointment of the Admissions Committee, and she sits on and deliberates with the Admissions Committee. Lucero also sits on the Admissions Policy and Oversight Committee as an *ex officio* member and has significant influence over UCLA Med's admissions policies. Lucero is sued in her official capacity. Defendants have stipulated in this case that any injunctive or declaratory relief against Lucero in her "official capacit[y] will apply to and be binding on UCLA and the David Geffen School of Medicine at UCLA." Dkt. 27, ¶ 4.

17. UCLA Med is located in this District. On information and belief, Mr. Frenk and Ms. Lucero reside within this District, and the acts complained of by Mr. Block and the Regents took place in this District.

## FACTUAL ALLEGATIONS

### I. UCLA Medical School's Admissions Process

18. UCLA Med is highly selective. Each year, it receives between 11,000 and 14,000 applicants yet matriculates roughly 175 medical students.

19. UCLA Med does not have a minimum GPA or MCAT score that applicants must have before they can apply or be admitted; all completed applications are considered, regardless of MCAT or GPA. According to the admissions office, applicants are even "competitive" for UCLA Med "as long as" their GPA is "over a 3.0." *What Is the Holistic Admissions Approach for Medical School* at 0:41-0:46, David Geffen School of Medicine, YouTube (July 20, 2023), youtube.com/watch?v=482vInqbLVk. If an applicant's grades improved over time, that "upward trend" is also "always looked favorably upon by the [Admissions] Committee." *What GPA Do You Need to Get into Med School at UCLA? Is There a Cut-off?* at 0:28-0:48, David Geffen School of Medicine, YouTube (July 20, 2023), youtube.com/watch?v=LG-fAR75pJs.

20. There is no list of specific courses that applicants must take before they

6

can apply to or attend UCLA Med.

21. UCLA Med reviews applications and makes admission decisions through its Admissions Committee, which consists of approximately 20-30 faculty members. Admissions Committee members can serve up to three five-year terms. About five medical students also sit on the Admissions Committee to provide input on admission decisions. UCLA does not make public who sits on the Admissions Committee.

22. The Admissions Committee's application-review process for the traditional M.D. track generally takes place in the following steps: primary application, secondary application, interview, Admissions Committee deliberation, and decision.

23. **Primary Application**. Applicants submit a primary application through the American Medical College Application Service ("AMCAS"), which is run by the Association of American Medical Colleges ("AAMC"). UCLA Med is a member of AAMC.

24. AMCAS sends the applicant's primary application to the applicant's designated medical schools.

25. The primary application contains the applicant's biographical information (including race), citizenship status, family income, academic background, undergraduate GPA, MCAT score, internship and volunteer experience, and personal statement.

26. UCLA Med receives an applicant's primary application through AMCAS and uses the primary application to initially screen applicants. It purportedly removes the checkbox information for race and ethnicity.

27. UCLA Med requires applicants to take AAMC's PREview Exam, which attempts to measure applicants' professional readiness and situational judgment. The PREview Exam is a multiple-choice test that purports to measure applicants' cultural awareness, cultural humility, empathy and compassion, and

interpersonal skills, among others. The PREview Exam was created by diversity-affairs officers from various medical schools, whom AAMC calls its "DEI constituents," to "level the playing field" for applicants deemed historically underrepresented in medicine. It does so by stressing factors other than academics.

28. It costs $100 to take the PREview Exam. The PREview Exam scores initially get reported to UCLA as part of the applicant's primary application. UCLA Med again asks about the PREview Exam in the secondary application.

29. **Secondary Application**. After primary review, select applicants receive an invitation to submit a UCLA-specific secondary application.

30. The secondary application asks the applicant to submit several open ended responses. For instance, in 2024, UCLA Med asked a series of questions, including the following: "Do you identify as being part of a group that has been marginalized (examples include, but are not limited to LGBTQIA, disabilities, federally recognized tribe) in terms of access to education or healthcare? If you answered "Yes" …, describe how this inequity has impacted you or your community and how educational disparity, health disparity and/or marginalization has impacted you and your community." On its face and by design, this question asks Black applicants to reveal their race so that UCLA Med can know and consider it.

31. After the secondary review, select students get an opportunity to interview with faculty members. The interviews are conducted either in person or remotely by video.

