HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
JEFFREY MORRISON (MO No. 44401)
Deputy Assistant Attorney General
JOHN P. MERTENS (CA No. 252762)
Acting Chief, Educational Opportunities Section
Email: john.mertens@usdoj.gov
BRIAN REPPER (VA No. 90254)
Deputy Chief, Educational Opportunities Section
JAMES A. BRESLO (CA No. 162808)
Senior Trial Attorney, Educational Opportunities Section
    Civil Rights Division
    U.S. Department of Justice
    950 Pennsylvania Ave. NW
    Washington, DC 20530
    Telephone: (202) 598-9726

TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
    United States Attorney's Office
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2464
    E-Mail: julie.hamill@usdoj.gov

ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DO NO HARM, et al.,<br>      *Plaintiffs*,<br>  and<br><br>UNITED STATES OF AMERICA,<br>      *Plaintiff-Intervenor*,<br>  v. | Case No. 2:25-cv-04131-JWH-JDE<br><br>**PLAINTIFF-INTERVENOR UNITED STATES OF AMERICA'S NOTICE OF REVISIONS TO COMPLAINT**<br><br>Honorable John W. Holcomb<br>United States District Judge |

1

REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,

*Defendants*.

**TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Pursuant to the Court's Order of July 8, 2026 (Dkt. 103), Plaintiff-Intervenor, United States of America, hereby submits this Notice of Revisions containing a redline showing the amendments made to its Complaint, attached hereto as Exhibit 1.

Dated: July 13, 2026                          Respectfully submitted,

TODD BLANCHE                                  HARMEET K. DHILLON
Acting Attorney General                       Assistant Attorney General
BILAL A. ESSAYLI                              JESUS A. OSETE
First Assistant United States                 Principal Deputy Assistant Attorney
Attorney                                      General
                                              JEFFREY MORRISON
                                              Deputy Assistant Attorney General
*/s/ Julie A. Hamill*
JULIE A. HAMILL
Assistant United States Attorney              */s/ John P. Mertens*
United States Attorney's Office               JOHN P. MERTENS
                                              Acting Chief, Educational Opportunities
                                              Section
                                              BRIAN REPPER
                                              Deputy Chief, Educational Opportunities
                                              Section
                                              Civil Rights Division
                                              JAMES BRESLO
                                              Sr. Trial Attorney, Educational
                                              Opportunities Section
                                              Civil Rights Division

                                              ATTORNEYS FOR PLAINTIFF-
                                              INTERVENOR
                                              UNITED STATES OF AMERICA

3

# EXHIBIT 1

HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
JEFFREY MORRISON (MO No. 44401)
Deputy Assistant Attorney General
JOHN P. MERTENS (CA No. 252762)
Acting Chief, Educational Opportunities Section
BRIAN REPPER (VA No. 90254)
~~Acting~~ Deputy Chief, Educational Opportunities Section
JAMES A. BRESLO (CA No. 162808)
Senior Trial Attorney, Educational Opportunities Section
Civil Rights Division

U.S. Department of Justice
    950 Pennsylvania Ave. NW
    Washington, DC 20530
    Telephone: (202) 598-9726
    Email: john.mertens@usdoj.gov

TODD BLANCHE
~~Deputy~~Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney
United States Attorney's Office
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2464
    E-Mail: julie.hamill@usdoj.gov

ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

DO NO HARM, et al.,

       *Plaintiffs*,

  and

UNITED STATES OF AMERICA,

       *Plaintiff-Intervenor*,

  v.

Case No. 2:25-cv-04131-JWH-JDE

**UNITED STATES OF AMERICA'S FIRST AMENDED COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF AND RESCISSION**

1

EXHIBIT 1

~~DAVID GEFFEN SCHOOL OF MEDICINE AT UCLA, et al.,~~ REGENTS OF THE UNIVERSITY OF CALIFORNIA
    *Defendants*.

Honorable John W. Holcomb
United States District Judge

## INTRODUCTION

The United States brings this action to stop the David Geffen School of Medicine at UCLA ("~~UCLA Med~~DGSOM"), part of the University of California at Los Angeles ("UCLA") and itself a part of the ~~State~~University of California, system operated by the Regents of the University of California (the "Regents"), from engaging in race-based admissions in violation of the Equal Protection Clause, Title VI of the Civil Rights Act of 1964 ("Title VI"), contracts between UCLA and the United States, and the standards recently articulated by the United States Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 143 S. Ct. 2141, 216 L. Ed. 2d 857 (2023). After a long history of moving incrementally away from racial preferences in education, this Nation and its Supreme Court cast off this vestige of our troubled history surrounding race and set out to mandate colorblind admissions in all public (and publicly funded) universities.

Nevertheless, ~~UCLA Med's~~DGSOM's Associate Dean for Admissions, Jennifer Lucero, boldly states on her official profile that "she takes a special interest in diversity issues in medicine." There is but one legal avenue for a public or publicly funded medical school to pursue diversity in medicine: admit the most qualified candidates regardless of race, and expect that those most qualified candidates will come from every race, because they do.

Racial preferences cause three disastrous outcomes. First, if ~~UCLA Med~~DGSOM and other medical schools lower their academic standards to obtain the "right" racial mix, the result is less well academically qualified doctors practicing

medicine. Second, by lowering academic standards for certain applicants, patients will question whether their Underrepresented Minority ("URM," meaning Black, Hispanic, Pacific Islander, or Native American) doctor is really qualified to practice medicine and can give them the same quality care as a White or Asian doctor who did not receive preferential admission to medical school. This shadow follows URM doctors throughout their careers, whether or not that doctor needed a preference to be admitted to medical school. Third, it undermines and delays delivery upon the promise enshrined in the Fourteenth Amendment to the United States Constitution that each state government and its constituent parts, including ~~UCLA Med~~the Regents, will treat its citizens equally without regard to their race. (The Regents also made a contractual promise not to discriminate based on race each time it accepted federal taxpayer funds.)

"The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748, 127 S. Ct. 2738, 2768, 168 L. Ed. 2d 508 (2007). The United States intervenes, because ending racial discrimination in our university systems is of general public importance.

## PRELIMINARY STATEMENT

1. This action challenges the constitutionality of a policy and practice of ~~UCLA Med~~DGSOM to consider race in medical school admissions.

2. This action was filed by plaintiffs Do No Harm, Students for Fair Admissions, and Kelly Mahoney.

3. The plaintiffs title their first count of their ~~claim for relief~~Complaint, "Violation of the Fourteenth Amendment," and expressly assert as the basis for ~~this~~the count that "The Fourteenth Amendment provides, among other things, that no person shall be denied 'the equal protection of the laws.' U.S. Const. amend XIV, § 1." Plaintiffs' Second Amended Complaint, ¶ 132.

~~1.~~    4. Count 1 of the plaintiffs' ~~claim for relief~~Complaint asserts that

plaintiffs are denied equal protection based on race, because ~~Defendants~~the Regents take race into account to racially balance their medical school classes via racially unequal admissions at ~~UCLA Med~~DGSOM. *See* Plaintiffs' Second Amended Complaint, ¶ ~~134.~~

¶¶ 129-52. This Action was brought to seek relief from the denial of equal protection of the laws under the Fourteenth Amendment to the Constitution and Title VI on account of race. The Attorney General of the United States has certified that this case is of general public importance, and intervenes under 42 U.S.C. § 2000h-2 to seek declaratory relief that ~~UCLA Med~~DGSOM has been and continues to consider race in admissions in violation of the Equal Protection rights of Plaintiffs and others who apply to ~~UCLA Med~~DGSOM, and to permanently enjoin the violation.

## JURISDICTION AND VENUE

~~6.~~ 5. The claims asserted herein arise under the Fourteenth Amendment to the United States Constitution, and Title VI (42 U.S.C. § ~~1983.~~2000d *et seq.*).

~~7.~~ 6. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). Declaratory relief is authorized by 28 U.S.C. §§ 2201-02.

~~8.~~ 7. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because ~~at least some of the Defendants reside in this District, UCLA Med~~DGSOM is located in this District, and a substantial part of the events or omissions giving rise to this claim occurred here.

## PARTIES

~~9.~~ 8. Plaintiff-Intervenor is the United States of America.

~~10.~~ 9. On information and belief, plaintiff Do No Harm is a nonprofit organization that advocates against radical, divisive, and discriminatory ideologies in medical education, clinical practice, and research.

~~11.~~ 10. On information and belief, plaintiff Students for Fair Admissions is a nonprofit organization that advocates for human rights and civil liberties, including

4

EXHIBIT 1

equal protection under the law from racial preferences in school admissions that are unfair, unnecessary, and unconstitutional.

12. 11. On information and belief, plaintiff Kelly Mahoney is a qualified college graduate who applied to, and was rejected from, UCLA MedDGSOM.

13. 12. Defendant the Regents of the University of California is a state agency that operates the UC System. Under Article IX, §9 of the California Constitution, the Regents have the "full powers of organization and government" over the UC System, including UCLA Medand DGSOM. Cal. Const. Art. IX, §9(a). DefendantsThe Regents have stipulated in this case that any injunctive or declaratory relief against the Regents "will apply to and be binding on UCLA and the David Geffen School of Medicine at UCLA." Dkt. 27, ¶ 4. DGSOM is located in this District. On information and belief, the acts complained of by the Regents took place in this District.

14. Defendant Julio Frenk is the current chancellor of UCLA. Under the Regents' bylaws, the chancellor is "the executiv[e]" head of UCLA's campuses, including UCLA Med. He sets and has the power to change UCLA's "policies," including UCLA Med's admissions policies and practices. He is also "responsible for the organization, internal administration, operation, financial management, and discipline of [UCLA's] campuses," including monitoring how UCLA Med conducts admissions and overseeing its compliance with federal and state laws banning the use of race in admissions. He further "oversee[s] all faculty personnel and other staff at their locations," including Lucero and everyone who administers admissions at UCLA Med. Frenk is sued in his official capacity. Defendants have stipulated in this case that any injunctive or declaratory relief against Frenk in his "official capacit[y] will apply to and be binding on UCLA and the David Geffen School of Medicine at UCLA." Dkt. 27, ¶ 4.

15. Defendant Gene Block was chancellor of UCLA from August 2007 to July 2024. He was chancellor when Lucero was hired, and when UCLA Med adopted

5

EXHIBIT 1

and implemented the main policies and practices challenged in this lawsuit. An outspoken critic of Prop 209, Block created and oversaw the implementation of UCLA's "efforts at UCLA to increase representation of African American" students. As chancellor, Block was responsible for addressing allegations that a UCLA school was violating the law in how it conducted admissions, including the allegations in this lawsuit. In response to the "Varsity Blues" sting, for example, Block issued a statement falsely stating that "UCLA is absolutely committed to ensuring that every applicant is considered purely on their merits." And when three separate researchers at UCLA found that the school gave race-based admissions preferences to Black applicants, Block issued a statement falsely stating that "UCLA neither discriminates nor grants preference to prospective students based on race, ethnicity, sex or national origin." Block is sued in his personal capacity.

16. Defendant Jennifer Lucero has been the Associate Dean of Admissions at UCLA Med since 2020. Lucero has significant input on the appointment of the Admissions Committee, and she sits on and deliberates with the Admissions Committee. Lucero also sits on the Admissions Policy and Oversight Committee as an *ex officio* member and has significant influence over UCLA Med's admissions policies. Lucero is sued in her official capacity. Defendants have stipulated in this case that any injunctive or declaratory relief against Lucero in her "official capacit[y] will apply to and be binding on UCLA and the David Geffen School of Medicine at UCLA." Dkt. 27, ¶ 4.

17. UCLA Med is located in this District. On information and belief, Mr. Frenk and Ms. Lucero reside within this District, and the acts complained of by Mr. Block and the Regents took place in this District.

## FACTUAL ALLEGATIONS

### I. UCLA Medical School'sDGSOM's Admissions Process

18. UCLA Med13. DGSOM is highly selective. Each year, it receives between 11,000 and 14,000 applicants yet matriculates roughly 175 medical

students.

19.    UCLA Med14. DGSOM asserts it does not have a minimum GPA or MCAT score that applicants must have before they can apply or be admitted; all completed applications are considered, regardless of MCAT or GPA. According to the admissions office, applicants are even "competitive" for UCLA MedDGSOM "as long as" their GPA is "over a 3.0." *What Is the Holistic Admissions Approach for Medical School* at 0:41-0:46, David Geffen School of Medicine, YouTube (July 20, 2023), youtube.com/watch?v=482vInqbLVk.  If an applicant's grades improved over time, that "upward trend" is also "always looked favorably upon by the [Admissions] Committee." *What GPA Do You Need to Get into Med School at UCLA? Is There a Cut-off?* at 0:28-0:48, David Geffen School of Medicine, YouTube (July 20, 2023), youtube.com/watch?v=LG-fAR75pJs.

20.    15. There is no list of specific courses that applicants must take before they can apply to or attend UCLA MedDGSOM.

21.    UCLA Med16. DGSOM reviews applications and makes admission decisions through its Admissions Committee, which consists of approximately 20-3025 faculty and staff members. Admissions Committee members can serve up to three five-year terms. About five medical students also sit on the Admissions Committee to provide input on admission decisions. UCLA does not make public who sits on the Admissions Committee.

22.    17. The Admissions Committee's application-review process for the traditional M.D. track generally takes place in the following steps: primary application, secondary application, interview, Admissions Committee deliberation, and decision.

23.    18. **Primary Application**. Applicants submit a primary application through the American Medical College Application Service ("AMCAS"), which is run by the Association of American Medical Colleges ("AAMC"). UCLA MedDGSOM is a member of AAMC.

24. 19. AMCAS sends the applicant's primary application to the applicant's designated medical schools.

25. 20. The primary application contains the applicant's biographical information (including race), citizenship status, family income, academic background, undergraduate GPA, MCAT score, internship and volunteer experience, and personal statement.

26. UCLA Med21. DGSOM receives an applicant's primary application through AMCAS and uses the primary application to initially screen applicants. It purportedly removes the checkbox information for race and ethnicity.

27. UCLA Med22. DGSOM requires applicants to take AAMC's PREview Exam, which attempts to measure applicants' professional readiness and situational judgment. The PREview Exam is a multiple-choice test that purports to measure applicants' cultural awareness, cultural humility, empathy and compassion, and interpersonal skills, among others. The PREview Exam was created by diversity-affairs officers from various medical schools, whom AAMC calls its "DEI constituents," to "level the playing field" for applicants deemed historically underrepresented in medicine. It does so by stressing factors other than academics.

28. 23. It costs $100 to take the PREview Exam. The PREview Exam scores initially get reported to UCLA as part of the applicant's primary application. UCLA MedDGSOM again asks about the PREview Exam in the secondary application.

29. 24. **Secondary Application**. After primary review, select applicants receive an invitation to submit a UCLA-specific secondary application.

30. 25. The secondary application asks the applicant to submit several open-ended responses. For instance, in 2024, UCLA MedDGSOM asked a series of questions, including the following: "Do you identify as being part of a group that has been marginalized (examples include, but are not limited to LGBTQIA, disabilities, federally recognized tribe) in terms of access to education or healthcare?

EXHIBIT 1

If you answered "Yes" …, describe how this inequity has impacted you or your community and how educational disparity, health disparity and/or marginalization has impacted you and your community." On its face and by design, this question asks Black applicants to reveal their race so that ~~UCLA Med~~DGSOM can know and consider it.

31. 26. After the secondary review, select students get an opportunity to interview with faculty members. The interviews are conducted either in person or remotely by video.

32. 27. After the interviews, the Admissions Committee deliberates on the applications together.

33. 28. After the Admissions Committee deliberates, it ranks the applicants and makes final admission decisions on who to admit.

34. 29. At each step of the process—, *i.e.,* primary review, secondary review, interview, and Admissions Committee deliberation—, the Admissions Committee purports to review each application holistically. Harvard, UNC, and virtually all other elite universities that openly considered race in admissions before *SFFA v. Harvard* likewise used holistic admissions. *Cf.* 600 U.S. at 257 (Thomas, J., concurring) ("Harvard's 'holistic' admissions policy began in the 1920s when it was developed to exclude Jews."). Notwithstanding *SFFA v. Harvard*, AAMC has encouraged medical schools like ~~UCLA Med~~DGSOM to continue using holistic review to "boost racial diversity."

**II. ~~UCLA Med~~DGSOM Uses Race as a Factor in Admissions~~.~~**

35. 30. In defiance of state and federal law, ~~UCLA Med~~DGSOM uses race as a factor in admissions.

36. 31. Both the UC System and ~~UCLA Med~~DGSOM have publicly expressed their intent to racially balance the class. ~~UCLA Med's~~DGSOM's Associate Dean ~~of~~for Admissions, Lucero, both publicly and privately said she uses race as a factor in making admission decisions. And whistleblowers confirm that the

9
EXHIBIT 1

Admissions Committee, either led or intimidated by Lucero, use all available methods to glean an applicant's race, openly discuss applicants' race, and use race to hold students to different standards.

37. 32. In the *SFFA* case, the UC System submitted an amicus brief stating that it "implemented numerous and wide-ranging race-neutral measures designed to increase … racial diversity." The UC System also said that, although "Proposition 209 barred consideration of race in admissions decisions at public universities in California," its competitor universities outside of California "must retain the ability to engage in the … consideration of race." Had the Supreme Court adopted that position, it would have made it harder for the UC System to attract minority students. As Chancellor Gene Block ("Block") once put it, "the most serious competition for UCLA" in trying to enroll Black students is "highly ranked private colleges and universities" openly using race in admissions. The UC System's position at the Supreme Court thus makes no sense unless its schools were still using race, and it hoped that the Supreme Court would say the practice was lawful under federal law.

38. 33. Similarly, in 2024, the UC System said that "system- and campus-level strategies and innovations are being piloted or have been implemented" to "achieve representational diversity in its student body."

39. 34. The UC System further adopted the "UC 2030 Capacity Plan," with the goal of having its student bodies "better reflec[t] California's racial/ethnic … diversity." The UC System President wanted "intentional" "growth" in terms of making "graduate students … better reflect and tap the talent of underrepresented populations who represent the majority of Californians." To support this goal of "mov[ing] the needle on the diversity of graduate students," the Regents "requested graduate professional programs" to "present race/ethnicity data on students and faculty, along with diversity plans within the program."

40. 35. The UC System meticulously measures its racial outcomes in a variety of ways, including by closely tracking the racial demographics of its students.

"The whole goal of public universities," according to then-chancellor Block, is to "represent the demographics of the community that we serve."

41. 36. UCLA commissioned a report by Robert Mare to study its admissions process for undergraduates—which, like ~~UCLA Med~~DGSOM, uses "holistic" review. Even the Mare report found that, over a two-year span, the admission of nearly one-third of all admitted Black students could not be explained on grounds other than race. In response to this shocking finding, then-Chancellor Block did not order an investigation or any changes to decrease the use of race in admissions. UCLA instead endorsed Mare's study as proof that its holistic admissions were working as intended. Throughout his tenure, Block refused to investigate or make any changes in response to evidence that UCLA was using race in admissions, including credible evidence about ~~UCLA Med~~DGSOM.

42. 37. When he was chancellor, Block oversaw UCLA's efforts to achieve "diversity" in admissions, including by "adopt[ing] admissions policies that are designed to draw together a student body that looks like" the country. He often touted each year that the incoming class was "the most diverse" in UCLA's "103-history." Yet Block elsewhere maintained that "it is nearly impossible to achieve true diversity on our campuses without taking some account of race or ethnicity in admissions."

43. 38. Block created the new position of "vice chancellor for equity, diversity, and inclusion"—as well as new "diversity officers" who reported to the vice chancellor—with the specific mandate to "strengthen campus diversity and equity."

44. 39. In 2020, ~~UCLA Med~~DGSOM adopted the "Anti-Racism Roadmap" with the purpose of creating a "path toward racial justice, equity, diversity and inclusion."

45. 40. Under the roadmap, ~~UCLA Med~~DGSOM instituted sweeping policies concerning race in its operations:

        a. ~~UCLA Med~~DGSOM re-defined "merit" to include "diversity and

11

EXHIBIT 1

inclusion initiatives."

b. ~~UCLA Med~~DGSOM committed itself to increasing BIPOC employees and chairs among its faculty and created a special pathway for BIPOC postdoctoral trainees, fellows, and residents to become faculty.

c. ~~UCLA Med~~DGSOM committed itself to creating special opportunities for BIPOC researchers to present seminars, present research, and otherwise participate in research opportunities, including by providing "minority supplements" to NIH grants.

d. ~~UCLA Med~~DGSOM vowed that the medical-student body "should reflect the population of State of California" and adopted a strategic plan to "increase the number of URiM students." The term "URiM" stands for underrepresented in medicine. Its proponents consider all Blacks to be underrepresented and all Whites and Asians to be overrepresented.

e. ~~UCLA Med~~DGSOM vowed collaboration among the Admissions Committee, the Admissions Policy Oversight Committee, and the Faculty Executive Committee to "review and improve diversity to reflect the population of the State of California."

f. ~~UCLA Med~~DGSOM sought the participation of "diverse" medical students and the Equity, Diversity, and Inclusion Office in the admissions process to further its racial goals.

g. ~~UCLA Med~~DGSOM also explained how it would monitor the racial numbers in the admissions process. It explained that it would engage in "strategic planning to improve diversity for all UCLA Health professional students using data-driven, evidence-based approaches." In addition, it would "collect and publicly report data on diversity in all school programs."

~~46.    UCLA Med's~~41. DGSOM's Anti-Racism Roadmap has separately

12

EXHIBIT 1

been incorporated into the school's diversity statements, which the Admissions Committee applies in reviewing each application.

47. 42. In 2020, UCLA MedDGSOM named Lucero its Associate Dean offor Admissions. Lucero is also the Vice Chair of DEI efforts at UCLA Health, the hospital system affiliated with UCLA MedDGSOM.

48. 43. Lucero is an outspoken advocate for using race as a factor in admissions and hiring in medical school and healthcare. Lucero has stated her view that every part of society—including academic medicine—is structurally racist. Lucero has stated her view that racism affects admission decisions and impedes DEI efforts. Lucero has also stated her view that comments like "We want diversity, but we also want qualified people" are biased and racist.

49. 44. Lucero has stated in articles and public interviews that it's important to racially diversify medical-school admissions, residencies, and leadership positions in medicine. As Associate Dean offor Admissions, Lucero has significant influence over the appointment of Admissions Committee members. Lucero has remade the Admissions Committee to be, what she calls, a "brave space" that both looks racially diverse and is where the Admissions Committee members feel free to further DEI efforts.

50. 45. Consistent with Lucero's beliefs, UCLA Med'sDGSOM's current "Guiding Principles for Student Representation" state that the chair of the Admissions Committee will ensure that medical students who identify as BIPOC are placed on the Admissions Committee to provide their input on admissions.

51. 46. Given the UC System's and UCLA Med'sDGSOM's explicit desire to racially balance the student body, and with Lucero at the helm, the Admissions Committee makes admission decisions by using race as a factor.

52. 47. Lucero and her handpicked Admissions Committee take advantage of UCLA's holistic-review procedure to uncover and then use applicants' race.

53. 48. Lucero and the Admissions Committee routinely admit Black

applicants with GPA and MCAT scores significantly below the scores necessary for Whites and Asians to be seriously considered for admission.

54. 49. Lucero and the Admissions Committee explicitly discuss and use applicants' race. On one occasion when the Admissions Committee was deliberating on a Black applicant with a significantly below-average GPA and MCAT score, Lucero stated: "Did you not know African- American women are dying at a higher rate than everyone else?" "We need people like this in the medical school."

55. 50. Admissions Committee members report that the bar for underrepresented minorities is "as low as you could possibly imagine" and that the Admissions Committee "completely disregards grades and achievements" for those applicants.

56. 51. Lucero regularly bullies and berates members of the Admissions Committee who voice concerns about admitting below-average Black applicants by labeling them as "privileged" and implying that they are racist.

57. 52. Lucero and the Admissions Committee regularly glean the applicants' race through direct and indirect means. The secondary application even asks questions designed to uncover applicants' race. The interviews further enable the Admissions Committee to know applicants' race and ethnicity.

58. 53. Statistical evidence confirms that Lucero and the Admissions Committee have been, and are, using race.

59. 54. According to data reviewed by the United States, UCLA Med'sDGSOM's class incoming in 2021 has median MCAT scores of 509 for both Black and Hispanic, 516 for Asian, and 513 for White matriculants. These correspond to percentile rankings of 77, 93, and 87, respectively.

60. 55. According to data reviewed by the United States, UCLA Med'sDGSOM's class incoming in 2022 has median MCAT scores of 508 for Black, 507 for Hispanic, and 514 for both Asian and White matriculants. These correspond to percentile rankings of 72, 69, and 88, respectively.

14

EXHIBIT 1

61. 56. According to data reviewed by the United States, ~~UCLA Med's~~DGSOM's class incoming in 2023 has median MCAT scores of 507 for both Black and Hispanic, and 514 for both Asian and White matriculants. These correspond to percentile rankings of 68 and 88, respectively.

62. 57. According to data reviewed by the United States, ~~UCLA Med's~~DGSOM's class incoming in 2024 has median MCAT scores of 508 for Black, 506 for Hispanic, 515 for Asian, and 513 for White matriculants. These correspond to percentile rankings of 75, 66, 90, and 86, respectively.

63. 58. Lucero's and the Admissions Committee's illegal use of race in admissions was known, and caused grave concern, among ~~UCLA Med's~~DGSOM's faculty members.

64. 59. After receiving multiple complaints for years, UCLA's internal Discrimination Prevention Office, charged with ensuring compliance with Title VI and other laws, sought to investigate Lucero and ~~UCLA Med's~~DGSOM's admissions practices.

65. 60. Four members of the Admissions Committee initially agreed to participate in that investigation. But the Admissions Committee had required its members to sign a nondisclosure agreement barring any discussion of the Admissions Committee's deliberations. When these four members wrote to ~~UCLA Med's~~DGSOM's administration seeking written assurance that they would not be retaliated against for cooperating with the internal probe, the administration refused to give them that assurance. ~~UCLA Med's~~DGSOM's administration thus effectively shut down UCLA's internal probe.

**III. ~~UCLA Med's~~DGSOM's Racial Discrimination Has Harmed and Continues to Harm Americans~~.~~**

66. 61. Americans suffer a "form of injury under the Equal Protection Clause [by] being forced to compete in a race-based system that may prejudice the[m]." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701,

719 (2007) (citation omitted).

67.   62. The United States has an interest in ensuring that its civil rights laws are followed.

63. UCLA is the recipient of many grants from the federal government. UCLA reports it received federal grants in the amount of $584 million in 2025 alone.

64. An example of one such grant is $1,500,000 from the Department of Justice ("DOJ") for a "Youth Justice Navigator Initiative," a project to build a "free, interactive, opensource mobile app and website that will serve as a companion to youth and families navigating the juvenile legal system."

65. This grant creates a legally binding contract between UCLA and the DOJ. As a condition of its receipt of federal financial assistance, UCLA signed contractual assurances that all its programs and activities would be conducted in compliance with all requirements of Title VI and its implementing regulations. *See* 28 C.F.R. § 42.105.

66. The DOJ grant provides, "Several civil rights laws, including Title VI of the Civil Rights Act of 1964 and Section 504 of the Rehabilitation Act of 1973, require recipients of federal financial assistance (recipients) to give assurances that they will comply with those laws. Taken together, these and other civil rights laws prohibit recipients from discriminating in the provision of services and employment because of race, color, national origin, religion, disability, and sex or from discriminating in the provision of services on the basis of age."

67. The DOJ grant further provides, "Should you accept the award and then fail to comply with an award requirement, DOJ will pursue appropriate remedies for non-compliance, which may include termination of the award and/or a requirement to repay award funds."

68. UCLA had at least four active DOJ grants from June 2023 to present, each of which includes the above-cited language concerning compliance with civil rights laws, including:

16

EXHIBIT 1

a. Award ID 15PNIJ-24-GG-01575-RESS "Graduate Research Fellowship" (01/01/2025 to12/31/2025) $47,052

b. Award ID 2019-R2-CX-0014 "Research and Evaluation on Gangs and Gang Violence" (01/01/2020 to 12/31/2023) $550,610

c. Award ID 15PJDP-24-GK-01652-MUMU "Youth Justice Navigator Initiative" (10/01/2024 to 09/30/2027) $1,500,000

d. Award ID 15JOVW-24-GG-01523-MUMU Research and Evaluation Initiative 11/01/2024 to 10/31/2026 $492,200

69. On May 9, 2025, the United States opened a Title VI compliance review of DGSOM.  As part of that review the United States requested applicant level admissions data and admissions related documents and correspondence.  DGSOM provided over 1,400 pages of information.

70. Upon a thorough review of such information, as well as conducting an investigation, the United States issued a Findings Letter on May 6, 2026, in which it concluded that DGSOM "discriminated on the basis of race for the incoming classes of 2023 through 2025, in violation of Title VI." See Exhibit A attached hereto.

71. The DOJ Findings Letter offered to negotiate with DGSOM in good faith to bring DGSOM into voluntary compliance with Title VI. Those negotiations did not result in voluntary compliance.

## **FIRST** CLAIM FOR RELIEF

### Violation of the Fourteenth Amendment

72. The United States repeats and realleges the preceding allegations.

73. The Fourteenth Amendment provides, among other things, that no person shall be denied "the equal protection of the laws." U.S. Const. amend. XIV, §1.

74. The "central mandate" of equal protection is "racial neutrality" by the government. *Miller v. Johnson*, 515 U.S. 900, 904 (1995). And the "'core

17
EXHIBIT 1

purpose' of the Equal Protection Clause" is to "'d[o] away with all governmentally imposed discrimination based on race.'" *SFFA v. Harvard*, 600 U.S. at 206 (emphasis added). "[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000).

71. Defendants75. The Regents, through UCLA MedDGSOM, intentionally engage in a system of racial balancing that provides racial preferences in admissions, and thereby treats applicants differently based on their race, all in violation of the equal protection rights of applicants. UCLA MedDGSOM uses a "holistic" application review method to disguise this systemic racism.

72. UCLA Med's76. DGSOM's systemically racist approach to admissions is not justified by any legitimate governmental purpose, nor is it narrowly tailored to meet any purpose, and is illegal under the Fourteenth Amendment as interpreted by the US Supreme Court.

73. 77. Before and certainly after *SFFA v. Harvard*, Defendantsthe Regents knew for certain that UCLA MedDGSOM should not consider race in admissions. Yet theyit perpetuated the practice anyway behind closed doors, while falsely denying it in theirits statements to the public and even to the Supreme Court. When whistleblowers, investigators, and others tried to reveal this discrimination, Defendantsthe Regents acted to conceal it by shutting down internal investigations and baselessly denying public-records requests. Lucero (on behalf of the Regents) in particular used intimidation and shaming tactics to pressure the Admissions Committee to unlawfully consider race in their decisions—, including forcing them to sit through a two-hour lecture by her sister.

## SECOND CLAIM FOR RELIEF

### Violation of Title VI of the Civil Rights Act of 1964

78. The United States repeats and realleges the preceding allegations.

79. Title VI of the Civil Rights Act of 1964 provides, "No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

80. The Regents are covered by Title VI. Title VI defines "program or activity" to mean "all of the operations of" a "university" or "public system of higher education . . . any part of which is extended Federal financial assistance." 42 U.S.C. §2000d-4a(2)(A).

81. The UC System and UCLA receive federal funds in the form of federal student aid and research grants, including from the United States Department of Justice.

82. Under 42 U.S.C. §2000d-7(a)(1), a state is "not … immune … from suit in Federal court for a violation of … title VI."

83. The United States has the authority to conduct compliance reviews and investigations. 28 C.F.R. §42.107.  If it concludes that illegal discrimination is occurring, and the entity fails to correct it, then the United States may suspend or terminate funding, or "use any other means authorized by law, to induce compliance … ." 28 C.F.R. §42.108.

84. The United States has found, after an investigation, that DGSOM has been discriminating based upon race in admissions. It brings this action to induce compliance with Title VI.

85. DGSOM has caused and will continue to cause applicants to be "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" its admissions policies and practices "on the ground of race, color, or national origin." 42 U.S.C. §2000d.

86. Title VI has "'independent force'" and makes it "*always* unlawful to discriminate among persons even in part because of race." *Harvard*, 600 U.S. at 308-09 (Gorsuch, J., concurring).

87. At a minimum, because DGSOM violates the Fourteenth Amendment, it also violates Title VI. *Gratz v. Bollinger*, 539 U.S. 244, 276 ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.")

## THIRD CLAIM FOR RELIEF

### Breach of Contract

88. The United States repeats and realleges the preceding allegations.

89. At all times alleged in this Complaint, UCLA has received grants of federal funds, including from the DOJ. These grants are legally binding contracts that require DGSOM to comply with Title VI throughout the duration of the grants.

90. DGSOM has materially breached the terms of the grants by failing to comply with Title VI.

91. The United States has fulfilled all obligations owing to date under the grants, or in the alternative, fulfilled all obligations owing until the date of DGSOM's breach of the grants.

92. Compliance with Title VI is a material term of the grants.

93. DGSOM's failure to comply with Title VI is grounds for the United States to rescind grant payments made during the period of noncompliance.

## PRAYER FOR RELIEF

94. The United States asks this Court to enter judgment in their favor and against ~~Defendants~~Defendant and to provide the following relief:

A.    A declaratory judgment that ~~UCLA Med's~~DGSOM's admissions policies, practices, and decisions violate the Constitution by discriminating against applicants on the ~~ground~~grounds of race.

B.    A permanent injunction prohibiting ~~UCLA Med~~DGSOM from in any way considering applicants' race, or considering any other factor for the purpose of, in full or in part, discriminating based on race, when making

20
EXHIBIT 1

admission decisions.

C.     The appointment of a monitor to oversee all decisions relating to admissions at ~~UCLA Med,~~DGSOM to ensure compliance with federal law.

~~D~~D.    Rescind all previous grants and/or payments made to UCLA by the DOJ from June 29, 2023 (the date of the Supreme Court *SFFA* ruling) to the present and return of all such monies received by UCLA to the United States.

E.     Terminate any existing DOJ grant agreements.

F.     A damages award to the United States and injured applicants.

G.     Any other legal or equitable relief the Court deems just and proper.


DATED: ~~January 28,~~July -- 2026.              ____Respectfully submitted:

HARMEET K. DHILLON
Assistant Attorney General
JESUS A. OSETE
Principal Deputy Assistant Attorney General
JEFFREY MORRISON
Deputy Assistant Attorney General

*/s/ John P. Mertens*
JOHN P. MERTENS
Acting Chief, Educational Opportunities Section
~~Acting~~ BRIAN REPPER
Deputy Chief, Educational Opportunities Section
Civil Rights Division
JAMES BRESLO
Senior Trial Attorney, Educational Opportunities Section
Civil Rights Division

TODD BLANCHE
~~Deputy~~Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

*/s/ Julie A. Hamill*
JULIE A. HAMILL
Assistant United States Attorney
United States Attorney's Office


ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA