HARMEET K. DHILLON
Assistant Attorney General

U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-9726
Email: john.mertens@usdoj.gov

ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA
*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DO NO HARM, et al.,<br>*Plaintiffs*,<br>and<br><br>UNITED STATES OF AMERICA,<br>*Plaintiff-Intervenor*,<br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA<br>*Defendants*. | Case No. 2:25-cv-04131-JWH-JDE<br><br>**UNITED STATES OF AMERICA'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT IN INTERVENTION**<br><br>Honorable John W. Holcomb<br>United States District Judge |

JEFFREY MORRISON (MO No. 44401)
Deputy Assistant Attorney General
JOHN P. MERTENS (CA No. 252762)
Acting Chief, Educational Opportunities Section
BRUCE ABRAMSON (Admission Pending)
Senior Counsel, Educational Opportunities Section
BRIAN REPPER (VA No. 90254)
Deputy Chief, Educational Opportunities Section
ANTHONY MEREDITH (VA No. 40373)
Trial Attorney, Educational Opportunities Section
Civil Rights Division

U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-9726
Email: john.mertens@usdoj.gov

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (CA No. 272742)
Assistant United States Attorney

United States Attorney's Office
300 North Los Angeles Street, Suite 7516
Los Angeles, California 90012
Telephone: (213) 894-2464
E-Mail: julie.hamill@usdoj.gov

ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION .......................................................................................... 1

BACKGROUND ............................................................................................ 3

LEGAL STANDARD .................................................................................... 6

ARGUMENT ....................................................................................................7

1 The Complaint Contains Facts Stating a Clear Violation of Title VI...........................7
2 Contract Law Applies to Grants Under Title VI………………………..……….…..8
3 Retrospective Relief is Available Under Contract Law……………………………….8
4 Title VI Compliance Is Material to the Contracts……………………………..…...10
5 The Materiality of a Required Contract Clause is a Question of Fact……….……12
6 Title VI Applies University-wide…………………………………...………….12

CONCLUSION...............................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Family Ass'n, Inc. v. City & County of S.F.*,
277 F.3d 1114 (9th Cir. 2002)…………………………………………………6

*Amber Res. Co. v. United States*,
538 F.3d 1358 (Fed. Cir. 2008)………………………..……...……………10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)……………………………………………...……….…….7

*Barnes v. Gorman,*
536 U.S. 181 (2002) ..........................................................................................9

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)…………………………………………………….....…6, 7

*Bell v. New Jersey,*
461 U.S. 773 (1983)…………………………………………………………. 10

*Bennett v. Kentucky Department of Education*,
470 U.S. 656 (1985) ....................8

*Board of Pub. Instruction of Taylor County, Florida v. Finch*,
414 F.2d 1068 (5th Cir. 1969) ....................14

*Crowley v. EpiCept Corp.*,
883 F.3d 739 (9th Cir. 2018)....................12

*Estate of Reynolds v. Martin*,
985 F.2d 470 (9th Cir. 1993)....................16

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984)....................14, 15, 16

*Keyes v. Sch. Dist.*,
413 U.S. 189 (1973)....................17

*Kousisis v. United States*,
605 U.S. 114 (2025)....................11

*Lynch v. United States*,
292 U.S. 571 (1934)....................10

*Mobil Oil Expl. & Producing Se. v. United States*,
530 U.S. 604 (2000)....................10

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001)....................6

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011)....................6

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,
600 U.S. 181 (2023) ....................1, 3

## STATUTES AND REGULATIONS

42 U.S.C.
§ 2000d .................... 3
§ 2000d-1 ....................4, 13
§ 2000d-4a....................13, 16

§ 2000h-3……………………………..……..…………………………………4,8

28 C.F.R.
§ 42.105 .......................................................................................................... 11
§ 42.108 .......................................................................................................... 13
§ 42.202 .......................................................................................................... 13

## OTHER AUTHORITIES

Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution...….3, 9
Title VI of the Civil Rights Act of 1964 ………………..………………....see generally
California's Prop. 209…………………………………...……………………………2
Graham, Hugh Davis, "The Storm over Grove City College: Civil Rights Regulation, Higher Education, and the Reagan Administration," 38 *History of Education Quarterly* 4: 407–429 (1998)……………………………………………………………..15, 16
https://www.congress.gov/100/statute/STATUTE-102/STATUTE-102-Pg28.pdf.........16

## INTRODUCTION

The Court should deny this Motion to Dismiss, filed under Rule 12(b)(6), which seeks dismissal by setting forth facts contrary to the complaint, and legal argument that does not rely on the applicable law. The Motion filed by the David Geffen School of Medicine at UCLA ("UCLA Med") asks this Court to forget the proper roles of complaints, trials, and 12(b)(6) motions, by suggesting that the United States[1] has asked "this Court to impose [] unprecedented and extraordinary remed[ies]… based on its conclusory allegations."[2] That is not, in fact, what the United States has asked of this Court. Rather, the United States asks the Court *to hold a trial*, where it will establish that UCLA Med has discriminated on the basis of race in its admissions processes. This showing constitutes a violation of Title VI of the Civil Rights Act of 1964 ("Title VI") and separately, a breach of UCLA Med's contracts with the United States.

The United States's First Amended Complaint-in-Intervention ("Complaint") presented concrete, specific facts outlining the case it will make at trial: For many years, schools including UCLA Med, prided themselves on "diversity" initiatives that considered race as a factor in admissions. In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) (*"SFFA*"), the Supreme Court clarified that such race-conscious processes are discriminatory under Title VI. In response, many schools and administrators—including at UCLA Med—announced that they would seek workarounds to continue their discriminatory behavior. UCLA Med classes admitted since *SFFA* continue to show widely different admission criteria for applicants belonging to different racial groupings. Specific allegations in the Complaint support every element of this case.

---

[1] UCLA Med refers to the United States as the "Government," in its briefing. However, The University of California is a part of the government of the State of California, and its subparts UCLA and UCLA Med are thus also governmental entities. For clarity, this brief refers to plaintiff-intervenor as the "United States."

[2] Def.'s Mem. in Supp. of Mot. to Dismiss Pl.-Intervenor's First Am. Compl.-in-Intervention 6:2–5, ECF 108-1.

In its Order Regarding the Defendants' first motion to dismiss in this matter ("Order,") this Court reminded UCLA Med that in a ruling on a 12(b)(6) motion, all of the allegations in the complaint must be taken as true.[3] Despite this basic premise of Rule 12 motions, UCLA Med seeks to dismiss the claims now because "[UCLA Med] has long complied with California's Prop. 209 and federal antidiscrimination laws."[4]

UCLA Med then asks this Court to adopt an interpretation of Title VI that ignores clear definitions in both the statute and its implementing regulations—and that Congress explicitly rejected when drafting the statutory definitions. To get there, UCLA Med had to rely on outdated case law from another Circuit and ignore subsequent legal developments that included a Supreme Court ruling supportive of the position it takes today—and a four-year-long political battle to overturn it, in which Congress overrode a Presidential veto *for the explicit purpose of making UCLA Med's position untenable.*

UCLA Med also asks this Court to conflate contractual duty and breach with remedies—and to rule, as a matter of law, that because clauses prohibiting the recipients of federal funds from discriminating on the basis of race are now standard parts of all government contracts, they are "not material" and therefore unenforceable under contract law. It also—again—misreads the Complaint to suggest that the government is seeking contract remedies under its Title VI claim, rather than under its contract claim.[5]

---

[3] Order Regarding Defendants' Motion to Dismiss ("Order"), ECF No. 75 at 4.

[4] MTD 6:8–9. UCLA Med's claim that it complies with Prop 209 is more relevant to the Plaintiffs' claims than the United States's claims. However, the laws overlap as both federal law and Prop 209 prohibit the use of race in admissions. Underscoring that Defendants' factual assertions have no role in a 12(b)(6) motion, and must be tested at trial, one of UCLA Med's admissions officers has already admitted that UCLA Med's admissions training materials instruct admissions personnel in a manner that violates Prop 209. [T. McAllister Deposition at 165:20–23.] Since this is not a summary judgment motion, the deposition is not attached and is referenced only for illustrative purposes.

[5] First Am. Compl.-in-Intervention ¶ 93, ECF No. 104.

UCLA Med's motion also asks this Court to make sweeping legal rulings limiting the United States's ability to enforce the civil rights laws based entirely upon generalized pointers to treatises rather than citations to laws, regulations, or case law.

A large part of UCLA Med's ploy here follows the same path that this Court rejected in its Order regarding the Defendant's first motion to dismiss:[6] UCLA Med would like this Court to eliminate powerful remedies from consideration, prior to the establishment of specific liability, to ensure that "even if the [United States] could prove that UCLA Med violates Title VI by considering race in its admissions, any such violation could not support the [United States]'s extraordinary and draconian request[s]"[7] for relief. It is hardly extraordinary or draconian to ask that UCLA Med restore the federal funds it accepted under a contractual duty to abide by Title VI, after violating those agreements by continuing to use race in admissions after the *SFFA* decision.

The Court should deny its motion in its entirety.

## BACKGROUND

The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits discriminatory state action. Title VI of the Civil Rights Act of 1964 ("Title VI") makes the matter even clearer, explicitly prohibiting discrimination based on race.[8] The Supreme Court drove the point home in *SFFA*: college admissions processes that apply differing standards to applicants from different demographic groupings (specifically groupings defined around race) violate both of these prohibitions. All attempts to justify discrimination based on race are subject to strict scrutiny.[9] A university's asserted interest in racial "diversity" in its classes, among its graduates, or within the profession its training, necessarily fails this test.[10]

---

[6] Order at 10–11.
[7] MTD 6:12–14.
[8] 42 U.S.C. § 2000d.
[9] *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206 (2023).
[10] *Id*. at 214.

UCLA Med, as part of UCLA, itself part of the University of California system, is a state agency subject to the Fourteenth Amendment.[11] UCLA receives federal funds, including funding from the Department of Justice.[12] UCLA Med is bound by the non-discrimination rules of Title VI, and it is subject to its enforcement provisions.

Title VI's clear statutory language outlines two distinct enforcement paths within the statute. The first is prospective, allowing an agency to terminate an existing contract, or refuse to grant a future contract, following a finding of noncompliance and an opportunity for a hearing. The second is more flexible, extending to "any other means authorized by law."[13] The second, "any other means," enforcement path aligns Title VI's statutory language with the clear historical purpose of the landmark civil rights legislation that created it. Prior to 1964, civil rights enforcement—particularly efforts to undo the legacy of *de jure* racial discrimination—was slow and uneven. Congress designed the Civil Rights Act of 1964 to create new and powerful enforcement paths, but did not "deny, impair, or otherwise affect any right or authority of the … United States … under existing law to institute … any action or proceeding."[14] Nothing precludes the United States from pursuing either enforcement path, or pursuing means outside of Title VI. As to UCLA Med, the United States has pursued the second path, as well as a breach of contract claim outside of Title VI.

Because the contracts between the United States and the University of California, include an assurance clause requiring adherence to Title VI,[15] discriminatory admissions policies that violate Title VI also breach those contracts. The United States may thus pursue the remedies available in contract cases, with potential limitations on remedies arising only after specific bases for liability have been established.

---

[11] Complaint ¶ 12.
[12] Complaint ¶¶ 63–64.
[13] 42 U.S.C. § 2000d-1.
[14] 42 U.S.C. § 2000h-3.
[15] Complaint ¶¶ 66–67.

The Complaint provides ample detail that makes a simple point: Prior to *SFFA*, UCLA Med prided itself on the diversity of its classes and its commitment to enrolling Underrepresented Minorities in Medicine ("URM," *i.e.*, black, Hispanic, Pacific Islander, or Native American).[16] Numerous University of California leaders, including UCLA Med's Associate Dean for Admissions, Jennifer Lucero,[17] were vocal in their support for DEI initiatives because, "represent[ing] the demographics of the community [they] serve" is a primary goal, far more important than admitting "qualified people."[18] While *SFFA* may have changed the legality of DEI initiatives (at least at the federal level), the allegations of the Complaint make clear the Defendants have not reconsidered the use of DEI initiatives. UCLA Med's position is clear: racial considerations are an appropriate and important part of medical school admissions process, even if they are illegal.

The Complaint reviews UCLA Med's admissions process to show *where* UCLA Med injects racial considerations.[19] The Complaint then documents relevant UCLA Med, UCLA, and University of California leaders explaining *why* racial balance and representativeness are among their primary goals.[20] Then the Complaint cites specific numbers—MCAT scores—showing *how* UCLA Med's admissions standards varied by demographic grouping (or, stated another way, discriminated based on race).[21] None of these demonstrations are conclusory; they are all grounded in detail. And for the purposes of this motion, they must be assumed to be true.

Taken together, the United States' Complaint has framed and supported a clear and logical case: (i) UCLA Med believes that it is appropriate and virtuous to consider race when assembling a medical school class; (ii) UCLA Med has adopted admission processes that enable the consideration of race; (iii) UCLA Med's entering classes show that it has

---

[16] Complaint 2:24-3:11.
[17] Complaint ¶¶ 43–44.
[18] Complaint ¶ 35.
[19] Complaint ¶¶ 13–29.
[20] Complaint ¶¶ 30–52.
[21] Complaint ¶¶ 53–57.

tilted the admissions scales on the basis of race; (iv) the different racial categories in UCLA Med's entering classes showed markedly different median MCAT scores. *Therefore*: (v) UCLA Med intentionally pits racial considerations against objective measures of merit to achieve its desired goal of a racially "diverse" student body that "looks like California." Furthermore, this matter is only at the pleading stage. The United States has not yet completed discovery of UCLA Med or offered expert reports and testimony to prove that UCLA Med has discriminated based on race in its admissions. The Court should deny the motion to dismiss and wait for the discovery process to move forward. When proved at trial, the allegations in the Complaint will establish UCLA Med's violation of Title VI and breach of contract.

## LEGAL STANDARD

This Court has already laid out the legal standard applicable to assessing UCLA Med's motion and stated that "to survive a motion to dismiss, a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face:'"

> A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in a complaint. See *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In ruling on a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Am. Family Ass'n*, 277 F.3d at 1120. Although a complaint attacked by a Rule 12(b)(6) motion "does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).
>
> To state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Twombly*, 550 U.S. at 555–56 (citations and footnote omitted). Accordingly, **to survive a**

> **motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face**," which means that a plaintiff must plead sufficient factual content to "allow[] the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint must contain "well-pleaded facts" from which the court can "infer more than the mere possibility of misconduct." *Id*. at 679.[22]

As described below, the United States' Complaint provides more than sufficient "well-pleaded facts" to allow this Court to deny this motion to dismiss.

## ARGUMENT

### 1. The Complaint Contains Facts Stating a Violation of Title VI

The Complaint pleads sufficiently to pass the motion to dismiss stage. As noted above, the Complaint pleads facts concerning UCLA Med's motive for discriminating, the processes that enabled UCLA Med's discrimination, and the effects of UCLA Med's discrimination as manifested in its recent entering classes. It thus sets up a straightforward inference of blatant, intentional discrimination based on race in clear violation of Title VI—which the Court presumes true and from which the Court can draw the reasonable inference that the defendant is liable for the misconduct alleged.

UCLA Med does not argue that the pleadings fail to allege facts sufficient to clear the hurdle and defeat its 12(b)(6) motion. Instead, it suggests that the United States has asked this Court to impose "unprecedented and extraordinary" remedies on the basis of "conclusory allegations."[23] Proceeding from there, UCLA Med asks this Court to make sweeping and unsupportable legal rulings limiting available remedies, and on that basis dismiss the United States's ability to terminate grants to UCLA prospectively, to recover funding retrospectively, and to proceed under any contract theory.[24]

---

[22] Order at 4 (emphasis added).
[23] MTD 6:2–5.
[24] *See*, Defendant's [Proposed] Order appended to the present motion.

To dispel any doubt, the United States *is not* asking this Court to impose any remedies based on conclusory allegations. The United States acknowledges that this Court will impose remedies *only after* it has proved its case at trial. The appropriate time for this Court to consider potential limitations on remedies is after considering the factual bases and legal specifics establishing UCLA Med's liability. The Court should deny UCLA Med's motion to limit the available remedies, as a matter of law, under Rule 12(b)(6).

**2. Contract Law Applies to Grants Under Title VI**

Part of UCLA Med's contract defense is to argue that Title VI does not permit a coexisting contract claim. UCLA Med does not dispute the contractual nature of grants, only that Title VI somehow supplants a contract cause of action. This claim is wrong as a matter of statute: "Nothing in this Act shall be construed to deny, impair, or otherwise affect any right or authority of the Attorney General or of the United States or any agency or officer thereof under existing law to institute … any action or proceeding." 42 USC §2000h-3.

UCLA Med supports this assertion with a reference to *Bennett v. Ky. Dep't of Educ*., 470 U.S. 656 (1985). However, that case provides that the grant-receiving "State gave certain assurances as a condition for receiving the federal funds, and if those assurances were not complied with, the United States is entitled to recover amounts spent contrary to the terms of the grant agreement."[25] Similarly, UCLA Med gave assurances that it would comply with Title VI as a condition for receiving federal funds and did not comply with those assurances (at least as per the allegations of the Complaint). The United States seeks the same relief for the same reason—a failure to abide by the terms of the assurances given.

**3. Retrospective Relief is Available Under Contract Law**

UCLA Med asserts that "Title VI limits the [United States] to forward-looking remedies," and that "the return of grant funds already disbursed and spent for their

[25] *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 663 (1985).

intended purposes is unavailable as a matter of law."[26] The Complaint contains three causes of action seeking relief: The first for UCLA Med's violation of the Equal Protection Clause; the second for UCLA Med's violation of Title VI; and the third for UCLA Med's breach of contract.

The United States does not raise retrospective relief in the context of either UCLA Med's Equal Protection or its Title VI violations. Retrospective relief arises only in the context of the breach of contract claim: "[UCLA Med]'s failure to comply with Title VI is grounds for the United States to rescind grant payments made during the period of noncompliance."[27]

Restitution is a standard contract remedy as available to the United States as it is to all other parties, including for violations of Title VI. In *Barnes v. Gorman*, the Supreme Court addressed the availability of standard contract remedies in the context of private suits alleging violations of Title VI:

> Title VI invokes Congress's power under the Spending Clause to place conditions on the grant of federal funds. We have repeatedly characterized this statute and other Spending Clause legislation as "much in the nature of a *contract:* in return for federal funds, the [recipients] agree to comply with federally imposed conditions." ... A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract.
>
> . . .
>
> When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires….[28]

The Supreme Court has long been clear that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable

[26] MTD 6:23–25.
[27] Complaint ¶ 93.
[28] *Barnes v. Gorman*, 536 U.S. 181, 185–189 (2002), (internal references omitted; emphasis in original).

to contracts between private individuals."[29] Therefore, contrary to UCLA Med's claim about the "return of grant funds already disbursed and spent," restitution is an available and standard contract remedy. The Federal Circuit stated matter-of-factly that "because an award of restitution in a breach of contract case is a standard contract-based remedy, the Court of Federal Claims has jurisdiction to grant that form of relief."[30] As a remedy applicable to private individuals, it is available to the United States.

That reference to "rights and duties" confirms the symmetry in the relationship between government and contractor. Thus, the Supreme Court's explanation that "[i]f the Government said it would break, or did break, an important contractual promise, thereby substantially impairing the value of the contracts to the companies, then (unless the companies waived their rights to restitution) the Government must give the companies their money back"[31] applies in the other direction, as well. Because UCLA Med broke an important contractual promise to the government, UCLA Med must give the United States its money back. In fact, the Supreme Court has applied that principle to matters close to the one at issue here: it ruled that the Secretary of Education was fully authorized to recoup funds already disbursed when New Jersey breached its assurances to comply with Title I.[32] The Court should deny UCLA Med's motion to dismiss the United States's contract claims or limit the available remedies.

**4. Title VI Compliance Is Material to the Contracts**

UCLA Med claims that even if it is found to have breached its contractual obligation to adhere to Title VI's nondiscrimination rules, those assurances (included in all government contracts), and thus their breach, are "not material."[33] The Supreme Court has determined that under the common law, whether in tort or in contract, "materiality looks

[29] *Lynch v. United States*, 292 U.S. 571, 579 (1934).
[30] *Amber Res. Co. v. United States*, 538 F.3d 1358, 1378 (Fed. Cir. 2008)).
[31] *Mobil Oil Expl. & Producing Se. v. United States*, 530 U.S. 604, 608 (2000) (internal citation omitted).
[32] *See*, *Bell v. New Jersey*, 461 U.S. 773 (1983)
[33] MTD 18:9–19.

to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation. Resembling a but-for standard, materiality asks whether the misrepresentation constituted an inducement or motive to enter into a transaction."[34] As the implementing regulations provide, "an assurance that the program will be conducted or the facility operated in compliance with all requirements imposed by or pursuant to" Title VI is a precondition to "the extension of any Federal financial assistance pursuant to the application."[35] In other words, had UCLA Med attempted to strike the clause or withhold assurance, the United States would have rejected its applications. Far from being "not material," clauses implementing Title VI are a hard "but-for" requirement without which UCLA Med, UCLA, and the University of California system would not and could not have obtained *any* federal funding.

UCLA Med further argues that it lacked "notice" of a "condition on federal funds."[36] Yet the applicable regulations provide clear notice addressing *precisely* the point at issue here: "In the case of any application for Federal financial assistance for any purpose to an academic institution, the assurance required by this section shall extend to admission practices and to all other practices relating to the treatment of students."[37] And "[t]he assurance required with respect to an academic institution . . . insofar as the assurance relates to the institution's practices with respect to admission . . . shall be applicable to the entire institution or facility."[38]

The United States could not have been clearer in stating *both* that any institutional assurances of Title VI compliance apply to admissions *and* that any assurances made vis-à-vis admissions apply to the entire institution. The United States put UCLA Med, UCLA, and the University of California system on notice that an admissions office non-compliant

---

[34] *Kousisis v. United States*, 605 U.S. 114, 131 (2025) (internal quotation marks and citations omitted).
[35] 28 C.F.R. § 42.105(a)(1)
[36] MTD 19:25–20:19.
[37] 28 C.F.R. § 42.105(c)(1)
[38] 28 C.F.R. § 42.105(c)(2)

with Title VI renders false any assurances made to obtain any federal funds. Title VI compliance is a material term for these contracts with the United States.

**5. The Materiality of a Required Contract Clause is a Question of Fact**

Setting aside the centrality of eradicating discrimination within educational institutions to the Civil Rights Movement—and thus to Title VI—the immateriality argument is also misplaced. It is misplaced in a 12(b)(6) Motion to Dismiss because "[w]hether a breach is material is generally a question of fact for the jury."[39] UCLA Med is free to argue at trial that the University of California's representations of a facility free of race discrimination, issued at a time that UCLA Med maintained and planned to continue its discriminatory admissions procedure—a representation without which it would have obtained no federal funding—are "not material." It is not an appropriate question for resolution, as a matter of law, under 12(b)(6). The Court should dismiss the motion to dismiss.

**6. Title VI Applies University-wide**

UCLA Med's arguments about the limitations on Title VI enforcement[40] rest upon outdated law and ignore the clear language of both the statute and its implementing regulations, and the history of the Civil Rights Restoration Act of 1987. Contrary to the assertions of UCLA Med, its violations of Title VI jeopardize federal financial assistance at the entire university, not just the school of medicine or the admissions office.

UCLA Med asserts that the United States is "attempting to leverage its allegations concerning one aspect of one professional school within UCLA ([UCLA Med] admissions) into a basis for terminating all DOJ grants to UCLA regardless of whether the grants are tied to [UCLA Med]'s admissions practices. Title VI does not permit that."[41]

---

[39] *Crowley v. EpiCept Corp.*, 883 F.3d 739, 753 (9th Cir. 2018) (Wardlaw, J., dissenting in part)

[40] MTD 10:16–13:20.

[41] MTD 13:13–16.

Title VI does permit that. The United States could find the entire University of California system in violation. "[T]he term 'program or activity' and the term 'program' mean all of the operations of— … a public system of higher education."[42] The United States has limited the remedy it seeks in its Complaint to UCLA. The Title VI violation alleged here also provides a predicate for every other federal agency to follow suit (subject to appropriate administrative procedures).

The United States's position is not even a close call—recalling again, that for the purposes of a 12(b)(6) motion, the allegations in the United States's well-pleaded complaint are assumed to be true.

To begin, UCLA Med claims: "The [United States] may attempt to terminate federal funding only with respect to 'the particular program, *or part thereof*' as to which an express finding of noncompliance with Title VI has been made.' 42 U.S.C. § 2000d-1 (emphasis added)."[43] UCLA Med's preferred interpretation of that clause—limiting any remedy to the UCLA Med admissions office—ignores a crystalline definition: "For the purposes of this subchapter, the term 'program or activity' and the term 'program' mean all of the operations of—a college, university, or other postsecondary institution, or a public system of higher education."[44] UCLA is a university, and the University of California system is a public system of higher education. UCLA Med also makes a nonspecific "see also" reference to "28 C.F.R. § 42.108(c) (DOJ implementing regulations)."[45] Like the statute, however, the regulations also define their terms: "***Program or activity*** means the operation of the agency or organizational unit of government receiving or substantially benefiting from financial assistance awarded, e.g., a police department or department of corrections."[46] The University of California is an

[42] 42 U.S.C. § 2000d-4a(2)(A).
[43] MTD 11:20–21. (quotation, emphases, and citation in original).
[44] 42 U.S.C. § 2000d-4a(2)(A)
[45] MTD 11:22–23
[46] 28 C.F.R. § 42.202(k) (italics in original).

"agency or organizational unit of government;" UCLA Med is not. The effect of the regulatory limitation is to insulate California's many other state agencies from Title VI violations occurring at the University of California. It does not insulate the University of California from UCLA Med.

Next, UCLA Med draws its preferred definition from *Board of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068 (5th Cir. 1969), a Fifth Circuit case decided in 1969.[47] But *Board of Pub. Instruction*'s ruling on this point is no longer good law; it was clearly repudiated and overturned by statute in 1988. UCLA Med's conclusion would find support in the Supreme Court's ruling in *Grove City Coll. v. Bell*, 465 U.S. 555, 557 (1984) (superseded by statute)—a ruling that actually reached the conclusion UCLA Med attributed to *Board of Pub. Instruction*. But subsequent legal development rendered UCLA Med's position unsustainable today.

Grove City College is a private, coeducational, liberal arts college with a preference for avoiding federal oversight. It thus declined to seek federal funding—but it did enroll students who received financial aid under a federal Department of Education ("DOE") program. DOE determined that Grove City was thus a recipient of federal financial assistance and requested its assurance of compliance with Title IX. Grove City refused to sign the assurances.[48]

The Supreme Court reached two points of direct relevance to the present dispute. Its first, which proved noncontroversial and remains good law, was that Grove City's refusal to sign the assurance rendered it ineligible for federal funding, including the indirect tuition aid granted to its students.[49] This conclusion goes directly to UCLA Med's assertions about the "materiality" of such assurances, as noted above; it confirms the "but for" nature of the assurances to contract formation.

---

[47] MTD 11:24–12:6.
[48] *Grove City*, 465 U.S. 559–60.
[49] *Id*. at 563.

The Court's second ruling set off a political firestorm:[50]

> The Assurance of Compliance regulation itself does not, on its face, impose institution-wide obligations. Recipients must provide assurance only that "each education program or activity operated by . . . [them] *and to which this part applies* will be operated in compliance with this part." The regulations apply, by their terms, "to every recipient and to *each education program or activity* operated by such recipient *which receives or benefits from Federal financial assistance*." … Nor does the Department now claim that its regulations reach beyond the College's student aid program…. Under this opinion, consistent with the program-specific requirements of Title IX, the covered education program is the College's financial aid program.[51]

In other words, in a case that Congress specifically and explicitly overruled by statute, the Supreme Court ruled *precisely* as UCLA Med is now arguing—that the effects of noncompliance in UCLA Med's admissions processes cannot ripple beyond UCLA Med. But *Grove City* is no longer good law, and the position UCLA Med takes today is untenable.

The history leading to that statutory development is instructive. Opposition to *Grove City* began with the National Organization of Women's claim that by cabining the effects of Title IX noncompliance (or to be more precise, Title IX assurance opt-out) to a specific campus operation, the Court had empowered colleges to discriminate against women.[52] It snowballed from there, leading to a large coalition of civil rights groups and ultimately to a bipartisan "Grove City Bill" drafted to repudiate and overturned the Court's ruling.[53]

The political battle raged for four years: a bipartisan majority in the Democratic-led Congress sought to extend the scope of Title IX—along with Title VI and other civil rights laws—from specific offending programs to the entirety of the institution operating such

---

[50] *See*, Graham, Hugh Davis, "The Storm over Grove City College: Civil Rights Regulation, Higher Education, and the Reagan Administration," 38 *Hist. of Educ. Q.* 4: 407–429 (1998).

[51] *Grove City Coll. v. Bell*, 465 U.S. 555, 574–75 (1984) (emphasis in original).

[52] Graham at 408.

[53] Graham at 418–19.

programs. The Reagan Administration insisted that the limitation confirmed in the *Grove City* decision had been correct and should be preserved. Congress ultimately prevailed, overriding President Reagan's veto to pass the Civil Rights Restoration Act of 1987 (the formal name of the Grove City Bill).[54]

The ongoing relevance of the Grove City Bill is clear. The proper statute defining the current scope of Title VI, namely 42 U.S.C. § 2000d-4a, is sourced to Pub. L. 100-259 § 6, enacted March 22, 1988,[55] (i.e., the Civil Rights Restoration Act of 1987), which introduced the current Title VI statutory wording. The Ninth Circuit has characterized the "explicitly stated purpose" of the Civil Rights Restoration Act of 1987 as "[o]verturn[ing] the Supreme Court's decision in *Grove City College v. Bell,* which limited the scope of Title IX."[56]

## CONCLUSION

The likely implications to the University of California of a finding—after trial—that UCLA Med's admissions process discriminated on the basis of race are profound. The country has not faced the need to correct widespread legacy discrimination requiring judicial intervention since the school desegregation era. There, as here, powerful institutional leaders believed that their discrimination served an important public purpose, and that the legislation and Supreme Court rulings to the contrary were both in error and damaging to society. There, as here, those leaders sought proxies and workarounds to continue discriminating despite the law.

At that time, the Courts developed numerous rules that proved necessary and helpful in the fight against racial discrimination. Key among them were presumptions and the shifting of burdens: "a finding of intentionally segregative school board actions … creates a presumption that other segregated schooling within the system is not adventitious . . .

[54] Graham at 420.
[55] https://www.congress.gov/100/statute/STATUTE-102/STATUTE-102-Pg28.pdf.
[56] *Estate of Reynolds v. Martin*, 985 F.2d 470, 475 n.3 (9th Cir. 1993).

even if it is determined that different areas of the school district should be viewed independently of each other . . ."[57]

The logic of the Supreme Court's holding vis-à-vis segregation applies with equal force to today's racial discrimination in the name of "diversity." The University of California leadership, systemwide, has expressed views supportive of discrimination in the name of diversity. A demonstration of intentional diversity-based discrimination in any part of the University of California system renders it both fair and reasonable to require that these same authorities bear the burden of showing their diversity-driven actions as to other programs or units within the system were not also motivated by discriminatory intent.

The exposure of UCLA (and arguably the entire University of California system), is thus not simply a quirk of legislative drafting in the 1980s. It comports fully with the logic and lessons learned during our country's earlier efforts to root out racial discrimination and create the colorblind society of which Martin Luther King, Jr. dreamed. UCLA Med's entire argument about the scoping of Title VI enforcement rests upon an outdated interpretation of the statute, based on old case law from another circuit whose primary relevant holding was repudiated and overturned by statute *in a high-profile political battle over a Presidential veto.* Congress, the Courts, and the historic logic of the fight against racial discrimination all argue against it.

For the foregoing reasons, UCLA Med's motion to dismiss should be denied in its entirety. The United States' Complaint provides more than sufficient "well-pleaded facts" to allow this Court to deny this motion to dismiss and proceed towards trial on UCLA Med's ongoing admissions violations.

//

//

//

---

[57] *Keyes v. Sch. Dist.*, 413 U.S. 189, 208 (1973)

DATED: August 14, 2026.

Respectfully submitted:

HARMEET K. DHILLON
Assistant Attorney General
JEFFREY MORRISON
Deputy Assistant Attorney General

*/s/ John P. Mertens*
JOHN P. MERTENS
Acting Chief, Educational Opportunities Section
BRUCE ABRAMSON
Senior Counsel, Educational Opportunities Section
BRIAN REPPER
Deputy Chief, Educational Opportunities Section
ANTHONY MEREDITH
Trial Attorney, Educational Opportunities Section
Civil Rights Division

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

*/s/ Julie A. Hamill*
JULIE A. HAMILL
Assistant United States Attorney
United States Attorney's Office

ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA

**CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2**

The undersigned counsel of record for Plaintiff-Intervenor United States of America certifies that the memorandum of points and authorities contains 17 substantive pages which complies with this Court's Standing Order that overrides the word limit of Local Rule 11-6.1.

*/s/ John P. Mertens*
JOHN P. MERTENS
Acting Chief, Educational
Opportunities Section