32. After the interviews, the Admissions Committee deliberates on the applications together.

33. After the Admissions Committee deliberates, it ranks the applicants and makes final admission decisions on who to admit.

34. At each step of the process—primary review, secondary review, interview, and Admissions Committee deliberation—the Admissions Committee purports to review each application holistically. Harvard, UNC, and virtually all

other elite universities that openly considered race in admissions before *SFFA v. Harvard* likewise used holistic admissions. *Cf.* 600 U.S. at 257 (Thomas, J., concurring) ("Harvard's 'holistic' admissions policy began in the 1920s when it was developed to exclude Jews."). Notwithstanding *SFFA v. Harvard*, AAMC has encouraged medical schools like UCLA Med to continue using holistic review to "boost racial diversity."

**II. UCLA Med Uses Race as a Factor in Admissions.**

35. In defiance of state and federal law, UCLA Med uses race as a factor in admissions.

36. Both the UC System and UCLA Med have publicly expressed their intent to racially balance the class. UCLA Med's Dean of Admissions, Lucero, both publicly and privately said she uses race as a factor in making admission decisions. And whistleblowers confirm that the Admissions Committee, either led or intimidated by Lucero, use all available methods to glean an applicant's race, openly discuss applicants' race, and use race to hold students to different standards.

37. In the *SFFA* case, the UC System submitted an amicus brief stating that it "implemented numerous and wide-ranging race-neutral measures designed to increase … racial diversity." The UC System also said that, although "Proposition 209 barred consideration of race in admissions decisions at public universities in California," its competitor universities outside of California "must retain the ability to engage in the … consideration of race." Had the Supreme Court adopted that position, it would have made it harder for the UC System to attract minority students. As Chancellor Block once put it, "the most serious competition for UCLA" in trying to enroll Black students is "highly ranked private colleges and universities" openly using race in admissions. The UC System's position at the Supreme Court thus makes no sense unless its schools were still using race, and it hoped that the Supreme Court would say the practice was lawful under federal law.

38. Similarly, in 2024, the UC System said that "system- and campus-level

9

strategies and innovations are being piloted or have been implemented" to "achieve representational diversity in its student body."

39. The UC System further adopted the "UC 2030 Capacity Plan," with the goal of having its student bodies "better reflec[t] California's racial/ethnic … diversity." The UC System President wanted "intentional" "growth" in terms of making "graduate students … better reflect and tap the talent of underrepresented populations who represent the majority of Californians." To support this goal of "mov[ing] the needle on the diversity of graduate students," the Regents "requested graduate professional programs" to "present race/ethnicity data on students and faculty, along with diversity plans within the program."

40. The UC System meticulously measures its racial outcomes in a variety of ways, including by closely tracking the racial demographics of its students. "The whole goal of public universities," according to then-chancellor Block, is to "represent the demographics of the community that we serve."

41. UCLA commissioned a report by Robert Mare to study its admissions process for undergraduates—which, like UCLA Med, uses "holistic" review. Even the Mare report found that, over a two-year span, the admission of nearly one-third of all admitted Black students could not be explained on grounds other than race. In response to this shocking finding, then-Chancellor Block did not order an investigation or any changes to decrease the use of race in admissions. UCLA instead endorsed Mare's study as proof that its holistic admissions were working as intended. Throughout his tenure, Block refused to investigate or make any changes in response to evidence that UCLA was using race in admissions, including credible evidence about UCLA Med.

42. When he was chancellor, Block oversaw UCLA's efforts to achieve "diversity" in admissions, including by "adopt[ing] admissions policies that are designed to draw together a student body that looks like" the country. He often touted each year that the incoming class was "the most diverse" in UCLA's "103-history."

Yet Block elsewhere maintained that "it is nearly impossible to achieve true diversity on our campuses without taking some account of race or ethnicity in admissions."

43. Block created the new position of "vice chancellor for equity, diversity, and inclusion"—as well as new "diversity officers" who reported to the vice chancellor—with the specific mandate to "strengthen campus diversity and equity."

44. In 2020, UCLA Med adopted the "Anti-Racism Roadmap" with the purpose of creating a "path toward racial justice, equity, diversity and inclusion."

45. Under the roadmap, UCLA Med instituted sweeping policies concerning race in its operations:

    a. UCLA Med re-defined "merit" to include "diversity and inclusion initiatives."

    b. UCLA Med committed itself to increasing BIPOC employees and chairs among its faculty and created a special pathway for BIPOC postdoctoral trainees, fellows, and residents to become faculty.

    c. UCLA Med committed itself to creating special opportunities for BIPOC researchers to present seminars, present research, and otherwise participate in research opportunities, including by providing "minority supplements" to NIH grants.

    d. UCLA Med vowed that the medical-student body "should reflect the population of State of California" and adopted a strategic plan to "increase the number of URiM students." The term "URiM" stands for underrepresented in medicine. Its proponents consider all Blacks to be underrepresented and all Whites and Asians to be overrepresented.

    e. UCLA Med vowed collaboration among the Admissions Committee, the Admissions Policy Oversight Committee, and the Faculty Executive Committee to "review and improve diversity to reflect the population of the State of California."

    f. UCLA Med sought the participation of "diverse" medical

11

students and the Equity, Diversity, and Inclusion Office in the admissions process to further its racial goals.

  g. UCLA Med also explained how it would monitor the racial numbers in the admissions process. It explained that it would engage in "strategic planning to improve diversity for all UCLA Health professional students using data-driven, evidence-based approaches." In addition, it would "collect and publicly report data on diversity in all school programs."

46. UCLA Med's Anti-Racism Roadmap has separately been incorporated into the school's diversity statements, which the Admissions Committee applies in reviewing each application.

47. In 2020, UCLA Med named Lucero its Dean of Admissions. Lucero is also the Vice Chair of DEI efforts at UCLA Health, the hospital system affiliated with UCLA Med.

48. Lucero is an outspoken advocate for using race as a factor in admissions and hiring in medical school and healthcare. Lucero has stated her view that every part of society—including academic medicine—is structurally racist. Lucero has stated her view that racism affects admission decisions and impedes DEI efforts. Lucero has also stated her view that comments like "We want diversity, but we also want qualified people" are biased and racist.

49. Lucero has stated in articles and public interviews that it's important to racially diversify medical-school admissions, residencies, and leadership positions in medicine. As Dean of Admissions, Lucero has significant influence over the appointment of Admissions Committee members. Lucero has remade the Admissions Committee to be, what she calls, a "brave space" that both looks racially diverse and is where the Admissions Committee members feel free to further DEI efforts.

50. Consistent with Lucero's beliefs, UCLA Med's current "Guiding

Principles for Student Representation" state that the chair of the Admissions Committee will ensure that medical students who identify as BIPOC are placed on the Admissions Committee to provide their input on admissions.

51. Given the UC System's and UCLA Med's explicit desire to racially balance the student body, and with Lucero at the helm, the Admissions Committee makes admission decisions by using race as a factor.

52. Lucero and her handpicked Admissions Committee take advantage of UCLA's holistic-review procedure to uncover and then use applicants' race.

53. Lucero and the Admissions Committee routinely admit Black applicants with GPA and MCAT scores significantly below the scores necessary for Whites and Asians to be seriously considered for admission.

54. Lucero and the Admissions Committee explicitly discuss and use applicants' race. On one occasion when the Admissions Committee was deliberating on a Black applicant with a significantly below-average GPA and MCAT score, Lucero stated: "Did you not know African-American women are dying at a higher rate than everyone else?" "We need people like this in the medical school."

55. Admissions Committee members report that the bar for underrepresented minorities is "as low as you could possibly imagine" and that the Admissions Committee "completely disregards grades and achievements" for those applicants.

56. Lucero regularly bullies and berates members of the Admissions Committee who voice concerns about admitting below-average Black applicants by labeling them as "privileged" and implying that they are racist.

57. Lucero and the Admissions Committee regularly glean the applicants' race through direct and indirect means. The secondary application even asks questions designed to uncover applicants' race. The interviews further enable the Admissions Committee to know applicants' race and ethnicity.

58. Statistical evidence confirms that Lucero and the Admissions

Committee have been, and are, using race.

59. According to data reviewed by the United States, UCLA Med's class incoming in 2021 has median MCAT scores of 509 for Black and Hispanic, 516 for Asian, and 513 for White matriculants. These correspond to percentile rankings of 77, 93, and 87, respectively.

60. According to data reviewed by the United States, UCLA Med's class incoming in 2022 has median MCAT scores of 508 for Black, 507 for Hispanic, and 514 for Asian and White matriculants. These correspond to percentile rankings of 72, 69, and 88, respectively.

61. According to data reviewed by the United States, UCLA Med's class incoming in 2023 has median MCAT scores of 507 for Black and Hispanic, and 514 for Asian and White matriculants. These correspond to percentile rankings of 68 and 88, respectively.

62. According to data reviewed by the United States, UCLA Med's class incoming in 2024 has median MCAT scores of 508 for Black, 506 for Hispanic, 515 for Asian, and 513 for White matriculants. These correspond to percentile rankings of 75, 66, 90, and 86, respectively.

63. Lucero's and the Admissions Committee's illegal use of race in admissions was known, and caused grave concern, among UCLA Med's faculty members.

64. After receiving multiple complaints for years, UCLA's internal Discrimination Prevention Office, charged with ensuring compliance with Title VI and other laws, sought to investigate Lucero and UCLA Med's admissions practices.

65. Four members of the Admissions Committee initially agreed to participate in that investigation. But the Admissions Committee had required its members to sign a nondisclosure agreement barring any discussion of the Admissions Committee's deliberations. When these four members wrote to UCLA Med's administration seeking written assurance that they would not be retaliated

against for cooperating with the internal probe, the administration refused to give them that assurance. UCLA Med's administration thus effectively shut down UCLA's internal probe.

### III. UCLA Med's Racial Discrimination Has Harmed and Continues to Harm Americans.

66. Americans suffer a "form of injury under the Equal Protection Clause [by] being forced to compete in a race-based system that may prejudice the[m]." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (citation omitted).

67. The United States has an interest in ensuring that its civil rights laws are followed.

## CLAIM FOR RELIEF
### Violation of the Fourteenth Amendment

68. The United States repeats and realleges the preceding allegations.

69. The Fourteenth Amendment provides, among other things, that no person shall be denied "the equal protection of the laws." U.S. Const. amend. XIV, §1.

70. The "central mandate" of equal protection is "racial neutrality" by the government. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). And the "'core purpose' of the Equal Protection Clause" is to "'d[o] away with all governmentally imposed discrimination based on race.'" *SFFA v. Harvard*, 600 U.S. at 206 (emphasis added). "[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000).

71. Defendants through UCLA Med intentionally engage in a system of racial balancing that provides racial preferences in admissions, and thereby treats applicants differently based on their race, all in violation of the equal protection

rights of applicants. UCLA Med uses a "holistic" application review method to disguise this systemic racism.

72. UCLA Med's systemically racist approach to admissions is not justified by any legitimate governmental purpose, nor is it narrowly tailored to meet any purpose, and is illegal under the Fourteenth Amendment as interpreted by the US Supreme Court.

73. Before and certainly after *SFFA v. Harvard*, Defendants knew for certain that UCLA Med should not consider race in admissions. Yet they perpetuated the practice anyway behind closed doors, while falsely denying it in their statements to the public and even to the Supreme Court. When whistleblowers, investigators, and others tried to reveal this discrimination, Defendants acted to conceal it by shutting down internal investigations and baselessly denying public-records requests. Lucero in particular used intimidation and shaming tactics to pressure the Admissions Committee to unlawfully consider race in their decisions—including forcing them to sit through a two-hour lecture by her sister.

## PRAYER FOR RELIEF

The United States asks this Court to enter judgment in their favor and against Defendants and to provide the following relief:

A. A declaratory judgment that UCLA Med's admissions policies, practices, and decisions violate the Constitution by discriminating against applicants on the ground of race.

B. A permanent injunction prohibiting UCLA Med from in any way considering applicants' race when making admission decisions.

C. The appointment of a monitor to oversee all decisions relating to admissions at UCLA Med, to ensure compliance with federal law.

D. Any other legal or equitable relief the Court deems just and proper.

DATED: January 28, 2026.   Respectfully submitted:

HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
JEFFREY MORRISON
Acting Chief, Educational Opportunities Section

*/s/ John P. Mertens*
JOHN P. MERTENS
Acting Deputy Chief, Educational Opportunities Section
BRIAN REPPER
Trial Attorney, Educational Opportunities Section
Civil Rights Division

TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

*/s/ Julie A. Hamill*
JULIE A. HAMILL
Assistant United States Attorney
United States Attorney's Office

ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA